IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

BRANDON LESTER,            )
                                )
      Plaintiff,         )
                                )
v.                             )
                                )     Civil Action No.  7:15cv665
SMC TRANSPORT, LLC,    )
                                )
and                           )
                                )
ISRAEL MARTINEZ, JR.,    )
                                )
and                           )
                                )
SALINAS EXPRESS, LLC,    )
                                )
      Defendants.      )

## PLAINTIFF'S BRIEF IN SUPPORT OF PARTIAL SUMMARY JUDGMENT AGAINST SMC TRANSPORT, LLC AND SALINAS EXPRESS, LLC

The Plaintiff, Brandon Lester ("Lester"), by counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure, files this Brief in Support of Partial Summary Judgment herein.  For the reasons set forth below and based upon the evidence now in the record before this Court, Lester urges the Court to grant the pending Motion and significantly narrow the issues for consideration by the jury in this action.

## STATEMENT OF THE CASE

This action arises from a truck accident which occurred on October 26, 2015, on I-81 South in Botetourt County, Virginia, as the Plaintiff was proceeding to work before sunrise. After cresting a rise in his southbound lane of travel, Lester encountered Defendant Israel Martinez, Jr. ("Martinez") who was operating a tractor registered to and owned by SMC

Transport, LLC (the "SMC Tractor") while towing another disabled tractor leased to Salinas Express, LLC (the "Salinas Express Tractor"). At that moment, Martinez was attempting to make a U-turn out of the entrance ramp of the rest stop on I-81, at approximately mile marker 158.10. Unable to avoid the tractors which were blocking the southbound lanes of travel, Lester collided with the SMC Tractor and was subsequently hit from behind by another truck coming over the same rise on I-81 and encountering Lester's disabled vehicle. The force of impact ejected Lester from his vehicle and caused him severe personal injuries.

As the result of the events of October 26, 2015, Lester filed a Complaint against Martinez, SMC Transport, LLC ("SMC"), and Salinas Express, LLC ("Salinas Express") and has subsequently filed his First Amended Complaint against the same defendants asserting additional causes of action against them for the events giving rise to his injuries. The parties have engaged in depositions of most of the key witnesses on the issues being raised herein. The case is now ripe for partial summary judgment on such issues.

## PRELIMINARY STATEMENT

This action presents novel and disturbing evidence pertaining to the events of October 26, 2015, and the subsequent action of the trucking carriers named in this case. The story of this accident would be a bad comedy but for the fact it nearly caused one young man to lose his life and now live with the consequences of a broken back over his lifetime. It well demonstrates the abuses that led to the enactment of the Federal Motor Carrier Act ("FMA") and related regulations. Finally, it establishes a pattern of conduct by these carriers of disregarding corporate formalities, of disregarding federal regulations applicable to their businesses and of being willing to misrepresent evidence and arguably destroy evidence rather than face exposure for causing the accident and injuries in question.

As detailed more fully herein, on the date of the accident Roy Salinas, Martinez and one other Salinas Express employee, Eduardo Lozano ("Lozano"), were in the process of completing an interstate shipping run contractually undertaken by Salinas Express. Roy Salinas's initial efforts to deliver the goods was interrupted by a breakdown in Virginia of the Salinas Express Tractor he was utilizing, causing him to then return to Texas and, with assistance from the owner of Salinas Express, line up other employees and a mechanic to return to Virginia to retrieve the loaded trailer and disabled tractor. On the date of the accident, three days after the initial breakdown, Roy Salinas and the other Salinas Express' employees (Martinez and Lozano) had towed another Salinas Express tractor to Virginia in order to haul the Salinas Express trailer stranded at the rest stop to the customer whose shipment Roy Salinas had originally been hauling. They intended to use the SMC Tractor provided to Salinas Express by SMC to tow the disabled Salinas Express Tractor back to Texas. SMC's Tractor had been under repair since its purchase by SMC and this was the company's first chance to test it on an interstate run and to determine if it was ready to be used in SMC's business. This plan of action benefitted both companies, which are owned by cousins. Each company elected to have their own placards remain on their respective tractors for the interstate run culminating in the accident.

On the date of the accident, once Martinez, Roy Salinas, Lozano and the mechanic, Arturro Guitierrez ("Art"), had hitched the disabled Salinas Express Tractor to the SMC Tractor, they made the unconscionable decision to have Martinez illegally attempt to make a U-turn out the entrance ramp of the rest stop. The horrific accident which followed was of course inevitable as the entrance ramp in question was located immediately beyond a rise on

3

I-81 South which prevented any warning to motorists on the highway of what they would encounter on that dark morning, as they cleared the rise and reached the rest stop.

Just as unconscionable as the employees' action was the response by SMC and Salinas Express in the days and weeks following the accident. Each company disclaimed responsibility and denied any employment or agency relationship with Martinez or Roy Salinas at the time of the accident, despite the fact that Roy Salinas had been specifically assigned by Salinas Express to the shipment in question and despite the fact that the owner of SMC actually gave Roy Salinas permission to use the vehicle, and showed Roy Salinas, Martinez, and Lozano how to operate it. SMC affirmatively contacted the investigating trooper for the Virginia State Police claiming that, prior to the accident, the SMC Tractor had been parked at the Salinas Express facility in Texas and had been taken without permission of SMC, all of which was untrue as now admitted by SMC. Upon information and belief, SMC's insurance carrier subsequently attempted to tender Martinez's defense to Salinas Express, claiming that Martinez or Roy Salinas was in the process of purchasing the SMC Tractor from SMC but did not have permission to use it on the date of accident, yet another fabrication.

In turn, Salinas Express has denied and continues to deny that Martinez was an employee/agent, despite now having admitted that he had been paid cash for other jobs during the summer and fall months before the accident. Inexplicably, Salinas Express continues to maintain that Roy Salinas was the owner of the Salinas Express Tractor not acting for the company despite uncontroverted evidence that Rudy Salinas was the title owner of the vehicle, controlled its operation and his company contracted for the job in question. Finally, both SMC and Salinas Express deny that they have possession of

4

Martinez's log book despite his testimony that he left it with the SMC Tractor and despite actual video from the state trooper verifying that Martinez had the log book on the date of accident.

As set forth in more detail herein, some of the flagrant misrepresentations of these companies may be considered by this Court in assessing whether a credible disputed issue of fact exists on some of the critical issues of law raised by Plaintiff's Motion. However, even without consideration of the evolving factual theories of the Defendants, the evidence accompanying this Brief clearly establishes, as a matter of law, (1) that the disabled Salinas Express Tractor that was in use at the time of the accident was owned by Rudy Salinas and controlled by Salinas Express in connection with its business of transporting goods as a for-hire interstate carrier, (2) that Roy Salinas and Martinez, in using the Salinas Express Tractor, with its placards and under its ICC license, are employees of Salinas Express and it is vicariously liable for any finding of negligence and/or willful negligence against either in connection with the accident, (3) that Roy Salinas and Martinez, in using the SMC Tractor at the direction of Salinas Express to complete its interstate job, were acting as employees/agents of Salinas Express which is vicariously liable for any finding of negligence and/or willful negligence by either in connection with the accident, (4) that Roy Salinas and Martinez, in using the SMC Tractor with the permission of SMC, under its ICC license and placards, and in furtherance of its business interest, are also employee/agents of SMC which is vicariously liable for any finding of negligence and/or willful negligence against them, (5) that SMC is negligent *per se* in placing its SMC Tractor in the stream of interstate travel under its ICC license and with its placards without ensuring that it met the financial responsibility requirements mandated by the FMA for the accident at issue.

## STATEMENT OF FACTS

In addition to engaging in written discovery, the parties have completed a number of depositions in this action. Although additional depositions pertaining to the facts of the accident may still be taken, the following dispositive evidence has developed regarding the issues raised by the pending Motion.

### I. THE BUSINESS OF SALINAS EXPRESS

#### A. CORPORATE TESTIMONY OF SALINAS EXPRESS

The F.R.C.P. 30(b)(6) deposition of Salinas Express has been taken in this action through the testimony of corporate representative Rudy Salinas, the co-owner of the business. According to Rudy Salinas, in his capacity as spokesperson for the company, he testified that the business has no employees but functions through contractors, without which it would have no ability to carry out its business as an interstate carrier. (Salinas Express Deposition Transcript attached as Exhibit A, p. 9, l. 25, p. 17 l. 23). At the time of this accident Salinas Express leased nine trucks from their owner operators. (Exhibit A, p. 12, l. 6). The drivers of the company are paid in cash, usually by Rudy Salinas, who testified that Salinas Express does not document every payment which may have been made. (Exhibit A, p. 18-19, l. 6-12). Although Salinas Express refers to its drivers as contractors, its employment application and lease refer to such individuals as employees. (Exhibit A, p. 77, Dep. Exhibit 8). It also has a written employment manual and requires its drivers to check in every day during runs assigned by the company. (Exhibit A, p. 26-27). In addition, drivers for Salinas Express are required by the company to adhere to time deadlines for the delivery

of goods under its contracts.  (Exhibit A, p. 19, l. 12-14).  Finally, each driver is also required to check in with Rudy Salinas every day when the driver is on a job.  (Exhibit A, p. 26-27).

With respect to its business of shipping property on interstate jobs, Salinas Express contracts with a broker, who pays the company after the load is delivered and in turn then Salinas Express pays its operators, keeping seven percent (7%) of the payment on each job.  (Exhibit A, p. 24 l. 1-5, 8-11).

