

# David O. McAllister

### Accident Reconstruction Consultant
11130 Northborough Lane
Richmond, Virginia 23236
(804) 794-6746

August 11, 2016

Johneal M. White, Esq.
Glenn Robinson and Cathey PLC
Fulton Motor Lofts
400 Salem Ave., SW Suite 100
Roanoke, Va. 24016

RE: <u>Brandon Lester vs. SMC Transport, LLC, Israel Martinez, Jr. and Salinas Express, LLC Case #7:15-CV-00665</u>

Dear Ms. White:

As requested, I have conducted an Accident Investigation/Reconstruction Analysis on the above matter. This will serve as my written report. The following items I reviewed/considered, as well as my extensive background, education, experience and training in AI/AR and Highway Engineering:

1. Virginia State Police Investigation File Materials, including the Police Crash Report (FR-300), Trooper Atkins' field notes and witness statements, VSP Cruiser Video with Audio, VSP photographs and 911 Incident History details.
2. VDOT report and photographs.
3. Registration information for the SMC vehicle received from the Texas DMV.
4. Cab card for the SMC vehicle received from Texas DMV.
5. Salinas' driver logs.
6. A copy of all Initial Rule 26 Disclosures.
7. A copy of the on-line court records for Mr. Martinez reflecting the charges brought against him in Botetourt County.
8. Transcript of Martinez's hearing on January 25, 2026, in Botetourt County General District Court.
9. A transcribed document of the witnesses that were interviewed by Trooper Atkins (as contained on his cruiser's video/audio).
10. A deposition transcript of Trooper Atkins including exhibits.
11. Atleast <u>4</u> on-site inspections of the crash site during both daylight and nighttime conditions (consisting of numerous field measurements, photos and observations made by this investigator).

1

12. A review/analysis of the VDOT Highway Construction Plan and Profile sheets (and a VDOT Aerial photograph) of the I-81 crash site and vicinity.
13. An inspection of the Lester 1995 Toyota Tacoma pickup truck in Rockbridge County.
14. Research review of related time/distance/speed equations pertaining to stopping abilities and obstacle avoidance maneuvers (similar to 46.2-880, Code of Virginia).
15. Deposition transcripts of Brandon Lester, Israel Martinez and Roy Salinas.
16. Phone/meeting discussions with your office.
17. A Policy on Geometric Design of Rural Highways – 1965 edition by AASHO.

This document will represent my written preliminary report. If any new of different information comes to my attention, it would have to be reviewed/considered and my findings/conclusions may have to be amended if/where applicable.

<u>Crash Circumstances, as per Trooper Atkins Crash Report (FR-300), his investigation and his deposition:</u>

-This highway crash occurred Monday 5:15 a.m., October 26, 2015, at mile marker 158.10 on I-81 southbound lanes in Botetourt County, Virginia (directly in front of a designated driver rest area). It involved three vehicles; <u>Vehicle #1</u> was a 2003 Freightliner commercial road tractor (towing another tractor) owned by SMC Transport and driven by 40 year old Israel Martinez, Jr. of Zapata, Texas, (possessing a valid CDL). <u>Vehicle #2</u> was a 1995 Toyota Tacoma pickup owned/operated by 23 year old Brandon Clark Lester of Buchanan, Va. (possessing a valid Driver's License). <u>Vehicle #3</u> was a 2007 Hino Commercial, straight body/2 axle, 6 tire box truck (loaded with bread products) owned by CT, WWM Inc. and driven by 42 year old Anthony Ray Shifflett (possessing a valid CDL) from Dillwyn, Va. Drivers Lester and Shifflett sustained serious multiple injuries in the collisions, requiring them to be medivaced from the scene. Mr. Martinez sustained no injuries. Vehicles #'s 2 and 3 sustained serious contact/rollover damages (and were totaled in the crashes) and vehicle #1 sustained minor contact damage. Trooper Atkins indicated that only Mr. Lester was not belted at the time of impact.