Roy Salinas began working for the company in September of 2015 and was added as a driver to the Salinas Express insurance policy applicable for that year.  (Exhibit A, p. 16, l. 11, l. 23).  When working for Salinas Express, Roy Salinas typically drove Tractor 110, which is the same Salinas Express Tractor involved in the accident (Exhibit A, p. 13, l. 1-3).  The Salinas Express Tractor was purchased by Rudy Salinas and is titled in his name, although he testified that it currently belongs to his father who is in the process of selling it to Roy Salinas. (Exhibit A, p. 13, l. 8-10).   Rudy Salinas denied knowing how much Roy would be paying his father for the vehicle.  (Exhibit A, p. 14, l. 10).

Despite Salinas Express's claim in its pleadings that Roy Salinas owns the vehicle, Tractor 110 was used in the business of Salinas Express prior to the accident and even assigned by Salinas Express to Martinez for use prior to the accident.  (Exhibit A, p. 31-34, l. 1, 1. 20-25).  With regard to whether a written lease was necessary when Tractor 110 was employed by Salinas Express on interstate jobs, Rudy Salinas testified that he thought this was not necessary because it was titled in his name.  (Exhibit A, p. 38-39).  When Rudy Salinas learned of the accident at issue from Roy Salinas, he immediately inquired whether "my truck" was involved.  (Exhibit A, p. 45-46).  When questioned regarding why Salinas Express did not initially report the accident to its carrier, Rudy Salinas testified that "my

7

truck" was not damaged so he thought it unnecessary. (Exhibit A, p. 49). Tractor 110 continued to be used in the business of Salinas Express after the accident, including by drivers other than Roy Salinas and at the direction of Salinas Express (Exhibit A, p. 63, l. 5-13), as set forth below. Together these facts demonstrate that Roy Salinas was not the owner of the Salinas Express Tractor at the time of the accident, one of the questions of law on which plaintiff seeks a ruling on its pending Motion.

As noted above, Salinas Express also used Martinez as a driver in its business prior to the accident. (Exhibit A, p. 29, l. 3-21). Martinez filled out his employment application in January of 2015, according to Salinas Express, and was drug tested by the company in June or July of 2015. (Exhibit A, p. 30, l. 7-24). On those prior occasions when Martinez drove for the company, he was paid in cash and Salinas Express did not keep records of the payments. (Exhibit A, p. 32, l. 12-21). Salinas Express, through its owner, has no explanation for this and the "under the table" nature of the payments by the company was made clear in the Rule 30(b)(6) deposition:

**Q. Have you ever issued a 1099 to Israel Martinez?**

**A. No, Ma'am.**

**Q. Why not?**

**A. Because he only worked with me three, four times. I never-**

**Q. How many times does it take to work for you before you issue someone a 1099?**

**A. It all depends. I don't know.**

**Q. What does it depend on?**

**A. Depends how much money they make.**

**Q. Is there a certain cutoff?**

8

**A. No. I mean, I don't know.**

**Q. I mean, does Salinas Express have a policy about when it issues 1099s and when it doesn't?**

**A. Anybody that works for the company.**

**Q. So is there a reason why Israel Martinez was not issued one?**

**A. Because I paid him out of my pocket.**

(Exhibit A, p. 51-52, l. 14-25, 1-6).

With regard to Martinez's employment status for the trip in question, despite Rudy Salinas's daily conversations with Salinas Express's drivers, he denied knowledge that Martinez or Sergio Cuellar (SMC owner and a cousin of the Salinas brothers) would be involved in retrieving the disabled Salinas Express tractor. (Exhibit A, p. 44). However, he did recall that Roy Salinas called him after the initial breakdown and in general terms Rudy instructed him to go back to Virginia and get the job done, after which Roy asked for Martinez's phone number. (Exhibit A, p. 44, l. 5-6, p. 46, l. 16-25, p. 47, l. 1).

Rudy's requirement that his brother get the job done is consistent with his acknowledgement in his deposition that the load in question had to be delivered to the customer. In fact, Rudy Salinas also confirmed that he sent another employee (Lozano) with Roy to assist with delivery of that load. (Exhibit A, p. 42, l. 15-16). On behalf of Salinas Express, Rudy Salinas further admitted that the trip of Roy Salinas and Martinez allowed Salinas Express to fulfill its contract to deliver the load under the contract. (Exhibit A, p. 49, l. 6-9). Finally, Rudy Salinas admitted that in addition to Martinez's pre-accident work for Salinas Express, Martinez was also employed by the company following the accident to complete another job(s) involving the interstate delivery of goods. (Exhibit A, p. 88, l. 21-24).

9

### B. Testimony of Eduardo Lozano

The deposition of Eduardo Lozano shed further light on Salinas Express's business operations and the interstate job in question. According to Lozano, at the time of his deposition he had been employed by Salinas Express for approximately nine years. (Eduardo Lozano Deposition Transcript attached as Exhibit B, p. 8, l. 3-4). During this time, Rudy Salinas would pay him for his work in cash or with a personal check. (Exhibit B, p. 12, l. 5-17). Lozano does not own his own tractor but during the course of his work with Salinas Express would drive "Rudy's truck" or Tractor 110, on most jobs. (Exhibit B, p. 13, l. 1-10). Lozano further testified that Roy Salinas was also employed for Salinas Express and would use a truck from "Rudy or Dad" and lease on with the company to complete a run. (Exhibit B, p. 14, l. 2-7, 8-22). For his work with Salinas Express, Lozano was paid by the mile, starting at thirty-two cents and at the time of his deposition he was making forty cents per mile on company trips. (Exhibit B, p. 16, l. 3-10). With regard to maintenance on the trucks he utilized, Lozano indicated that Salinas Express was responsible for these costs. (Exhibit B, p. 19, l. 14-20). Finally, in terms of general practice, he confirmed that Salinas Express required him to check in with Rudy Salinas everyday while on a job and further required that his log books to be turned in after every job during his nine years with the company and these would be given to Rudy Salinas or his sister, the co-owner of the business. (Exhibit B, p. 20, l. 2-9, p. 21, l. 11-15, p. 22, l. 1-11, p. 24, l.20-24).

With respect to other employees of the company, Lozano confirmed that prior to the accident, Martinez had "helped" Salinas Express on several jobs. (Exhibit B, p. 17, l. 17-22).

On one such occasion, Martinez drove a run to Winchester, Virginia with Lozano. (Exhibit B, p. 18, l. 11-23).

With regard to the completion of the Salinas Express contract with its broker which was delayed by breakdown of the Salinas Express Tractor, Lozano testified that Rudy Salinas asked him to pick up the trailer in Virginia and complete delivery of the goods. (Exhibit B, p. 30, l. 18-21). After the accident, which Lozano denies witnessing, he testified that Roy Salinas and Martinez drove the SMC Tractor and disabled Salinas Express Tractor back to Texas. (Exhibit B, p. 37, l. 19-21).

### C. TESTIMONY OF ROY SALINAS

Roy Salinas was also deposed in connection with this action. At the time of his deposition in April, he estimated that he had worked for Salinas Express for two years, almost since the business had opened. (Roy Salinas Deposition Transcript attached as Exhibit C, p. 5-7, l. 25, 1-6). He did not fill out an application until September of 2015 because before that time he was working for both SMC and Salinas Express after his release from prison. (Exhibit C, p. 13, l. 8-11, p. 17, l. 8-9). When working on jobs for SMC, Roy Salinas had been allowed to use the Salinas Express Tractor on some jobs (Exhibit C, p. 14-15), thus suggesting one reason why SMC agreed to provide the SMC Tractor to Salinas Express for the job being completed by Roy Salinas.[1]

With respect to the Salinas Express Tractor, at the time of his deposition, Roy Salinas testified that he was in the process of purchasing the vehicle from his brother, Rudy Salinas. (Exhibit C, p. 7, l. 14-18). He was vague concerning the details of the sale, finally suggesting

---

[1] As detailed herein, SMC had its own business interest of testing the SMC Tractor on an interstate job, as it had been in a state of repair since its purchase and until its use by Roy Salinas.

11

that he was going to pay $18,000 and did not know how much he still owed. (Exhibit C, p. 9, l. 2-6).

In working for Salinas Express, Roy Salinas was paid by check which would be issued by Salinas Express. (Exhibit C, p. 19, l. 9-12). Echoing the testimony of Lozano, Roy confirmed that his brother, Rudy, assigned to Salinas Express' drivers the trips which each driver would be responsible for completing. (Exhibit C, p. 67, l. 12-13). He, likewise, confirmed that he was required to check in with Rudy during each job. (Exhibit C, p. 38, l. 15-17).

During the course of his deposition, Roy detailed the trip he had been on during which the Salinas Express Tractor broke down, leaving him unable to complete the job. Most importantly, despite Roy Salinas' efforts to insulate the company, his deposition made clear the role of Israel Martinez as an employee of Salinas Express with regard to retrieval of the Salinas Express Tractor and completion of the interstate trip contracted for by Salinas Express. Although initially denying that Rudy Salinas knew of Martinez's involvement in retrieving the tractor and completing the job, Roy Salinas finally admitted during his testimony that, with Rudy's knowledge, he called Martinez to help because of his employment status with Salinas Express, a company which Roy thought of as a family business he shared with his brother and sister:

> **Q. I believe you testified earlier that you really didn't know Israel socially, correct?**
>
> **A. That's correct, sir.**
>
> **Q. You only knew him through Salinas?**
>
> **A. That's correct.**
>
> **Q. You only met him three times?**

A.  Yes, sir; that's correct.

Q.  So you weren't friends?

A.  No, sir.

Q.  All right. I think you testified you're not related, correct?

A.  That's correct.

Q.  All right. You also testified that when you went to pick him up to go up to the trip up to Virginia, you called him first, correct?