2

-According to Trooper Atkins official Police Crash Report (FR-300p) driver's two and three exhibited <u>no</u> improper driver's actions, and driver one was listed as "other"- exiting the rest area (ramp) in the wrong direction. No driver, vehicle or roadway defects existed at the time, none of the three driver's visions were obscured and none were distracted. Alcohol and/or drug use was not suspected. Vehicle #1's maneuver was listed as "other" (exiting from the on-ramp) and "going straight ahead" for Vehicles # 2 and 3. No visible skidmark/tire mark was noted for Vehicle 1, and visible skidmarks/tiremarks were noted "after application of brakes" for Vehicles 2 and 3. The location of the first harmful event occurred on the roadway, the weather condition was listed as no adverse condition/clear-cloudy with the roadway surface dry, the crash occurred during darkness – road not lighted, the asphalt surface/traffic lanes were marked, and the angle collision occurred on a "straight-level" alignment (actually on a grade-curve).

-Trooper Atkins noted that driver #2 (Lester) was ejected in the collision, and that the (likely) speeds of Vehicles #1, 2, and 3 were "5 mph, 70 mph and 60 mph" respectively. The posted speed limit was 70 mph (as well as the maximum safe speeds) for Vehicles # 2 and 3. The MSS for Vehicle #1 was listed at "0 mph". Under the Crash Description section of the report (FR-300), Trooper Atkins noted "Vehicle 1 was in the rest area. Vehicle 2 and Vehicle 3 was traveling south on Interstate 81. Vehicle 1 exited the rest area in the wrong direction. Vehicle 1 struck Vehicle 2. Vehicle 3 then struck Vehicle 2." The vehicle's initial impacts were noted as "11, 12, and 12," for Vehicles 1, 2, and 3 respectively. The crash diagram was drawn to reflect that Vehicle #1's direction of travel was north and Vehicle # 2 and 3 were south. The diagram shows Vehicle #1 pulling out of the entrance ramp (to the rest area), and attempting a right turn while in the right, outside lane of I-81. Vehicle #2 originally in the right lane, attempts to swerve left but encounters V1 near the center of the southbound lanes. V3 following V2, steers to its left but contacts V2 broadside. Driver #2 (Lester) is ejected and comes to rest in the median, beyond the guardrail. Vehicles 2 and 3 continue south were they rollover in the southbound lanes. Both vehicles then travel off the road on the right between the SBL's and the grassy shoulder adjacent to the rest area. Vehicle #1 remains near the "gore area" adjacent to the right SBL and the off ramp into the rest area. Mr. Martinez was charged with

3

"Failure to obey a highway sign" and "Reckless Driving". (He was found guilty of both charges in his absence at the Botetourt County General District Court 3 months later.)

-Trooper Atkins received the call from VSP Communications notifying him of the crash at 5:35 a.m. He was dispatched at 5:39 and arrived on the scene at 5:52 a.m. The three involved vehicles and their drivers were still at the scene along with several witnesses, emergency personnel/equipment and a VDOT employee. Although the pickup and box truck remained at their final resting positions on the shoulder of I-81 SBL in front of the rest area, the Martinez tractor and towed vehicle had been moved back into the rest area's parking spaces. The scene was partially documented by Trooper Atkins' camcorder on his Cruiser as well as witness and driver statements. Trooper Atkins was assisted by several other Troopers who arrived on the scene. Although no measurements were made by VSP, photographic means helped document the circumstances and physical evidence of the crash. Written statements were gathered from 4 eye/ear witnesses (Bingaman, Brown, Mortensen and Zampini), and oral statements were made to Trooper Atkins by Mr. Lester and Mr. Martinez. Due to the serious injuries suffered by Mr. Shifflett, no statement was made by him.