A.  That's correct.

Q.  All right. How did you get the phone number for a person you didn't know?

A.  Through the company.

Q.  How did you get the phone number?

A.  My brother Rudy.

Q.  Rudy gave you Israel's phone number?

A.  Yes, sir.

Q.  When did he do that?

A.  When I called him that I was broke down.

Q.  Okay. And so Rudy gave you Israel's phone number and told you what?

A.  What do you mean?

Q.  Did Rudy tell you to call Israel?

A.  No, I asked him for the number so I could, because he was out of town. So I told him, like -- I knew that Israel had done a drug test for us, for the company, right, he was going to start working for us already and so I asked him for the number so he could help me.

Q.  Why did you pick Israel instead of another driver for Salinas?

A.   Because we didn't have nobody else.

13

**Q. Okay. You asked Rudy specifically for Israel's phone number?**

**A. Yes, sir.**

**Q. And Rudy gave you the phone number?**

**A. Yes, sir.**

**Q. And you told Rudy that you wanted Israel's phone number because you wanted him to go up to Virginia with you?**

**A. To help me.**

**Q. And Rudy understood that, correct?**

**A. Yes, sir.**

**Q. And Rudy didn't tell you, no, Israel can't do that, did he?**

**A. No, sir.**

**Q. He didn't say he can't do that because he doesn't work for us, correct?**

**A. No, sir.**

(Exhibit C, p. 79-81, l. 8-25, 1-25, 1-11).

Roy Salinas likewise confirmed that he had personally observed Martinez working as a driver for Salinas Express before he called him to assist on the job in question. (Exhibit C, p. 90-91, l. 21-25, 1-10). In addition to Martinez and Lozano, Roy Salinas was also in touch with his cousin and SMC's owner, Sergio Cuellar ("Cuellar"), who agreed to provide the SMC Tractor for use to complete the job. SMC's own interest in allowing use of its vehicle is detailed in Section II.

With respect to efforts by Roy Salinas and his companies (SMC and Salinas Express) to conclude the trip at issue, he testified that he and Martinez took turns driving the SMC Tractor to Virginia. (Exhibit C, p. 82, l. 1-3). When Martinez would drive, Roy Salinas confirmed that he observed him filling out logs for his portion of the drive. (Exhibit C, p. 62,

14

l. 21-23, p. 82, l. 4-6). He testified that he does not know what happened to Martinez's logs (Exhibit C, p. 64, l. 4-6), which have never been produced by the defendants in this action. With regard to his own logs he filled out for the trip from Texas to Virginia, Roy testified that he "threw them away" after he returned home following this horrific accident. (Exhibit C, p. 84, l. 3-12). He claims that because he was not in the act of working or hauling goods for Salinas Express or SMC, as opposed to hauling the Lozano-assigned Salinas Express Tractor, he was not required to keep them (Exhibit C, p. 38-39, l 21-25, 1-15, p. 64, l. 7-24), raising the obvious question as to why he created them in the first place.

Roy Salinas also testified regarding the accident at issue, as set forth in Section III herein.

### D. DISCOVERY RESPONSE AND TESTIMONY OF ISRAEL MARTINEZ

During the course of his deposition, Martinez also provided critical information regarding his role with Salinas Express. He testified that he left a local trucking company in order to join the company and was hired by his cousin, Rudy Salinas. (Israel Martinez Deposition Transcript attached as Exhibit D, p. 10, l. 1-25). He testified that Rudy Salinas worked with him on the long haul jobs for a few weeks (Exhibit D, p. 11, l. 6-12) and he then went on his first solo run in June of 2015. (Exhibit D, p. 12, l. 6-14). The trips he completed for Salinas Express were primarily to Winchester, Virginia, for deliveries to Home Depot. (*Id.*) However, his second long haul was to Colorado and he drove in many states for Salinas Express prior to the accident. (Exhibit D, p. 13, l. 18-25, p. 14, l. 11-17). Exhibit 3 to Martinez's deposition (Exhibit D) is a Facebook posting on one of his trips for Salinas Express in August of 2015 prior to the accident.

15

With regard to the protocol at Salinas Express, Martinez testified that Rudy Salinas would assign the work and tell Martinez which truck to drive. (Exhibit D, p. 15, l. 1-8). On his runs for the company, he would always keep a log and leave it in the tractor at the completion of each job. (Exhibit D, p. 15, l. 9-14). Martinez explained that while driving for Salinas Express, he was always unsure as to who actually owned the truck to which he was assigned because the brother and sister who owned the company both owned trucks (Exhibit D, p. 16, l. 3-18), but it did not matter because they were "all of the same label" for Salinas Express. (Exhibit D, p. 18, l. 3-25, p. 19, l. 1-8).

In the course of his work for Salinas Express, Martinez would receive "T-checks" from the company for expenses on the job. (Exhibit D, p. 17, l. 2-7). He was paid in cash by Salinas Express for his work, as were the other Salinas Express drivers. (Exhibit D, p. 20, l. 23-24). Salinas Express controlled the delivery date for the shipments (Exhibit D, p. 20, l. 11-14) and Rudy Salinas was in charge of the business. (Exhibit D, p. 16, l. 10-11).

With regard to the trip Martinez was on at the time of the accident at issue, he testified that Rudy called him and told him that a Salinas Express tractor had broken down and that Roy Salinas and Lozano needed his help in completing the load. (Exhibit D, p. 44-45, l. 1-25, 1-18). According to Martinez, Rudy further told him that Roy would pick him up (Exhibit D, p. 46, l. 23-24). Martinez confirmed in his testimony that, thereafter, he, Roy and Lozano met Sergio Cuellar at a truck stop in Texas and he showed them how to use the wench on the SMC Tractor. (Exhibit D, p. 50-51, l. 2-19, 1-18). After departing the truck stop, they picked up a mechanic as well, Art Guitierrez, to assist on the job. They were hauling another Salinas Express Tractor for Lozano to use to pick up the trailer in Virginia

16

and complete delivery of the shipment. (Exhibit D, p. 57-58, l. 20-25, l. 1). Martinez actually went with Lozano after the accident to deliver the goods. (Exhibit D, p. 58, l. 2-6).

Martinez's testimony concerning his status as an employee of Salinas Express on the job in question is consistent with his Interrogatory response on this issue which states as follows:

> **ANSWER: Before the date of the accident, Roy Salinas was operating a commercial motor vehicle owned by Salinas Express, LLC that became disabled. Roy Salinas called me, advised that his vehicle was disabled at a rest stop in Virginia and instructed me to assist him by bringing another vehicle to Virginia that was equipped to tow the disabled Salinas truck. Roy instructed me to go to the Salinas Express yard in Zapata, Texas, to locate a truck with a towing mechanism that was in the yard with the keys inside the cab and to bring that vehicle to Virginia. Roy further instructed me to stop in Houston Texas on the way to Virginia to pick up an individual named "Art", who Roy explained was a mechanic that would also assist with the disabled vehicle. In response to Roy's instructions, I located the vehicle matching his description in the Salinas yard, drove that vehicle to Houston, and brought Art with me to Virginia to assist Roy Salinas with the disabled Salinas Express vehicle. I performed these activities in the same scope and manner as other work assignments I received from Salinas Express before the accident.**

Martinez also testified regarding the accident as set forth in Section III herein.

## II.     THE BUSINESS OF SMC

Finally, Sergio Cuellar, the owner of SMC, was deposed as the Rule 30(b)(6) representative of SMC. According to Cuellar, the business is run out of his brother's home in Weslaco, Texas (SMC Deposition Transcript attached as Exhibit E, p. 6, l. 7-14). With regard to its interstate long-haul business, SMC owns two trucks and operates seven other tractors through owner-operators, (Exhibit E, p. 8-10, l. 5-25, 1-8, 1-6).

The SMC Tractor involved in the accident was purchased in late July of 2015 and, according to Cuellar, was not assigned to a regular driver at the time of the accident because

it was not ready for use in the business due to mechanical issues. (Exhibit E, p. 13, l. 1-21). In order to make the SMC Tractor operational after its purchase, Cuellar worked over the next months to repair it. (Exhibit E, p. 15, l. 12-21). It was October 15, 2015, before the issues with the engine were corrected. (Exhibit E, p. 16, l. 2-20). Before this accident at issue in this case, the SMC Tractor had never been used by SMC to haul any freight for the company, (Exhibit E, p. 16, l. 17-19), making the trip in question a test run of the vehicle unbeknownst to Martinez and Roy Salinas. Even by October 15, the SMC Tractor still had some issues and SMC had never even tested it while hauling a load prior to the accident. (Exhibit E, p. 18-19, l. 13-25, 1-14). The trip to Virginia involving the accident was the first time the SMC Tractor had been used "for any stretch of time" since SMC owned the vehicle, (Exhibit E, p. 19-20, l. 25, 1-3), and clearly benefitted SMC which did not have to test it in the course of one of its own long-haul contacts.