-Trooper Atkins' investigation revealed that the truck driven by Mr. Martinez (Vehicle #1) was towing another tractor that had broken down sometime earlier and was parked at the rest area. Mr. Martinez told the Trooper that he was pulling <u>out</u> of the rest area's entrance ("the wrong way") when the crash occurred. He was positioned in the paved gore area where the entrance ramp merges with the outside, right lane of southbound I-81 (See FR-300). Trooper Atkins investigation led him to believe that Martinez was attempting to turn right and continue south on I-81. While V1 was either stopped or slowly moving, Mr. Lester (V2) approached the rest area ramp entrance and encountered the presence of Martinez's tractor. His intent was to continue on southbound. Physical evidence from VSP photos of the scene, show tire skid marks made by the Toyota pickup starting near the center of the two SBL's of I-81. As the Toyota is skidding, its right front strikes the left center/corner of the Martinez tractor which was positioned nearly perpendicular to the SBL of I-81. This initial impact causes the Toyota to rotate clockwise until it slides to a stop just south of the Martinez truck while angled across the

4

center of the road facing westward toward the rest area. Within a short time period the Shifflett box truck (V3) following some distance behind Mr. Lester's Toyota, approached the disabled and stopped Toyota and the now stopped Martinez tractor truck/combination. Without leaving any discernible pre-impact braking/tire skid marks, the full front of the box truck struck the right center side of the Toyota, totally collapsing its right side. The pickup's right rear wheel/axle was broken causing the lower frame components to gouge into the pavement's asphalt. The Toyota's frame was bent, partially separating the cab from the bed. The bed was partially torn off its rear frame rails. The wooden cap attached to the Toyota's bed was torn off. Glass and other parts of the vehicle came loose and were scattered to the road and shoulder surface as debris. The Toyota was violently pushed down the road while arcing across the two SBL's toward the right shoulder. At least two discernible tire scuff marks are evident in the VSP photograph images showing the post-impact travel distance and path made by the Toyota from its contact with the box truck until it runs off the road, across the paved right shoulder and into the soft sod/grass berm area located within the unpaved gore area separating the SBL and the off ramp. After reaching the sod berm that is constructed on a down grade/ditch line embankment, the Toyota is tripped by the berm and begins to rollover onto its left side and roof where it came to a final rest still facing the rest area. It is believed that Mr. Lester became ejected and was thrown across the median guardrail during the beginning stages of the impact with the box truck.

-Physical evidence contained in the VSP photos likewise show that at the broadside impact between the box truck and the Toyota, the box truck was entirely within the left SBL of I-81. Located in the center of the left lane at the area where several gouge marks are positioned, two conspicuous tire collision scuff/scrub marks are present. These tire marks were made by the box truck's two steering axle tires depicting the area of impact. They are irregular in shape and size and clearly show the box truck's post impact travel distance and direction. After impact, the box truck is beginning to also rotate clockwise as it is yawing across both SBL's and toward the right shoulder. The presence of at least 3 arcing/off tracking tire scuff marks are present diagonally crossing the pavement and show's the box truck's exit off the SBLs and paved shoulder and into the depressed grassy berm. The box truck, after colliding with/digging into the raised earthen berm/shoulder then rolls

5

over onto its left side and roof. It comes to rest on the earthern berm against some trees/brush south of the Toyota's final rest. Mr. Shifflett by wearing his safety belt rode down the collision from inside his vehicle and was not ejected.

-The initial impact in the roadway between the Toyota's right front and the left center/corner of Martinez's tractor can be seen in the VSP photos at the point where the Toyota's pre-impact/braking skid tiremarks abruptly change direction and shape. The skid marks first begin uniform in appearance and travel straight ahead nearly in the center of both SBLs; adjacent to the painted gore area separating the rest area on ramp and the two southbound lanes of I-81. At a point estimated at least 50-75 feet into the two skid marks length, a third and fourth skid/scuff mark begins to show up on the pavement. This separation indicates the off tracking movement of the Toyota from the impact collision between the Martinez tractor. Because this initial impact was _not_ as great a collision (although still significant based on the damages sustained on both these vehicles) as the second collision between the box truck and the Toyota, no gouge marks and/or collision scuff marks are evident on the pavement. Contained in the VSP photos are also liquid and solid debris scattered along the pavement and shoulders. The second impact between the box truck and the Toyota occurred south of the initial impact and is plainly visible within the VSP photos. (as mentioned earlier).