During the course of his deposition for SMC, Cuellar confirmed that Roy Salinas had worked for SMC in 2015, but left the company to join his brother(s) at Salinas Express. (Exhibit E, p. 24, l. 2-11). During his period of employment with SMC, when operating under the lease with that company, Cuellar testified that Roy Salinas used the Salinas Express Tractor. (Exhibit E, p. 24, l. 12-15). Cuellar further testified that he was uncertain as to the title owner of that vehicle (Exhibit E, p. 25, l. 4-9).

Prior to the accident at issue, Cuellar testified that he was contacted by Roy Salinas asking to borrow a tractor with a hitch to pick up "his tractor," which was agreeable to Cuellar. (Exhibit E, p. 28, l. 1-14) Cuellar testified that he may have also talked to his cousin, Rudy Salinas, owner of Salinas Express, about borrowing the truck. (Exhibit E, p. 29, l. 14-18) During the deposition, Cuellar admitted that he knew the earlier breakdown of the

18

Salinas Express Tractor necessitating use of the SMC Tractor occurred during a Salinas Express shipment and that his truck would allow the company to complete the delivery. (Exhibit E, p. 35-36, l. 24-25, 1-5).

With regard to subsequent use of the SMC Tractor, Cuellar testified that after Roy Salinas picked up the tractor, Cuellar had to meet him and two other individuals with Roy at a truck stop to show them how to hook up two tractors with the towing equipment. (Exhibit E, p. 30, l. 1-11). Cuellar recognized Lozano but denied knowing who Martinez was or being introduced to him. (Exhibit E, p. 30-31, l. 12-25, 1-3). During his interaction with Roy at that time or earlier, Cuellar, on behalf of SMC, did not restrict use of the SMC Tractor. (Exhibit E, p. 33, l. 17-22). Likewise, Cuellar admitted that he made no attempt to remove the SMC logo and DOT Number during his interaction with Roy Salinas and his crew. (Exhibit E, p. 45, l. 9-12).

Cuellar, during his testimony denies that he has ever spoken to Martinez. (Exhibit E, p. 38, l. 15-16). He did, however, confirm that after the accident, in December of 2015, he recognized Martinez when seeing him with another Salinas Express driver in Alabama at a truck stop, (Exhibit E, p. 39, l. 1-24), presumably on a job for Salinas Express.

Despite Cuellar's testimony regarding the alleged lack of any relationship whatsoever with Martinez, or even knowing his name, his phone records tell a different story. According to Martinez's records received in response to a subpoena to AT&T in this action, Martinez received phone calls approximately two hours following the accident from Samuel Cuellar and then, moments later, from Sergio Cuellar. (Exhibit F).

Finally, with regard to SMC's involvement in allowing use of the SMC Tractor to complete Salinas Express's job, Cuellar admitted during his testimony that he did not tell

Roy Salinas, Martinez or Lozano that he did not have insurance on the SMC Tractor which was being provided for their use on an interstate job. (Exhibit E, p. 64, l. 19-23).

Although testifying in the course of the SMC deposition that he was uncertain regarding whether the SMC Tractor had insurance coverage on it when SMC provided the vehicle to Roy Salinas for use on a Salinas Express job (Exhibit E, p. 65, l. 2-18), Cuellar admitted that after the accident at issue, he called his insurance agent and added the tractor to SMC's policy. (Exhibit E, p. 65, l. 19-25).

### III. THE ACCIDENT

#### A. TESTIMONY OF TROOPER ATKINS AND THE VIRGINIA STATE POLICE INVESTIGATION

The horrific facts surrounding the accident in this case are not largely in dispute and can be briefly described through the testimony of the investigating state trooper, Trooper Atkins ("Atkins"). Atkins arrived at the crash site in Botetourt County at 5:52 a.m. and, during the course of his deposition, confirmed that Exhibit 1 to his deposition is a complete copy of his investigative file and file notes regarding the accident (Trooper Atkins Deposition Transcript attached as Exhibit G, p. 10, l. 15-21).

Upon arrival at the scene, Atkins recalls speaking with Lester and Atkins believes he was the first person to arrive at the scene and speak with Lester. (Exhibit G, p. 21, l. 16-23). At that time, Lester was in a lot of pain and screaming for help, appearing to have a serious injury, (Exhibit G, p. 22, l. 2-3), and was located over the guardrail and an embankment on the left side of the highway. (Exhibit G, p. 22, l. 6-7). With regard to Martinez's statement to law enforcement, Atkins indicated during his testimony that Martinez admitted that he was attempting a right turn out of the entranceway of the rest stop where his tractor

was located in order to head south onto I-81. (Exhibit G, p. 28, l. 6-12). In effect, Martinez indicated to Trooper Atkins that he was attempting to go up north on the southbound entrance ramp to make a U-turn to head southbound on I-81. (Exhibit G, p. 29, l. 6-10).

During the course of his deposition, Atkins testified regarding where Martinez and his tractors were located at the time of the accident. Atkins confirmed that Martinez showed him where he was on Interstate 81 South at the moment of impact (Exhibit G, p. 29, l. 6-22). Although Atkins could not remember Martinez admitting to blocking both lanes, he did admit to being in the travel portion of I-81, which is where the debris was also located. (Exhibit G, p. 29-30, l. 23-24, 1-10). Likewise, although Atkins could not remember which southbound lane contained the debris from the first accident between the Lester pick-up truck and the SMC Tractor, (Exhibit G, p. 30, l. 12-14), the point of impact in the subsequent impact between the bread truck and Lester's disabled vehicle took place in the left hand lane of I-81 south. (Exhibit G, p. 39-40, l. 22-24).

During Atkins' interview of Martinez, Martinez also handed the Trooper his log books (Exhibit G, p. 45, l. 9-14), but Atkins returned them immediately to Martinez, explaining in his deposition that he was not trained to review DOT Logs. (Exhibit G, p. 44, l. 20-22). Finally, following Trooper Atkins' interview of Martinez and completion of accident – related work at the scene, Atkins testified that he caught Martinez again attempting to make a U-turn out of the entrance ramp of the rest stop onto I-81 South, (Exhibit G, p. 68, l. 3-12). Trooper Atkins stopped him but given his need to get to the hospital, he did not write Martinez another ticket. (Exhibit G, p. 68, l. 11-15).

The eye witness statements[2] provided to Trooper Atkins included the following:

**Karen Bingaman:**
**Coming South 81 approaching the rest stop, saw a blue truck in the highway disabled. The truck comes by me in the left lane. It doesn't see the truck and slams into the [pick up]. [I] noticed truck inside the rest stop who was coming out the wrong way! I stopped to check on the blue truck when I noticed a man in the right side of the road. I got over to him with others. He was standing and screaming - - said he got thrown from the truck.**

**Debara Day Brown:**
**Heard crash and observed blue truck tumble to the right side of highway. The trailer truck proceeded to flip cab around and fall over. My daughter ran to blue truck to check on the driver. No one was there. She said she heard a man yell across the highway, she proceeded with the guy to help. Beginning, as we were driving into the rest stop a tractor trailer was coming out the wrong way.**

**Christine Zampini:**
**Our car was pulling into the rest stop when we observed sparks and pop from the left lane. At that time, I had assumed it to be a blown tire. Approximately three seconds after the sparks and pop, I observed the blue pick-up truck land in front of us. I left our car and checked the truck which had no passengers. I heard screaming across the road. I observed a man, later identified as Brandon Lester, yelling "hey". When I was able to cross the road, Mr. Lester stated he was thrown from his car. He was confused but able to take direction. He reported his name, date of birth, girlfriend, and dogs to me. I instructed him to lie down and held his neck for support. Mr. Lester refused to state where he was going but several times asked to have someone call his girlfriend. Additionally, he reported prior injury to his lower back.**

### B.   MARTINEZ TESTIMONY

During the course of his testimony in this action, Martinez confirmed that when he, Roy Salinas, Lozano and Art arrived at the rest stop in Botetourt County on October 26th, they first unhooked the Lozano-assigned Salinas Express tractor which they had been towing

---

[2] Such statements are admissible under Federal Rule of Evidence 803(1)(2) and (8). See also *Jones v. C. H. Robinson Worldwide, Inc.,* 558 F. Supp. 2d 630; (W.D. Va. 2008).

Case 7:15-cv-00665-GEC   Document 71   Filed 06/24/16   Page 22 of 45   Pageid#: 581

with the SMC Tractor. (Exhibit D, p. 63, l. 13-15). In then hooking the SMC Tractor to the disabled Salinas Express Tractor, Martinez explained that they had to position the SMC Tractor such that it was facing north in order to hook up the south-facing disabled Salinas Express Tractor. (Exhibit D, p. 67, l. 5-18). Martinez could not recall who actually operated the SMC vehicle to accomplish this, (Exhibit D, l. 19-21), but his testimony makes clear that they were all involved in the process.

Although Martinez admitted during the course of his deposition that the rest stop was too crowded to allow the crew to turn the SMC Tractor around to go south out of the exit to the rest stop, he denied that he was attempting to make a U-turn out of the entranceway onto I-81 South at the time of the accident, (Exhibit D, p. 69, l. 6-24, p. 72, l. 3-9), but was instead attempting to turn into the area designated for cars. (Exhibit D, p. 71, l. 16-19). Regardless of his current theory regarding the maneuver, Martinez testified that Art and Roy Salinas were spotting for him at the time of the accident. (Exhibit D, p. 72, l. 16-22). Art and Roy were checking for approaching vehicles and screaming instructions at Martinez. (Exhibit D, p. 73, l. 10-25). According to Martinez's testimony, as he was turning at the front of the entrance ramp, Roy yelled for him to stop, at which time Martinez was uncertain whether he was in either of the southbound lanes of I-81. (Exhibit D, p. 75, l. 5-19). From his position in the SMC Tractor, a white car was able to avoid Martinez by going around him in the left lane on I-81. (*Id*.). According to Martinez:

> **Q. So at some point do you know exactly what Roy screamed?**
>
> **A. Yeah, because like I was moving the truck, I was trying to work it. I never saw the light coming by. Then the only thing he told me just stop before, because he thought I was trying to make like a U-turn [or] something when I was just trying to move the truck so I can able to back it up. He told me to stop and I just stopped just like that. And that's**

**when I saw that white car. It just slowed down. It was slowing down. That's when the accident happened.**

(Exhibit D, p. 75-76, l.20-25, 1-5).