-Of the 4 eye/ear witnesses interviewed by Trooper Atkins, it would appear that Ms. Karen Bingaman was the only independent witness to observe the collision between the (stopped) Toyota and the box truck. She had slowed from the right SBL and was entering the rest area's on ramp when she saw the (Martinez) tractor approaching her "coming out the wrong way". She then sees the blue truck (Lester's Toyota pickup) in the highway, disabled. (A) truck comes by her (the Shifflett box truck passing her in the left lane), "doesn't see the (Toyota) truck and slams into it. She stops and renders aid to Mr. Lester who was on the left side of the SBL and who told her "he got thrown from truck". Ms. Brown indicated that she was also entering the rest area and noticed the wrong way (Martinez) tractor approaching her. She then "heard (a) crash" and then observed the blue truck (Lester) tumble to the right side of highway. Her daughter ran to the blue truck to check on the driver, but "no one was there". She

6

further advised Trooper Atkins that (her daughter) "heard a man yell (from) across the highway – she proceeded with the guy to help." Another witness, Ms. Christie Mortensen, advised that as she was entering the rest area entrance ramp she encountered the Martinez truck's headlights facing her. This truck appeared to be backing up. Once past the towing tractor trailer and arriving at the rest stop (building) she and the rest stop attendant "heard" an impact. The fourth witness, Ms. Christine Zampini, advised she was pulling into the rest stop when she "observed sparks and a pop (coming from the left lane. "Approximately 3 seconds after (seeing) the sparks and (hearing) the pop, she observed the blue pickup truck (Lester Toyota) land in front of us". She went to the pickup that had no passengers (in it). She then heard screaming (from) across the road who later identified himself as Branden Lester. Mr. Lester stated that he was thrown from his car (pickup).

-Trooper Atkins interviewed Mr. Martinez who advised that he was the driver of V 1 (SMC tractor pulling the Salinas tractor) and was going the wrong way up the rest area entrance ramp. He pointed out to Trooper Atkins where he was positioned when he was turning right onto the SBL of I-81. He also said he saw the approach (head lights) of the Lester Toyota and that they did, in fact, make contact. He estimated that about 30 seconds passed between the first collision and the second collision. The Toyota was stopped and disabled in the center of the SBL when it was struck by the bread truck.

-Mr. Branden Lester testified in his deposition that he was en route from his (grandmother's) home in Lexington to his employment in Roanoke when the collisions occurred. He left home about 5:15 a.m. He advised the lighting conditions were dark, the roadway was unlit and that as he was approaching the rest area, he was traveling about 60 mph. He was in the right lane and no vehicles were immediately either following or in front of him at the time. He was not on his cell phone and was not late for work. He had been driving on the interstate only about 4 miles when he approached the rest area. He saw his headlights shine on a truck in the road ( in front of him) and he slammed on his brakes. He saw two trucks across both lanes (of the interstate). He said the tractor was facing (the median guardrail) indicating that the Martinez tractor was positioned at a near perpendicular angle toward him. After the impact (between the right front center/corner of his Toyota and the tractor's left

7

front center/corner), his pickup ended up angled in the roadway (facing the rest area). His engine was off, his lights were not burning, and although he attempted to get out of his vehicle, he could not open his door. He can't recall the exact amount of time between the first and second collisions although it was a short time duration. He was able to speed dial his supervisor at work and tell him that he had been involved in a wreck. He then remembers seeing headlights approaching and then the second collision. He does not remember how he got out of his pickup or any details of the second collision or the events afterwards.