**Q. But you do think you were in part of the Interstate?**

**A. I thought I was because Roy screamed at me - that's why I got all scared and just slammed the brakes. Then that's why I saw that white car that was passing through. That's when the accident happened because what happened in that that car, that white car was coming in the fast lane. I'm talking about the left-hand side, the fast lane. And then what happened, that car just slowed down a little bit because they saw my headlights and my flashers. That's when the Toyota, I think he was, I don't know, I don't want to say anything but I think he was distracted that he just made that skip, like, he thought he was going to hit that white car, he skip it to the right-hand side, then tried to turn that truck back inside to the left-hand side, that's why he hit me on the headlights.**

(Exhibit D, p. 76-77, l. 21-25, 1-13).

The impact between the SMC Tractor and the Toyota pick-up truck driven by the plaintiff occurred in the left hand lane of travel. (Exhibit D, p. 81, l. 19-24). After this collision, Martinez testified that Art Guitierrez ran out onto I-81 and pulled Lester out of his vehicle. (Exhibit D, p. 83, l. 3-12). Then, he recalls that a bread truck came over the rise and hit the little pick-up truck. (Exhibit D, p. 83, l. 16-17). According to Martinez, this second collision caused the pick up to spin, (Exhibit D, p. 87, l. 9), and then the bread truck hit Lester (Exhibit D, p. 88, l. 23-25) who "flew away." (Exhibit D, p. 89, l. 1-12).

During the course of his testimony, Martinez admitted telling Trooper Atkins that there was roughly 30 seconds between the first and second collisions although he now thinks it was one or two minutes. (Exhibit D, p. 92, l. 11-23). He also admitted telling Atkins that he never saw anyone get out of the Toyota pick-up truck but contends that this was inaccurate because he was in shock. (Exhibit D, p. 92-93, l. 24-25, 1-3). Finally, during the

course of his testimony Martinez admitted that in response to Trooper Atkins incredulously asking him if he realized what he had caused, Martinez confessed that he "messed up." (Exhibit D, p. 100, l. 14-16, Video Excerpt of Martinez Statement to Trooper Atkins, Exhibit H).

### C. TESTIMONY OF ROY SALINAS

During the course of his continued testimony, Roy Salinas echoed Martinez in confirming that on October 26th, the entire crew helped in hooking up the disabled Salinas Express Tractor to the SMC Tractor once they arrived at the rest stop. (Exhibit C, p. 44, l. 4-9). He further confirmed that, in this process, the SMC Tractor had to be turned around to face north. (Exhibit C, p. 42-43, l. 19-25, 1-4). Thereafter, Roy claims that he went inside the rest area to wash up and when he came out, Martinez was in the SMC Tractor and almost completely at the end of the entrance ramp, and moving forward. (Exhibit C, p. 46-47, l. 19-25, 1-2). Realizing that Martinez was going to go into the southbound lanes, Roy Salinas testified that he started running over to Martinez, yelling at him to stop. (Exhibit C, p. 48, l. 1-15). During this time, Roy saw a white car in one of the southbound lane comes to a stop and saw the little pick-up swerve to avoid the white car and then collide with the SMC Tractor. (*Id.*).

With regard to the location of the SMC Tractor at impact, Roy Salinas testified that from his vantage point, he could not see where the impact occurred. (Exhibit C, p. 49, l. 14-24). However, he could see the pick-up sliding sideways after avoiding the white car and impacting with the SMC Tractor and bouncing off. (Exhibit C, p. 52, l. 17-24). After this, Roy testified that he began running back away from the interstate because a lot of debris was flying into the rest area. (Exhibit C, p. 53, l. 11-14). He actually only heard the noise of the

25

collision between the bread truck and the stationary pick-up truck, (*Id*., l. 16-22), which was resting sideways between the right and left southbound lanes of travel. (Exhibit C, p. 54, l. 1-13). Finally, right before he began running away from I-81, Roy Salinas testified that he saw Art pull the plaintiff from his truck and begin running back across the highway towards the rest stop, with the young man running towards the opposite side of the roadway. (Exhibit C, p. 55, l. 3-12). As Art and the young man were running, the bread truck was coming towards them and Roy recalls that Art narrowly missed getting hit. (Exhibit C, p. 55, l. 13-18).

### D. TESTIMONY OF BRANDON LESTER

According to Bandon Lester, he woke up on the morning of October 26th around 4:30 a.m., took a shower, ate a bowl of oatmeal and left his home for work at approximately 5:15 a.m. (Brandon Lester Deposition Transcript attached as Exhibit I, p. 65-66, l. 7-12, 5-9). He recalls that there was a drizzling rain, or heavy fog, which was enough to make the road damp. (Exhibit I, p. 66, l. 10-17). Lester testified that once he got on I-81 South at Buchannan, he does not recall encountering any other vehicles on the roadway before the tractors at the truck stop where the accident happened. (Exhibit I, p. 67-68, l. 17-24, 1). As he approached the rest stop at approximately 60 miles per hour, he recalls seeing the tractor in the middle of the road, across both southbound lanes and he had no ability to avoid hitting it despite slamming on his brakes. (Exhibit I, p. 71, l. 2-17). According to Lester, the tractor towing another tractor had been pulling out onto I-81. (Exhibit I, p. 78, l. 9-22).

After the first collision, Lester testified that he remembers that the impact stalled out his pick-up, and nothing, including the lights, would work. (Exhibit I, p. 84, l. 7-21). Even the car door would not open. (Exhibit I, p. 84, l. 22-24). Lester testified that after he attempted to get out of his vehicle unsuccessfully, he heard something, and looked up in his

rearview mirror and saw a truck coming towards him.  (Exhibit I, p. 81, l. 15-21).  Lester then recalls something hitting the vehicle but cannot recall exactly what happened thereafter. (Exhibit I, p. 92, l. 20-24).

## IV. <u>The Aftermath</u>

Following the events of October 26, 2015, both SMC and Salinas Express attempted to distance themselves from the actions of Martinez and Roy Salinas and, to date, deny an agency or employment relationship with either of them at the time of the accident.  Neither company investigated the accident or took any formal action towards either employee, instead, as noted herein, they have tried to hide the truth of what happened in order to avoid liability.

With respect to Salinas Express, Rudy Salinas confirmed as the corporate representative of Salinas Express that the company did not require Israel Martinez to complete a drug test after the accident because he was not driving "my [Rudy's] truck." (Exhibit A, p. 65, l. 1-5).    Rudy Salinas admitted that at the time Lozano told him about the accident, he didn't want the details of it.  (Exhibit A, p. 65, l. 15-18).  Even after learning that Martinez was towing the Salinas Express Tractor, Rudy Salinas did not ask how that sequence of events came about.  (Exhibit A, p. 67, l. 18-22).  And, in explaining why no investigation was undertaken by Salinas Express, Rudy Salinas simply stated that because my truck wasn't damaged.  I didn't think there was any reason to do it."  (Exhibit A, p. 68, l. 4-9).  Rudy Salinas further claimed that he has never been provided any logs by Martinez for the date of the accident or any jobs completed by Martinez prior to or after that date, (Exhibit A, p. 64, l. 21-22), despite testimony from other Salinas Express drivers that Martinez did complete them.  The lack of credibility of Rudy Salinas and Salinas Express is

also evident from the fact that Martinez's employment application with the company now has a date of January, 2016, in different handwriting and ink. According to Martinez, when he turned in the application in July of 2015, he did not date it, and he does not know who misdated it well after he began working there. (Exhibit D, p. 31, 33, l. 16-23, 20-24).

In responding to plaintiff's Interrogatories in this action, Salinas has represented that prior to the accident, Martinez did not perform any work, paid or unpaid, on behalf of Salinas Express contrary to the clear evidence described in the above Statement of Facts. (Salinas Express's Answers to Plaintiff's First Interrogatories and Responses to First Requests for Production of Documents attached hereto as Exhibit J, see Answer to Interrogatory Number 3). Salinas initially denied generally that Martinez was an employee of the company at the time of the accident instead asserting that he was hired in January of 2016. (Answer to Interrogatory Numbers 2 and 6).[3] In response to Plaintiff's Request for Production of Documents, Salinas Express has denied having any log books in which Martinez appears or made any entries, from one month before the accident to the present date. (Response to Request for Production Numbers 8 and 9). Finally, Salinas Express has also denied having any records reflecting payments made to Israel Martinez, despite having acknowledged under oath in its corporate and employees' individual depositions[4] that he was paid on jobs prior to the accident. (Response to Request for Production Numbers 12 and 13).

---

[3] Salinas Express has now amended its discovery response but, of course, cannot undo the fact that it produced in discovery an employment application containing the wrong date which supported its initial contention that Martinez was not hired until January of 2016 – a claim which has now been exposed as a fabrication.