-Mr. Martinez testified in his deposition that in the minutes proceeding the crash, that the rest area parking spaces and on ramp was full of vehicles whereby making his job of turning round his truck that was connected to the disabled truck impossible. He advised that his intent was to pull (the wrong way) onto the entrance ramp and down to the merge area to a wider area so he could backup and turn around (to eventually go out the correct way, south of the rest area). He said he had his headlamps (and flashers) activated as he was attempting to go out the wrong way. When asked if at any point (during his maneuver) did part of his tractor get into either of the through lanes of I-81, he testified "I don't know". When asked again "but you do think you were in part of the interstate? He replied "I thought I was because Roy (Salinas who was standing nearby) screamed at me" (to stop). "That's why I got all scared and just slammed on the brakes". Mr. Martinez further noted that just before the initial impact an unidentified "white car" traveling in the left, SBL of I-81 was slowing and travelled by his truck with no mishap. He then saw the approach of the Toyota's headlights coming toward him also in the left lane only a couple of seconds behind the white car. The Toyota pickup made contact with the tractor's left front corner (and headlamp/front bumper) and stopped in the road. Although Mr Martinez remembers telling Trooper Atkins that only about 30 seconds occurred between the time of the first collision and the collision with the southbound box truck, he said in his deposition that the time duration was more like "a couple of minutes, like one, two minutes, three minutes". Mr. Martinez's accounts of the events leading up to and immediately after the collisions are in direct contradiction of statements from the witnesses and what he initially told the Trooper, as well as to Trooper Atkins conclusions.

8

Roadway design, construction and sight distance measurements at the crash site:

-Based on actual roadway measurements, VDOT Construction Plan/Profile sheets and a VDOT aerial photograph, certain opinions can be made concerning the area lay-out at the crash site. (The roadway has not been changed from the date of the crash and the first inspection of the site by this investigator, nearly 7 months after the crash). Interstate 81 is an older interstate facility designed in the late 1950's and opened for traffic about 1961. It is generally of a light mountainous/rolling terrain design, comprised of two southbound and northbound lanes each divided by a variable width earthen and treed median. The asphalt lanes are typical 12 foot wide lanes, with a 10 foot wide outside shoulder and an approximately 3.5 foot wide inside paved shoulder. Milled rumble strips are provided along the edges of the inside and outside lanes. Typical solid yellow and white fog lines are provided along the edges of the inside and outside lanes respectively. Typical white broken centerlines about 10 feet long separated by spaces 30 feet long are provided separating the two main lanes. A strong post aluminum W-beam guardrail is located along the inside edge of the left shoulder. Attached to the outside and inside guardrails are "button like"/yellow/white reflectors and running along the center of the through lanes, are embedded, night-time reflectorized delineators. A diamond shaped off ramp leading to the designated rest area is provided along the right lane. The ramp is relatively short in length for present interstate design standards in that it is approximately 390 feet long from its taper to the white painted gore area separating the ramp from the right lane. Accompanying the off-ramp are typically installed reflectorized directional signs indicating where the off ramp is located from the main lane. At least 4 such signs are placed within a two mile advance of the ramp. Green and white mile marker signs are placed each 1/10 mile along the outside edge of the interstate.

-A horizontal curve about 1 degree in sharpness that turns to the left begins about 400 feet before the off ramp and is about 1045 feet in length. The area of impact is located about 900 feet within the curve. In combination is an upgrade proceeding the ramp of about 2%. The "top" of the vertical curve is located about 700 feet before the rest area off ramp begins. The downgrade measured along the crash site (located adjacent

9

to the wide paved gore area painted in a V-design separating the off ramp from the right through lane) is about 2.7%. Of significance is the designed vertical sight distance approaching the crash site of only 660 feet.

-The design, construction and condition of I-81 through out the rest area off-ramp are deemed in excellent condition with no defects. The rough asphalt pavement surface is of a textured nature with an estimated, typical dry-level friction coefficient of about .70 g's. The roadway has a posted speed limit of 70 mph for all vehicles and the rolling/winding nature of the interstate mainly follows the natural contours of the local landscape. The southbound lanes are constructed higher than the northbound lanes. At the time of inspection, no tire skid/scuff marks existed on the pavement. However, certain gouge marks and furrow marks were evident on the right, outside earthen shoulder indicating where the Toyota pickup and box truck came to rest. Although the rest area was equipped with 5 overhead sodium vapor illuminaires within the parking spaces, no artificial lighting exists along the road and mainlines of I-81.