[4] See, Salinas Express 30(b)(6) Deposition Exhibit A, p. 29, l. 3-21; p. 30, l. 7-24; and p. 32, l. 12-21 and Lozano Deposition Exhibit B, p. 17, l. 17-22 and p. 12, l. 5-9; and Roy Salinas Deposition Exhibit C, p. 90-91, l. 21-25, 1-10.)

With regard to SMC, a female representative of the company affirmatively contacted Trooper Atkins following the accident and told him that although Martinez had been employed with the company, he was not authorized to have taken the SMC Tractor on the date of the accident and it was without SMC's permission. (Exhibit G, p. 86, l. 14-24). Sergio Cuellar, the owner of SMC, admitted in deposition that his female assistant did contact the State Police to obtain a copy of the accident report. He denies knowledge concerning what was relayed to Trooper Atkins. (Exhibit E, p. 67, l. 5-17). However, he must have relayed the same misinformation to SMC's insurance carrier, United Specialty Insurance Company, which has filed a Counterclaim/Cross-Claim in the companion declaratory judgment action representing to this Court that the SMC Tractor was taken from the Salinas Express' yard by Martinez without actual or constructive permission of SMC. (*See*, United's Cross-Claim, Civil Action Number 7:16cv00075).[5] With respect to the travel of the SMC Tractor for the job in question, Cuellar never asked for the logs from any drivers because it was allegedly not being used for SMC. (Exhibit E, p. 69, l. 16-18). Finally, as noted above, despite Cuellar's unequivocal deposition testimony that he had never met Martinez before the accident or had any conversation with him, the telephone records disclosed as Exhibit F clearly establish otherwise.

---

[5] Plaintiff anticipates obtaining further evidence regarding the different version of events being circulated by SMC once it is in possession of responses to a subpoena to SMC's carrier asking for the source of a letter which United's TPA sent to Salinas Express's carrier tending SMC's defense based on a claim that Roy Salinas was in the process of purchasing the SMC Tractor but did not have permission to use it on the job in question. See Exhibit K. This Exhibit is not hearsay as it is not submitted for the truth of its contents, but rather as relevant evidence of the conspiracy between the parties of efforts to disclaim responsibility for their actions.

29

## ARGUMENT AND AUTHORITIES

A.    STANDARD FOR SUMMARY JUDGMENT

As this Court is aware, a party is entitled to summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242. 247-48, 106 S. Ct. 2505. 91 L. Ed. 2d 202 (1986); see also *Kelley v. United Parcel Service, Inc.*, 528 Fed. Appx. 285, 2013 WL 2480211, at *1 (4th Cir. 2013). The moving party has the initial burden of showing that no genuine dispute of material facts exists; however, "[o]nce a [moving party] makes a properly supported motion for summary judgment, the burden shifts to the [nonmoving party] to set forth specific facts showing that there is a genuine issue for trial." *Sylvia Development Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir. 1995).

When reviewing a motion for summary judgment, the Court must "draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion." *Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir.1992), cert. denied, 507 U.S. 918. 113 S. Ct. 1276, 122 L. Ed. 2d 671 (1993); see also *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405 (4th Cir. 2005).  However, "only 'reasonable' inferences from the evidence need be considered by the court." *Sylvia Development Corp.*, 48 F.3d at 818. The Court of Appeals for the Fourth Circuit has further elaborated on this principle, indicating that "[p]ermissible inferences must still be within the range of reasonable possibility... and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Id*. (quoting *Ford Motor Co. v.*

*McDavid*, 259 F.2d 261, 266 (4th Cir. 1958) cert denied, 358 U.S. 908, 79 S. Ct. 234. 3 L. Ed. 2d 229 (1958)). "Whether an inference is reasonable cannot be decided in a vacuum; it must be considered 'in light of the competing inferences' to the contrary." *Id*. (citing, *Matsushita Elect. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 588, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

Thus, "[c]onclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's] case," to defeat an otherwise properly supported motion for summary judgment. *Kelley*, 528 Fed. Appx. 285, 2013 WL 2480211, at *1 (quoting, *Thompson v. Potomac Elec. Power Co*., 312 F.3d 645. 649 (4th Cir. 2002)). "Accordingly, to deny a motion for summary judgment, '[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate to support a jury verdict.'" *Standard Fire Ins. Co. v. Armstrong*, 2013 U.S. Dist. LEXIS 65784, 2013 WL 1933828, at *2 (E.D. Va. May 8. 2013) (quoting, *Thompson v. Everett, Inc. v. Nat'l Cable Adver., LP*, 57 F.3d 1317, 1323 (4th Cir. 1995); *OOIDA Risk Retention Grp., Inc. v. Griffin*, 2016 U.S. Dist. LEXIS 57469 (E.D. Va. 2016)).

B.    **BACKGROUND REGARDING THE FEDERAL MOTOR CARRIER ACT AND THE MCS-90 ENDORSEMENT**

Under 49 U.S.C. § 13101 *et seq*., Congress has delegated extensive regulatory authority over the trucking industry to the Secretary of Transportation ("Secretary"). In order to be an approved transportation provider, a motor carrier must be registered by the Secretary. *49 U.S. C. §13901*. The Secretary is charged with registering motor carriers and assuring that they comply with congressional requirements. *49 U.S.C. §13902*. One of these requirements is that the transportation provider "file with the Secretary a bond, insurance

policy, or other type of security approved by the Secretary, in an amount not less than such amount as the Secretary prescribes[.]" *49 U.S.C. §13906(a)(1)*. This submission constitutes evidence of the company's financial responsibility. Registrants are permitted to offer evidence of their financial responsibility in one of four ways: (1) by filing proof of insurance; (2) by filing proof of a guarantee; (3) by filing a surety bond issued by a bonding company authorized to do business in the United States; or (4) qualification as a self-insurer. *49 U.S.C. §31139(e)*.

If a registrant opts for the first mode of proving its financial responsibility, *49 C.F.R. § 387.7(d)(1)* provides that the registrant's insurer must maintain a "Form MCS-90 Endorsement," otherwise known as an "Endorsement for Motor Carrier Policies of Insurance for Public Liability Under Sections 29 and 30 of the Motor Carrier Act of 1980." The required language of the MCS-90 endorsement is found at *49 C.F.R. §387.15*, Illustration I and is approximately one page long. The relevant portions of the endorsement are as follows:

> **In consideration of the premium stated in the policy to which this endorsement is attached, the insurer (the company) agrees to pay, within the limits of liability described herein, any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Sections 29 and 30 of the Motor Carrier Act of 1980 regardless of whether or not each motor vehicle is specifically described in the policy and whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere. Such insurance as is afforded, for public liability, does not apply to injury to or death of the insured's employees while engaged in the course of their employment, or property transported by the insured, designated as cargo. It is understood and agreed that no condition, provision, stipulation, or limitation contained in the policy, this endorsement, or any other endorsement thereon, or violation thereof, shall relieve the company from liability or from the payment of any final judgment, within the limits of liability herein described, irrespective of the financial condition, insolvency or bankruptcy of the insured. However, all terms, conditions, and limitations in the policy to which the endorsement is attached shall remain in full force and effect**

**as binding between the insured and the company. The insured agrees to reimburse the company for any payment made by the company on account of any accident, claim, or suit involving a breach of the terms of the policy, and for any payment that the company would not have been obligated to make under the provisions of the policy except for the agreement contained in this endorsement.**

49 C.F.R. §387.15, at Illustration I (emphasis added); Pl.'s Exhibit A, ECF No. 1-1, at 32.

In *Canal Ins. Co. v. Distribution Services, Inc.*, 320 F.3d 488 (4th Cir 2003), the Fourth Circuit gave a brief summary of the MCS-90 endorsement. The Secretary, pursuant to the authority granted by *49 U.S.C. §13906(f)* to require motor carrier insurers to append appropriate form endorsements to their policies, issued regulations mandating that every liability insurance policy covering a motor carrier contain the MCS-90 endorsement. *Id*. at 489. This authority was delegated to the Secretary as part of the Motor Carriers Act of 1980 ("MCA"), enacted, in part, "to address abuses that had arisen in the interstate trucking industry which threatened public safety[.]" *Id*. *See also*, *Prestige Casualty Co. Michigan Mutual Ins. Co.*, 99 F.3d 1340, 1342-1343 (6th Cir. 1996). Protecting the public was the undisputed primary goal of the MCA. *Id*. ("It is well-established that the primary purpose of the MCS-90 endorsement is to assure that injured members of the public are able to obtain judgment from negligent authorized interstate carriers." Citing, *John Deere Ins. Co. v. Nueva*, 229 F.3d 853, 857 (9th Cir. 2000), cert. denied, 534 U.S. 1127, 122 S. Ct. 1063, 151 L. Ed. 2d 967 (2002)). To effectuate this policy goal, "the MCS-90 endorsement creates a suretyship by the insurer to protect the public when the insurance policy to which the MCS-90 endorsement is attached otherwise provides no coverage to the insured." *Id*. (Citations omitted).