Accident Investigation/Reconstruction Conclusions:

1. Based on all the information reviewed and considered, this investigator is in general agreement with Trooper Atkins as to <u>where</u> the collisions took place and <u>who</u> was at fault in the cause of this crash. Specifically, the first impact occurred near the center of the two southbound lanes of I-81, directly out from the paved gore area. The Martinez tractor pulling the second tractor was at a near 90 degree angle across the inside/right lane of I-81 essentially blocking part of the highway for SB traffic. In such a configuration, the tractor's left front corner (headlamp assembly) and front center left bumper were struck by the skidding Lester Toyota pickup. This collision caused the Toyota to rotate and slide to a stop near the center of the SBL and knocked the pickup's lighting system out. The resulting damage caused the Toyota <u>not</u> to be able to be re-started and the driver's door <u>not</u> to function properly. As a result, the Toyota was in a dangerous, vulnerable, and undetectable position in the roadway. Within a short time period, the following Shifflet box truck approached the stopped pickup and without its driver seeing the Toyota's presence, slammed

10

into the side of the pickup. This second collision resulted in the probable ejection of Mr. Lester and the running off the road of both crash involved trucks.

2. The cause of this crash clearly rests with the dangerous driving behavior of Mr. Martinez. As a professional trucker possessing a CDL he should have known better than to exit his vehicle on an entrance ramp. A ramp that was clearly signed with large red/white "Do Not Enter" and "Wrong Way" signs; a ramp that was clearly marked with two white painted "arrows" denoting that ramp traffic was only ingressing and not egressing; a ramp that he could clearly see only ingressing traffic using; a ramp that had parked vehicles facing southbound and not northbound; and a ramp that he himself had used to enter from I-81 main line. His sole driving actions during the dark early morning hours clearly caused the two collisions that soon followed.

3. The point of impact between the Martinez tractor and the Lester Toyota clearly occurred in the two southbound lanes of I-81 and not on the paved gore/shoulder area. Physical evidence such as tiremarks from the Toyota is all located near the center of the southbound lanes. There is absolutely no physical evidence anywhere on/near the right shoulder that would locate such an area of impact.

4. Damage to the Toyota pickup from contacting the Martinez tractor is obvious. Its right front corner were all deformed and forced inward/backward. Black paint transfers/striations from the tractor are evident on the corner of the pickup. Likewise, contact damage to the tractor's left front corner and bumper areas are evident. The left front headlamp/reflector assembly were broken thus leaving only one active headlamp on the tractor available to burn. It was the collision with the tractor that caused the Toyota to end up where it did and in the position it was facing and causing it to be without power and lights, and vulnerable to the approach of the southbound bread truck. It is probable that the resulting initial damage to the Toyota (and certainly the collision itself) prevented Mr. Lester from a speedy and clear exit path out of the driver's door.

5. The position of the Martinez tractor-combination, nearly at a broadside angle to Mr. Lester's approach, allowed it to be hard to detect and see for southbound traffic. It's headlamps were facing the median guardrail and not northward. It wasn't until the Toyota's headlight beams struck the tractor's left side that Mr. Lester could see

11

what it was in front of him and appreciate the hazard that was looming ahead. The small roof-mounted amber identification lamps and a small marker lamp/reflector on the side tractor, would have been hard to detect due to them blending into the numerous "points of lights" and other button reflectors in the immediate area.

6. The southbound lanes of I-81 adjacent to the rest area and where the Martinez truck was located are dark and unlighted. The 5 sodium vapor lights located in the parking lots did not provide illumination out into the road. Therefore, the only lighting available to Mr. Lester to see the presence of the Martinez truck were the throw distance of his headlamp beams, which were insufficient for him to detect, identify, decide and respond to the hazard facing him.