In determining which vehicles are subject to the financial requirements under the MCA, Section 30 of the MCA, codified as amended at 49 U.S.C. §31139(b), provides:

> **The Secretary of Transportation shall prescribe regulations to require minimum levels of financial responsibility sufficient to satisfy liability amounts established by the Secretary covering public liability, property damage, and environmental restoration for the transportation of property by motor carrier or motor private carrier (as such terms are defined in section 13102 of this title) in the United States between a place in a State and-**
>
> **(A)** **a place in another State;**
>
> **(B)** **another place in the same State through a place outside of that State; or**
>
> **(C)** **a place outside the United States.**

The federal regulations promulgated pursuant to the MCA further define "motor carrier" as a "for-hire motor carrier or a private motor carrier," 49 *C.F.R.* §387.5. Relatedly, "for-hire carrier" is defined as "the business of transporting, for compensation, the goods or property of another." *Id*. Finally, these regulations "establish that the minimum financial responsibility requirements of the MCA apply to 'for-hire motor carriers operating motor vehicles transporting property in interstate or foreign commerce' and for-hire motor carriers transporting hazardous materials." *Herrod v. Wilshire Ins. Co*., 499 F.App'x 753, 759-60 (10th Cir. 2012 (unpublished) (quoting 49, *C.F.R.* § 387.3(a),(b)).

With regard to leasing arrangements among motor carriers, the Fourth Circuit in *Proctor v. Colonial Refrigerated Transp., Inc.,* 494 F.2d 89, 91 (4th Cir. 1974), considered whether the lessee motor carrier, operating under a certificate from the ICC, is liable to an employee of a lessor for injuries resulting from the negligence of the lessor in the operation of

Case 7:15-cv-00665-GEC   Document 71   Filed 06/24/16   Page 34 of 45   Pageid#: 593

his equipment in the business of the lessee-carrier. After examining the applicable regulatory language and statutory scheme, the Four Circuit found that:

> These [ICC] regulations and the statute under which they were promulgated require and provide that under such lease arrangements, the lessee-carriers "will have full direction and control of such [leased] vehicles and will be *fully responsible* for the operation thereof ... *as if they were the owners of such vehicles*. . . ." These regulations were promulgated by the Commission to correct widespread abuses incident to the use of leased equipment by the carriers, and "the intent [of the regulations] was to make sure that licensed carriers would be *responsible in fact, as well as in law, for the... supervision of borrowed drivers*." The statute and regulatory pattern clearly eliminate the independent contractor concept from such lease arrangements and casts upon [the lessee-carrier] *full responsibility* for the negligence of [the lessor-contractor] as driver of the leased equipment. Any language to the contrary in the lease agreement would be violative of the spirit and letter of the federal regulations and therefore unenforceable.

Proctor, 494 F.2d at 91-92. (citations omitted) (emphasis added).

Courts from other Circuits have examined the regulatory language and statutory scheme discussed *supra* and concluded that federal law requires a driver furnished by a lessor-contractor to be considered a statutory employee of the lessee-carrier, thereby preempting traditional common law doctrines of master-servant relationships and *respondeat superior* when the driver injures a member of the public while the lease is in effect. *Judy v. Tri-State Motor Transit Co*., 844 F.2d 1496, 1501 (11th Cir. 1988) (citing, *Price v. Westmoreland*, 727 F.2d 494, 497 (5th Cir. 1984)); *Planet Ins. Co. v. Transport Indemnity*, 823 F.2d 285, 288 (9th Cir. 1987).

I.    AS A MATTER OF LAW, THE DISABLED SALINAS EXPRESS TRACTOR THAT WAS IN USE AT THE TIME OF THE ACCIDENT WAS OWNED BY RUDY SALINAS AND CONTROLLED BY SALINAS EXPRESS IN CONNECTION WITH ITS BUSINESS OF TRANSPORTING GOODS AS A FOR-HIRE INTERSTATE CARRIER.

Under Texas law, the general rule is that ownership of a vehicle rests in the person(s) named in the "Certificate of Title," creating a "presumption of ownership" on the issue.  See, *Vibbert v. PAR, Inc.,* 224 S.W. 3d 317, 321 (Tex. App. El Paso 2006); *Grant v. Espiritu,* 470 S.W. 3d 198 (Tex. App. El Paso 2015).  Here, the presumed owner of the Salinas Express Tractor is Rudy Salinas, the title owner, and the only remaining issue is whether, as a matter of law, Salinas Express has sufficient evidence to overcome the presumption so as to allow the issue to proceed to jury deliberation regarding Roy Salinas's alleged status as owner.

A ruling by this Court on this issue is critical because it goes to the issue of Salinas Express's vicarious liability which, likewise, becomes clear once Roy Salinas's status as simply a permissive user of the vehicle is established as a matter of law.  Salinas Express's entire defense in this action rests upon the theory that Roy Salinas was the owner of the tractor at the time of the accident.  Based upon this erroneous premise, Salinas Express goes on to theorize that Roy Salinas was not using it in the business of the company.  Setting aside momentarily the overwhelming evidence that Salinas Express was controlling operation of the vehicle for its business purposes at the time of the accident, it is clear from the undisputed evidence in this case that Roy was not, in fact or in law, the owner of the vehicle.

As established by the evidence now before the Court on the pending motion, it is uncontroverted by Salinas Express, Roy Salinas and Rudy Salinas that at the time of the accident in question, (1) Rudy Salinas was the title owner, (2) Rudy Salinas, on behalf of Salinas Express, controlled assignment and operation of the Salinas Express Tractor, (3)

36

although Rudy Salinas or his father were allegedly "in the process" of selling the Salinas Express Tractor to Roy, this had not yet occurred at the time of the accident and to this day has not occurred, and (4) the Salinas Express Tractor bore Salinas Express's logo and was returning from a Salinas Express job at the time of the accident of October 26. The lack of credibility of any argument to the contrary is further evidenced by Rudy Salinas's own constant reference to the Salinas Express Tractor as "my truck." Finally, the fact that Lozano and Martinez both believed the vehicle to be Rudy's or his sister's and had both been assigned to operate the vehicle by Rudy in the course of the business of Salinas Express makes any continued argument by Salinas Express baseless, further calling into question the credibility of the defendants.

Based upon the evidence in the case, which is completely without dispute, Lester urges this Court to conclude as a matter law that Roy Salinas is not the title owner and that the vehicle was owned by Rudy Salinas who was using it in the course of business for Salinas Express when he directed Roy Salinas to complete the Salinas Express job in question and get the disabled tractor back to Texas.

II. **AS A MATTER OF LAW, ROY SALINAS AND MARTINEZ, IN USING THE SALINAS EXPRESS TRACTOR, WITH ITS PLACARDS AND UNDER ITS ICC LICENSE ARE EMPLOYEES OF SALINAS EXPRESS AND IT IS VICARIOUSLY LIABLE FOR ANY FINDING OF NEGLIGENCE AND/OR WILLFUL NEGLIGENCE AGAINST EITHER.**

With Rudy Salinas's ownership established as a matter of law and with the undisputed facts establishing that the Salinas Express Tractor was utilized and controlled by Salinas Express in its interstate hauling operations, and under its ICC License, Salinas Express is treated by FMA as the owner of the vehicle with regard to its travel on interstate highways. Likewise, under FMA, as noted above, even if Martinez and Roy Salinas were considered to be independent contractors, they are defined as employees of Salinas Express

37

under the Act for purposes of vicarious liability.[6]  Again, the facts are undisputed that both Martinez and Roy Salinas were acting in furtherance of Salinas Express's business interest in delivering the interstate load in question and returning the Salinas Express tractor to the yard.

Salinas Express may argue that, although Martinez sand Roy Salinas may be liable for their negligence with regard to the accident in question, they were not hauling the trailer at the time of the accident and were thus not conducting the business of Salinas Express.  This argument, as a matter of law, fails given the fact that the employees in question were completing the final leg of the journey in returning the vehicle in question to its owners and, in fact, hauling it as property at the time of the collision.  Moreover, such an argument which suggests that, once any delivery is accomplished by an interstate carrier, then the return trip home is not governed by the FMA and its rules concerning financial liability requirements, would eviscerate the intent of the FMA, put in place to protect the public on interstate highways.  Accordingly, should the jury return a verdict against either Martinez or Roy Salinas or both, it should be instructed that Salinas Express is vicariously liable for each driver's actions.

III.  **As a matter of law, Salinas Express is vicariously liable for the use of the SMC Tractor by both Martinez and Roy Salinas should a jury return a verdict of negligence or willful negligence against either.**

The liability of Salinas Express which also flows from Martinez and Roy Salinas's use of the SMC Tractor at the time of the accident cannot be overcome by credible evidence to

---

[6] Martinez, Lozano and Roy Salinas are also properly characterized as employees of Salinas Express under Texas law.  None of them owned their own tractor and each was subject to the control of Salinas Express with regard to their assignments and the requirements of the job.  After they were hired by the company, they worked for no one else.  See *Newspapers Inc. v. Love*, 380 SW 2d 582 (Tex. 1964) (the "right of control" not the exercise of control governs the master-servant relationship).

38

the contrary. The undisputed evidence establishes that both Roy Salinas and Martinez were acting in furtherance of Salinas Express's business in attempting to tow the Salinas Express Tractor out of the rest stop and return it to its owner(s) at the Salinas Express yard for completion of the job in question. In effect, the SMC Tractor was a temporary substitute vehicle being used by Salinas Express in the course of its business to complete the interstate job in question, not only to tow another Salinas Express tractor to Virginia in order for it to haul the trailer full of goods, but to then return the disabled Salinas Express tractor back to Texas to complete its run. Setting aside the fact that its own placards were in use at the time of the accident, Salinas Express may argue that operation of the SMC Tractor was under the SMC logo thereby eliminating its employment or agency relationship with its drivers. However, SMC's placard liability does not diminish Salinas Express's own vicarious liability for shared employees accomplishing the mission of both entities. See, *Zamalloa v. Hart*, 31 F.3d 911 (9th Cir. 1994). Moreover, as many courts have recognized, placard liability is just the start of the inquiry into the potential liability of multiple interstate motor carriers in connection with an accident to which FMA applies. *National American Insurance Company v. Artisan & Truckers Cas. Co.*, (796 F.3d 717, 724 (7th Cir. 2015). ("Placard liability is not exclusive. Just because a plaintiff can quickly identify and sue the company whose vehicle that struck him dos not mean that the plaintiff cannot sue – and recover from – others who may be at fault.").