7. The Martinez tractor (SMC Transport) was a 2003 Freightliner 3 axle/10 tire truck pulling a 1988 Peterbilt 3 axle/10 tire tractor (Salinas Express), with the aid of a "Pro-Tote" towing device. The two tractors were hooked together front-to-rear/rear-to-front with the towing device connected to the Freightliner's 5th wheel and the device's hitch point to the Peterbilt's rear frame/bumper area with a tow bar and chains. (See VSP photos at the rest area). Both trucks are approximately 8 feet wide and their total/connected length about 55 feet long, nearly the length of a typical tractor trailer. The combination is steered by the lead tractor's front axle. In order for the Peterbilt to follow behind the Freightliner within a turning maneuver, the lead truck must first be steered by its driver (Mr. Martinez) and the trailing Peterbilt then turns behind it. Since the last/6th axle of the combination is the Peterbilt's steering axle, it must turn in the opposite direction than the lead tractor in order to complete a desired turning action. As with any long combination the turning angle or radius is rather difficult and takes a relatively long distance and effort in which to correctly complete the maneuver. In this situation, the sharp right turn executed by Mr. Martinez from the rest area's On Ramp onto the southbound lanes of I-81 would require the trailing Peterbilt to "off-track" to the right or "inside" the leading Freightliner's turn radius. It is doubtful, given the long length of the trucks' combination and axle spacings, that the trucks could have been successfully turned within only one continuous steering execution at this location. The likely turn radius given the restrictive narrow On Ramp width (which was reportedly congested with parked trucks along its western side), combined with the width of the paved gore

12

area and the widths of the southbound lanes, was shorter or narrower than the combination needed. (If, however, a driver was positioned inside the Peterbilt and was steering simultaneously with Mr. Martinez while attempting the sharp turning maneuver, the combination would have likely steered easier and within a shorter turn radius distance). It is estimated that the longest axle spacing on this size combination was about 47 feet long. In comparing the likely turning radius distance needed for this combination to a standard design size tractor trailer (as per American Association of State Highway Official's A Policy on Geometric Design of Rural Highways), the maximum distance to successfully negotiate a 90 degree, right hand turn in one-continuous steering action is at least 46.2 feet. The actual space at the crash location at the rest area was measured at about 46.8 feet. Depending upon the driving capabilities of Mr. Martinez at this location, it would appear that the absolute minimum distance for him to complete his right turn onto the interstate (from where he was allegedly attempting), was at best marginal, and the maneuver would have been slow moving, time consuming and require a sharp steering action. Such a turn at this location considering the surroundings, dark conditions and circumstances was certainly ill advised and reckless.

8. The posted speed limit on the mainline I-81 is 70 mph (as well as the MSS). Although the maximum approaching sight distance over the crest of the hill and around the curve where the Martinez truck was positioned was measured at about 800 feet (during daylight conditions), the available sight line at night time is severely reduced only to the distance of a vehicle's headlamps (in this situation). Typically, head lamp distance on low beams will shine out a maximum of about 150 feet, which is insufficient for a driver to see a hazard and be able to stop within. At 70 mph on this asphalt roadway surface (slight downgrade), the total stopping distance needed is about 397 feet (with a typical/average driver reaction time of 1.5 seconds). At 60 mph (based on Mr. Lester's estimated speed as he approached the crash site), a total stopping distance needed is about 310 feet -- both distances well in excess of the headlamps capabilities. (When considering the possibility of taking a sudden lane change maneuver to avoid the hazard, the distances are even longer than during an emergency stopping action). In order for Mr. Lester to avoid

Mr. Martinez's truck by braking, he would have had to be traveling at a speed less than 40 mph. (see 46.2-880 Code of Virginia)

9. To illustrate further the reckless driving behavior and poor judgment exhibited by Mr. Martinez on the morning of the crash, he later attempted the same driving maneuver after the crash site was cleared. Trooper Atkins witnessed him attempting to exit from the rest area entrance and threatened him with another Reckless Driving citation. Mr. Martinez then backed up his rig and eventually (he says) left the rest area in the proper manner.

This completes my Analysis at this time. If you have any questions, please advise. You are already in receipt of my photos and field measures. My complete file is available for inspection/review when requested. Thank you for allowing me to assist in this capacity.

Sincerely,

*[signature]*

David O. McAllister
Accident Reconstruction Consultant
Virginia Multidisciplinary Crash Investigation Team (Rct.)

Enclosures – Federal Rules/Expert Testimony, field notes/photo disc







Case 7:15-cv-00665-GEC  Document 143-9  Filed 11/02/16  Page 17 of 20  Pageid#: 3364