**IV.** **AS A MATTER OF LAW, ROY SALINAS AND MARTINEZ, IN USING THE SMC TRACTOR WITH THE PERMISSION OF SMC, UNDER ITS ICC LICENSE AND PLACARDS, AND IN FURTHERANCE OF ITS BUSINESS INTERESTS, ARE ALSO EMPLOYEES AND/OR AGENTS OF SMC WHICH IS VICARIOUSLY LIABLE FOR ANY FINDING OF NEGLIGENCE AND/OR WILLFUL NEGLIGENCE AGAINST THEM.**

In connection with interstate use of the SMC Tractor by Martinez and Roy Salinas, the evidence establishes SMC's previous reliance upon the Salinas Express Tractor in connection with its own business operations thus suggesting a *quid pro quo* arrangement between the companies, particularly given their familial connections. The evidence also establishes a clear benefit to SMC for use of the SMC Tractor on this interstate job to determine its functionality for use in SMC's normal hauling operations. Finally, the evidence is uncontroverted that SMC instructed Martinez and Roy Salinas on use of the towing assembly and did not remove its placards from the vehicle prior to the job in question. Although SMC has failed to cooperate with discovery on the issue, it is now also apparent that SMC was in touch with Martinez within hours of the accident thus confirming SMC's knowledge of his participation on the job.

The terms of the FMA are applicable given SMC's status as a licensed interstate motor carrier and decision to have Martinez and Roy Salinas operate the SMC Tractor on an interstate trip, hauling property on both the trip to Virginia and trip back to Texas under its placards. The federal regulations define "employer" as:

> **Any person engaged in a business effecting interstate commerce who *owns* or leases a commercial motor carrier vehicle in connection with that business, or assigns employees to operate it.**

49 C.F.R. §390.5.

An "employee" is defined in 49 C.F.R. §390.5. as:

40

> **Any individual, other than an employer, who is employed by an employer and who in the course of his or her employment directly affects commercial motor vehicle safety. Such term includes a driver of a commercial motor vehicle (including an independent contractor while the course of operating a commercial motor vehicle, a mechanic, and a freight handler).**

In this case, SMC meets the definition of an employer and Roy Salinas and Martinez meet the definition of employees in the context of having been provided use of the SMC Tractor by the owner of the company. By use of its placards in hauling a Salinas Express Tractor to and from Virginia to test out the SMC Tractor, SMC maintained its ultimate control over the vehicle as well. SMC has also been clear in this action in pointing out that it did not provide Salinas Express or these employees use of the SMC Tractor pursuant to a lease arrangement. This admission establishes that it is not relieved of liability as owner of the vehicle for the actions of the driver of the SMC Tractor at the time of the accident based on the terms of 49 U.S.C. §30106. In relevant part, §30106 states as follows:

> **An owner of a motor vehicle that rents or leases the vehicle to a person (or an affiliate of the owner) shall not be liable under the law of any State or political subdivision thereof, by reason of being the owner of the vehicle (or an affiliate of the owner) for harm to persons or property that results or arises out of the use, operation, or possession of the vehicle during the period of the rental or lease, if –**
>
> > **(1)     The owner (or an affiliate of the owner) is engaged in the trade or business of renting or leasing motor vehicles; and**
> >
> > **(2)     There is no negligence or criminal wrongdoing on the part of the owner (or an affiliate of the owner).**

Additionally, 49 C.F.R. § 390.21 governs the markings that a federally licensed motor carrier must, by law, display on their motor vehicles. It states, in part:

41

(b) Nature of marking. The marking must display the following information:

(1) [Effective until Sept. 30, 2016.] The legal name or a single trade name *of the motor carrier operating the self-propelled CMV*, as listed on the motor carrier identification report (Form MCS-150) and submitted in accordance with § 390.19

(emphasis added).

Here, the absence of a lease compels a finding of vicarious liability against SMC for the actions of its employees/agents once it put the SMC Tractor in interstate travel under its placards and as owner of the vehicle. SMC's intentional decision to allow use of its ICC license and placards for interstate job establishes as a matter of law, as noted above, its continuing control over the vehicle and, likewise, control over the agents to whom it gave authority to operate the SMC Tractor under its license. Its vicarious liability stemming from these actions is well supported by this Circuit which has repeatedly confirmed that changes to the FMA were intended to broaden its scope to include "leased" vehicles such that the authorized carrier is now required to "be responsible for operating those motor vehicles . . . *as if the motor vehicles were owned by the motor carrier*." See 49 U.S.C. §11107(a)(4) (emphasis added; *Ryder Truck Rental Company v. UTF Carriers, Inc.,* 719 F.Supp. 455 (W.D. Va. 1989). Accordingly, SMC, an authorized carrier who is in fact the owner of the tractor, not operating it pursuant to lease, clearly retains the same control and responsibility when it chooses to place its vehicle in interstate travel under its authority and license.

V. **AS A MATTER OF LAW, SMC IS NEGLIGENT *PER SE* IN PLACING ITS SMC TRACTOR IN THE STREAM OF INTERSTATE TRAVEL UNDER ITS ICC LICENSE AND WITH ITS PLACARDS IN COMPLETION OF AN INTERSTATE JOB WITHOUT ENSURING THAT IT MET THE FINANCIAL RESPONSIBILITY REQUIREMENTS MANDATED BY FMA FOR THE ACCIDENT AT ISSUE.**

Finally, the plaintiff seeks summary judgment on SMC's negligence *per se* in failing to meet the mandate of FMA concerning the financial responsibility requirements applicable to

42

SMC in placing the SMC Tractor in the stream of interstate travel under its ICC license and with its placards. As this Court is aware the doctrine of negligence *per se* in Virginia represents the adoption of "the requirements of a legislative enactment as the standard of conduct of a reasonable [person]." *Butler v. Freieden*, 208 Va. 352, 353, 158 S.E.2d 121, 122 (1967). As noted by the Virginia Supreme Court most recently in *Collett v. Cordovana*, 772 S.E.2d 584 (Va. 2015), the well-established elements of negligence *per se* require (1) proof that the defendant violated a statute enacted for public safety, (2) proof that the plaintiff belonged to the class of persons for whose benefit the statute was enacted, and the harm which occurred was of the type against which the statute was designed to protect, and (3) the statutory violation was a proximate cause of the plaintiff's injury. *Id*. at 589 (citations omitted).

In this action the evidence is undisputed that SMC allowed its SMC Tractor to be utilized in the interstate stream of travel and in connection with its own business operations and the interstate job of Salinas Express, with its placards affixed to the vehicle, despite the fact that it had not specifically added the SMC Tractor to its existing insurance policy at that time. Allowing use of its ICC license and placards for the job in question represented to Martinez and Roy Salinas, as well as members of the general public on the highways, that the SMC Tractor had available limits of at least $750,000 for members of the general public involved in an accident with the SMC Tractor, regardless of whether it was listed as a "covered auto" under the insurance policy maintained by SMC.

The minimum level of financial responsibility required by 49 C.F.R. §387.7 for SMC's placement of its SMC Tractor on the interstate highways established a duty owed by SMC to plaintiff Lester. Plaintiff Brandon Lester is a member of the public intended to be protected

by the enactment and requirements of 49 C.F.R. §387.7 and to the extent that SMC's insurance is inapplicable to the accident and Lester's damages, then SMC is in breach of its statutory duty and is independently liable to Lester on this basis.

## CONCLUSION

For the reasons set forth herein, plaintiff respectfully urges this Court to grant his pending Motion on all issues raised herein.

*Respectfully submitted,*

BRANDON LESTER


By:____s/MELISSA W. ROBINSON_____


Melissa W. Robinson (VSB #29065)
Victor S. ("Dinny") Skaff, III (VSB #40054)
Johneal M. White (VSB #74251)
*Counsel for Plaintiff*
GLENN ROBINSON & CATHEY, PLC
400 Salem Avenue, Suite 100
Roanoke, VA 24016
Phone: (540)767-2200
Fax: (540)767-2220
mrobinson@glennrob.com
vskaff@glennrob.com
jwhite@glennrob.com

44

## CERTIFICATE OF SERVICE

I hereby certify that on June 24th, 2016, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

> Daniel P. Frankl, Esquire
> Audra M. Dickens, Esquire
> FRANKL MILLER & WEBB, LLP
> 1711 Grandin Road SW
> Roanoke, VA  24015
>
> Lawrence A. "Lex" Dunn, Esquire
> Gibson Sinclair Wright, Esquire
> Morris & Morris, P.C.
> 11 South 12th Street - Fifth Floor
> Richmond, VA  23219
>
> David W. Hearn, Esquire
> Sands Anderson PC
> 1111 East Main Street, Suite 2400
> Richmond, VA  23219-1998

s/ MELISSA W. ROBINSON
OF COUNSEL
