

Transcript of **David O. McAllister**

**Date:** October 10, 2016

**Case:** Lester -v- SMC Transport, LLC, et al.

Planet Depos
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Worldwide Court Reporting | Interpretation | Trial Services

1          IN THE UNITED STATES DISTRICT COURT

          WESTERN DISTRICT OF VIRGINIA

2                 ROANOKE DIVISION

3    ************************************************************

4    BRANDON LESTER,

5              Plaintiff,

6

7      -vs-                        Case No. 7:15-cv-00665-GEC

8

9    SMC TRANSPORT, LLC,

     ISRAEL MARTINEZ, JR.,

10   and

     SALINAS EXPRESS, LLC,

11

               Defendants.

12

13   ************************************************************

14             DEPOSITION OF DAVID O. McALLISTER

15             12:29 p.m. to 5:01 p.m.

16                October 10, 2016

17             Charlottesville, Virginia

18

19

20

21   Job No. 124402/31846

22         REPORTED BY:  Shawna Hum Browne, RMR, CRR

2

```
 1              Deposition of DAVID O. McALLISTER, taken and

 2      transcribed on behalf of the Defendant, by and before

 3      Shawna Hum Browne, RMR, CRR, Notary Public in and for the

 4      Commonwealth of Virginia at large, pursuant to the Rules

 5      of the Supreme Court of Virginia and by Notice to Take

 6      Deposition; commencing at 12:29 p.m., October 10, 2016, at

 7      McGuireWoods, 310 4th Street, Charlottesville, Virginia.

 8

 9

10      APPEARANCES OF COUNSEL:

11

12          GLENN ROBINSON & CATHEY, PLC

13              Fulton Motor Lofts

14              400 Salem Avenue SW, Suite 100

15              Roanoke, Virginia  24016

                (540) 767-2203

16              mrobinson@glennrob.com

          BY:  MELISSA W. ROBINSON, ESQUIRE

17              Counsel for the Plaintiff

18

19          FRANKL MILLER & WEBB, LLP

                1711 Grandin Road

20              Roanoke, Virginia  24015

                (540) 527-3515

21              dfrankl@franklmillerwebb.com

          BY:  DAN PATRICK FRANKL, ESQUIRE

22              Counsel for Defendant Salinas Express, LLC
```

1    APPEARANCES OF COUNSEL:

2         MORRIS & MORRIS, PC

3              11 South 12th Street, Suite 500

4              Richmond, Virginia  23219

               (804) 344-8300

5              ldunn@morrismorris.com

         BY:  LAWRENCE A. DUNN, ESQUIRE

6              Counsel for Defendant SMC Transport, LLC

7

8         SANDS ANDERSON, PC

9              1111 East Main Street, Suite 2400

10             Richmond, Virginia  23219

               (804) 783-7285

11             dhearn@sandsanderson.com

         BY:  DAVID W. HEARN, ESQUIRE

12             Counsel for Defendant Israel Martinez, Jr.

13

14

15                        *  *  *  *  *

16

17

18

19

20

21

22

4

1                    I N D E X

2

3    WITNESS:  DAVID O. McALLISTER

4        Examination by Mr. Dunn........................8

5        Examination by Mr. Hearn.....................145

6        Examination by Mr. Frankl....................154

7        Examination by Mr. Dunn......................204

8

9

10

11                   E X H I B I T S

     Exhibit Number 1.................................21

12       Various e-mails and correspondence

     Exhibit Number 2.................................21

13       Various e-mails and correspondence

     Exhibit Number 3.................................21

14       Various e-mails and correspondence

     Exhibit Number 4.................................21

15       Various e-mails and correspondence

     Exhibit Number 5.................................22

16       Field notes

     Exhibit Number 6.................................23

17       Copy of aerial photo

     Exhibit Number 7.................................26

18       Camcorder notes and time chart

     Exhibit Number 8.................................67

19       Accident Reconstruction Report August 11, 2016

     Exhibit Number 9.................................71

20       Photo of initial impact between the Martinez
         tractor and the Lester pickup

21   Exhibit Number 10................................71

         Photo of initial impact between the Martinez

22       tractor and the Lester pickup

                        EXHIBITS

1   Exhibit Number 11................................71
      Photo of initial impact between the Martinez
2     tractor and the Lester pickup
3   Exhibit Number 12................................71
      Photo of initial impact between the Martinez
4     tractor and the Lester pickup
    Exhibit Number 13................................71
5     Photo of initial impact between the Martinez
      tractor and the Lester pickup
6   Exhibit Number 14................................71
      Photo of initial impact between the Martinez
7     tractor and the Lester pickup
    Exhibit Number 15................................75
8     Copy of Photo Exhibit Number 10
    Exhibit Number 16................................98
9     Photo showing damage done to the Martinez tractor
    Exhibit Number 17................................98
10    Photo showing damage done to the Martinez tractor
    Exhibit Number 18................................98
11    Photo showing damage done to the Martinez tractor
    Exhibit Number 19................................98
12    Photo showing damage done to the Martinez tractor
    Exhibit Number 20................................98
13    Photo showing damage done to the Martinez tractor
    Exhibit Number 21................................98
14    Photo showing damage done to the Martinez tractor
    Exhibit Number 22................................98
15    Photo showing damage done to the Martinez tractor
    Exhibit Number 23...............................114
16    Photo of Martinez tractor
    Exhibit Number 24...............................114
17    Photo of Martinez tractor

18  Exhibit Number 25...............................114
      Photo of Martinez tractor
19  Exhibit Number 26...............................114
      Photo of Martinez tractor
20  Exhibit Number 27...............................114
      Photo of Martinez tractor
21  Exhibit Number 28...............................114

22    Photo of Martinez tractor

1                        EXHIBITS
      Exhibit Number 29................................114
2        Photo of Martinez tractor
      Exhibit Number 30................................114
3        Photo of Martinez tractor
      Exhibit Number 31................................114
4        Photo of Martinez tractor
      Exhibit Number 32................................118
5        Photo of Martinez tractor
      Exhibit Number 33................................118
6        Photo of tractor being towed by the
         Martinez tractor
7      Exhibit Number 34................................118
         Photo of tractor being towed by the
8        Martinez tractor
      Exhibit Number 35................................118
9        Photo of tractor being towed by the
         Martinez tractor
10     Exhibit Number 36................................118
         Photo of tractor being towed by the
11       Martinez tractor
      Exhibit Number 37................................118
12       Photo of tractor being towed by the
         Martinez tractor
13     Exhibit Number 38................................118
         Photo of tractor being towed by the
14       Martinez tractor
      Exhibit Number 39................................118
15       Photo of tractor being towed by the
         Martinez tractor
16     Exhibit Number 40................................118
         Photo of tractor being towed by the
17       Martinez tractor
      Exhibit Number 41................................118
18       Photo of tractor being towed by the
         Martinez tractor
19     Exhibit Number 42................................145
         Police crash report
20     Exhibit Number 43................................156
         Daily driver's log
21     Exhibit Number 44................................162
         Photo showing markings in the roadway where
22       the second collision took place

1                          EXHIBITS

Exhibit Number 45...............................170

2      Photo showing paint transfer

Exhibit Number 46...............................170

3      Photo showing paint transfer

Exhibit Number 47...............................170

4      Photo showing significant crush on lower left

       the driver's door

5   Exhibit Number 48...............................191

       Photo

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

```
1                        * * * * *

2

3    (12:29 p.m., October 10, 2016)

4

5                   DAVID O. McALLISTER,

6              having been first duly sworn,

7         was examined and testified as follows:

8                E X A M I N A T I O N

9    BY MR. DUNN:

10        Q.    Can you state your full name for the record,

11   please.

12        A.    Yes, sir.  It's David Odell McAllister.  No

13   apostrophe.

14        Q.    And what is your work address?

15        A.    It's at my home, and that is [Confidential]

     [Confidential], one word --

17   [Confidential] which is actually in

18   [Confidential] County.

19        Q.    All right.  Very good.  And do you have a

20   phone number, a work number we can reach you?

21        A.    I do.  My office number is [Confidential].

22        Q.    All right.  When were you first employed for
```

1    this case?

2         A.    I'm going to have to consult my billing

3    records, which I haven't billed yet.  I've got a time

4    chart.  I want to say it was in March.  I think it was

5    March 7th this year, 2016.

6         Q.    All right.  And by whom were you employed?

7    Who called you?  Who contacted you?

8         A.    Ms. Robinson's office.  Gwen Johnson, I

9    believe her name was.  I think she's a secretary,

10   paralegal there.

11        Q.    All right.

12        A.    Then I was subsequently contacted by

13   Ms. White.

14        Q.    And what was the stated purpose of your

15   employment?

16        A.    Twofold.  One is, was I already involved?

17   Of course the answer was no.  And then secondly, would

18   I review the items that they have or that they will get

19   to determine, you know, if I can so-called investigate

20   and/or reconstruct it based upon the physical evidence,

21   things of that nature.  And I said I certainly would.

22        Q.    Any other instructions given to you at that

1    time?

2         A.    Other than a file is coming.  I said, "Well

3    send me things like accident report, police

4    photographs, police measurements, any recon crash team

5    reports, things like that."

6              And they said, "We'll send them to you as we

7    get them."

8         Q.    All right.  Now, that segues into my next

9    line of question here.  You brought a bunch of stuff

10   that's in front of you.  I assume that's all your file

11   records, right, for this case?

12        A.    For the most part.  I've got e-mail

13   correspondence.  Normally I don't print those off.

14        Q.    All right.

15        A.    But other than that, that's pretty much --

16   this is pretty much what I've reviewed, considered, and

17   used.

18        Q.    All right.  Tell me what you've got there as

19   far as your file.

20        A.    A lot.  You're welcome to copy it and see

21   it.  Obviously, like a billing record or a time chart

22   that I've been involved.  In no particular order, I've

Case 7:15-cv-00665-GEC   Document 143-13   Filed 11/02/16   Page 11 of 75   Pageid#: 3419

1  got deposition transcripts of, I think, four folks:

2  Mr. Salinas, Roy Salinas; Brandon Lester; Mr. Martinez;

3  Trooper Atkins.  And I believe that's all of the depos

4  that I've reviewed as of today.  That's all I've got.

5              In addition to that, I was sent, I guess, a

6  Complaint, legal information.  I was also sent --

7      Q.    Let me interrupt you.  You said a Complaint

8  and legal information?

9      A.    Well, I call this whole thing legal.  It's

10 written, I guess, by the attorneys, the Complaint and

11 interrogatory, things like that.

12     Q.    Okay.  And that's the Complaint for Brandon

13 Lester's case?

14     A.    It is.

15     Q.    All right.

16     A.    It is.

17             Let me see here.  I also was provided the

18 police crash report, the FR300P.  Trooper Atkins, for

19 the lack of a better word, I guess, his notes from his

20 SP50 pad.  That's like his field notes.  Handwritten

21 notes, I guess, from the four witnesses there that were

22 there at the crash site.  A copy of the CD.  I guess

12

1    it's a video from the cam recorder from -- I understand

2    it's Trooper Atkins' car, patrol car.  An incident

3    history details.  That's when all the troopers and the

4    people of record get calls from dispatch, things of

5    that nature.  I reviewed an incident report from the

6    Commonwealth of Virginia's VDOT.  I think there's a

7    lady there that worked there, was at the rest area.

8          Q.    Who signed that, the lady that you're

9    referring to?

10         A.    Who signed it?

11         Q.    Yes.

12         A.    I've got two signatures, a Susan Campbell

13   and a Wendy Montgomery.

14         Q.    Okay.

15         A.    I've also got -- I guess it's a typed

16   transcript of the four witness interviews.  And I

17   think -- it's my understanding that was taken, I

18   believe, off of the camcorder.  I was provided a number

19   of photographs, and I've put them all together.

20         Q.    All right.  Let me stop you right there.

21   Let me see that.  You're referring to the typed

22   transcript of witness interviews.  May I take a look at

Case 7:15-cv-00665-GEC   Document 143-13   Filed 11/02/16   Page 13 of 75   Pageid#: 3421

13

1   that?

2       A.    Yes, sir.  There's two other things in here

3   that I haven't told you yet.

4       Q.    I'm going to hand this back to you.  The

5   typed-up transcript of witness interviews, they came

6   off of the camcorder of the Trooper Atkins?

7       A.    That's my understanding, yes.

8           In addition to that, I guess initial

9   disclosures.  And that's the best I can explain to you

10  what it is.  Again, legal documents that were provided

11  to me.  I also received a Botetourt General District

12  Court traffic/criminal case details for Mr. Martinez.

13  I guess you might say the transcript of the trial,

14  Botetourt County General Domestic Relations District

15  Court January 25, 2016.

16      Q.    For Martinez's traffic court charges?  Is

17  that what you're talking about?

18      A.    Yes, sir.  He wasn't there, but the trooper,

19  I believe, is the primary person that spoke.

20      Q.    Okay.

21      A.    That testified.

22      Q.    Okay.

14

1      A.    In addition, the motor vehicle record

2  request response from -- I want to say that's Texas, I

3  think.  Then a Texas apportioned licensed cab card.

4      Q.    Wait a minute.  The record request from

5  Texas DMV is for records for what?  Can you tell from

6  that?

7      A.    I really can't tell.  Owner SMC Transport.

8  I guess it's a lienholder and things of that nature.

9      Q.    Okay.

10      A.    The daily driving logs of Mr. Martinez.  The

11  plaintiff's rule initial disclosures.  And then

12  Defendant Martinez's -- again, I guess it's Federal

13  Rules disclosures.  Then defense joint expert witness

14  designation for Mr. Theriault, Kevin Theriault, and his

15  written report.  And then just several sundry e-mail

16  correspondence notes, field notes that I took and made

17  when I was speaking with Ms. White.

18            What else?  Total, if my count is correct,

19  113 photographs taken at the scene of the wreck on

20  I-81, the rest area.  And it's my understanding they

21  were taken by the state police, and I think some of

22  them might have been VDOT photographs.  They show the

1    scene, some of the physical evidence, and shows the

2    damages.

3            I brought a CV of myself plus my testimonies

4    that I've had for the last several years, ten years

5    probably.  My field notes and measurements and

6    calculations, sundry miscellaneous calculations and the

7    basis of where I got these equations, I guess you might

8    say, and turning radii and things of that nature,

9    stopping distances.

10            I relied on the Code of Virginia 46.2-880.

11   Although I didn't turn to it, I'm well familiar with

12   it.  Copy of my report, preliminary report dated

13   August 11, 2016, I believe.  And I've not amended it or

14   added -- I have not added any addendums to it.  My

15   deposition notice of today.

16            In addition -- I think this is all I've got.

17   In addition, I've got a -- I don't have it, but I gave

18   it to Ms. White.  It was an aerial photograph, aerial

19   picture of the crash site that was taken, I want to

20   say, in 2008, I believe.  It shows again, the ramp,

21   off-ramp, the main line.  It shows the rest area over

22   to the right.

Case 7:15-cv-00665-GEC   Document 143-13   Filed 11/02/16   Page 16 of 75   Pageid#: 3424

16

Q.    Well, what is that that you have?  It looks

like an aerial photograph as well.

A.    That's the one I was just referring to.

Q.    I thought you said you gave that to

Ms. Robinson.

A.    I don't have the original.  This is a copy

that I made.  The original's a little bit -- I think

you can make it out a little bit better.

I think I said the DVD.

Q.    Let me ask you.  That aerial photograph --

I'm sorry -- where did you get that from?

A.    Department of Highways and Transportation,

VDOT in Richmond area office.  In addition to a set of

highway construction plan and profile sheets of the

vicinity.  And I've got that -- that was sent to me

electronically, e-mail.  And I copied the sheets that I

felt were germane.

Q.    The aerial photograph that you have there,

the copy that you have in front of you, do you know

when that was taken?

A.    I do.  I believe it was 2008.  And I've got

the scale and things like that in my notes here if you

1  want that.  I think 1 inch equals 75 feet.

2      Q.    And the e-mail construction?

3      A.    They're called VDOT plan and profile

4  construction sheets.  For lack of a better analogy,

5  it's like a -- it's like a blueprint of a building.

6  It's blueprints of the road, how they built the road.

7      Q.    And when were those generated?

8      A.    They were sent to me at my request through

9  VDOT, and they were generated e-mail.  VDOT now has the

10  capability, I think for the last probably eight or ten

11  years.  I'm a dinosaur.  I'd rather have them in my

12  hand.  But on this particular case, I think I was

13  driving back from Roanoke, and I asked the VDOT man to

14  just send it to me, and he did e-mail.  So I said, "All

15  right.  If I have any problems, I'll call you and come

16  down and get a sheet."  And he said okay.

17      Q.    But the plan and profile construction

18  sheets, when were they generated?  Do you know what

19  year --

20      A.    I can look on them.  I want to say they were

21  drawn up -- of course, there's amendments to them --

22  but I want to say the late 1950s, early 1960s.

1    Q.    And the one that you have in your record is

2    not the amended; it's the original one or the 1950s

3    one, or how are you going to describe that?

4    A.    As far as I know, it is the original.

5    Q.    All right.

6    A.    I've got the title sheet with me.  Well,

7    actually a copy of it.  Title sheet, plan sheet, and

8    profile sheets.  And we can get into that in-depth here

9    directly.

10        In addition, I think I said this, but I

11   think I've got the -- in fact, I know I've got the

12   video DVD, I believe, from the police officer.  I

13   suppose just a copy.

14        And then lastly, I've got photographs that I

15   took at the site.  And then I've got photographs, I

16   believe, of Mr. Lester's pickup truck.  I never saw the

17   Hino Shifflett truck, nor did I see the tractor

18   trailers.  And that is pretty much it that I can think

19   of.

20   Q.    Okay.  Anything else other than what you

21   just described that you've reviewed and/or relied on to

22   come to any opinions in this case?

1      A.    No, sir.  That's about it.

2            Now, I did meet with Mr. Lester.  I have to

3    look at my notes to see what date it was.  But the sole

4    purpose of meeting with him was to see his truck.  They

5    gave me all kinds of convoluted directions to get

6    there, and I think it had already been moved.  So

7    finally I said, "Let him call me and meet me."  So he

8    was kind enough to drive, and I followed him about -- I

9    don't know -- 8 or 10 miles into the hollows of

10   Rockbridge County, I reckon.

11           And of course, I met and have spoken

12   numerous times with counsel.

13      Q.    All right.

14      A.    Ms. White.  Again, primarily Johneal White.

15   That's about it.

16      Q.    The sundry e-mails and field notes that you

17   referred to, that's in a stapled stack there?

18      A.    They are.

19      Q.    I'll take a look at that.  Thank you.

20      A.    They may or may not be --

21           MR. DUNN:  You want to take a look at this?

22           MS. ROBINSON:  No.

20

1        THE WITNESS:  -- inclusive.  They're

2   probably hit and miss.  I think that's all that I've

3   got that I printed off.

4   BY MR. DUNN:

5        Q.    Okay.  So you just gave me -- it looks

6   like -- four stapled stacks of e-mails and --

7        A.    Correspondence.

8        Q.    -- correspondence?

9        A.    Right.

10        MR. DUNN:  Can we have this marked as

11   Deposition Exhibit Number 1 altogether.  Is that okay?

12        MS. ROBINSON:  Dave, do you mind releasing

13   them?

14        THE WITNESS:  Yeah.  I'll get my originals

15   back, right?

16        MR. DUNN:  Yes.

17        THE WITNESS:  Absolutely.  I don't care what

18   you do with them.

19        And they're kind of segmented there, so I

20   think -- aren't they?  Yeah.  There's a batch.  There's

21   a batch.  There's three batches.

22        MR. DUNN:  Let's have each batch marked as

Case 7:15-cv-00665-GEC   Document 143-13   Filed 11/02/16   Page 21 of 75   Pageid#: 3429

1    an exhibit.  So Exhibit 1, 2, 3, and 4.

2           (Exhibit Numbers 1-4 marked for

3           identification.)

4           MR. DUNN:  The court reporter's marked these

5    for identification purposes Exhibit 1, 2, 3, and 4.

6    And I'm going to give these back to you.

7           THE WITNESS:  Yes, sir.

8           MR. DUNN:  So they will be in your

9    possession.

10          THE WITNESS:  Thank you, sir.

11    BY MR. DUNN:

12      Q.    And also, Exhibits 1 through 4 include -- I

13    think there are two references, one to field notes and

14    sundry calculations and another reference was sundry

15    e-mails and field notes.  Same thing?

16      A.    No, no.

17      Q.    Okay.

18      A.    My field notes are separate, and that might

19    be another exhibit, should be.

20      Q.    Yeah.

21      A.    That's my field notes, my observations, and

22    sundry calculations.  And I think they're all together.

22

1      Q.    How would you describe Exhibits 1 through 4?

2  Do you call them various e-mails and correspondence?

3      A.    I would.  Yes, sir.

4          MR. DUNN:  And then we'll have this marked

5  as Exhibit 5 as your field notes.

6          THE WITNESS:  I agree.  Yeah, that's fine.

7          In one, like Exhibit 2, that has

8  Mr. Theriault's report that y'all submitted to me.  Or

9  that was submitted to me.  So that's fine.

10         MS. ROBINSON:  I'll look at 1 while you guys

11  are talking.

12         THE WITNESS:  That's a good characterization

13  of them.

14         (Exhibit Number 5 marked for

15         identification.)

16  BY MR. DUNN:

17      Q.    And I noticed that it's stapled.  There are

18  a couple pages that aren't necessarily stapled to this

19  stack.  Is that just because it's coming undone?

20      A.    Well, I was thinking they were all together.

21  You're right.  They came undone.

22      Q.    All right.  But for purposes of Exhibit 5,

23

1    it's -- they should be all one.  And I'm looking around

2    to see if we have a stapler here or something.

3        A.    Hold on.  I can count how many pages are in

4    here.  Thirty-one.  And some of them might be

5    duplicates.

6        Q.    But as far as the number of pages in that

7    Exhibit 5, it's 31 pages?

8        A.    Correct.

9            You have Scotch tape here.  We can put tape

10   on the back of it.  Now these 31 pages are stuck

11   together.  Not the best, but they're stuck together.

12           MR. DUNN:  And the overhead shot that you

13   mentioned earlier, we'll mark that as Exhibit Number 6

14   for identification purposes.  And where would you like

15   to have the exhibit sticker on this?

16           MS. ROBINSON:  Probably on the back.

17           (Exhibit Number 6 marked for

18           identification.)

19           THE WITNESS:  Now, on the back of that, on

20   the original is this sheet here.  It's the little

21   label.  You were asking me earlier the date it was

22   taken and the things of that nature.  So I copied that

1   off of the original.

2          MR. DUNN:  You're referring to a page that

3   is part of Exhibit 5?

4          THE WITNESS:  Correct.

5          MS. ROBINSON:  You can put some identifying

6   language at the top of that page if you want.

7          MR. FRANKL:  Just go ahead and read it for

8   the record.

9          MR. DUNN:  Just says, "Virginia Department

10  of Transportation.  Enclosed scale 1 inch equals

11  75 feet approximately."  And there's some other

12  highlighted notes on here along with a Post-it sticky.

13  The top right-hand corner, parentheses, $34.95,

14  parentheses close.

15         THE WITNESS:  All right.  If you want me to,

16  I can write on there, "On back of original VDOT aerial

17  photograph."  That way you can match it.

18         MR. DUNN:  You can put "On back of Exhibit

19  Number 6."

20         THE WITNESS:  Is that 6?

21         MR. DUNN:  This is 6.

22         THE WITNESS:  Oh, you want me to write all

1    this on the back of that?

2              MS. ROBINSON:  No.  He wants you to --

3              MR. DUNN:  No, no.

4              THE WITNESS:  Oh, I'm sorry.  On back of

5    Number 6.  Got it.  Done.

6    BY MR. DUNN:

7         Q.    And then these particular stack of, I guess,

8    prints of photographs, it's your understanding they're

9    from Virginia State Police and some are from VDOT?

10        A.    That's my understanding, correct.  And I've

11   numbered them in my numbering scheme, I guess you might

12   say.

13        Q.    And how did you do that, just one through

14   whatever?

15        A.    No.  I put them in an order that I could

16   use.  Most of them are -- don't hold me to this.  But

17   most of them, I guess, are -- I guess you might say

18   north of the crash site.  And then I'm kind of walking

19   south.  Or I'm using these in that scheme.  In other

20   words, I wouldn't want a picture of the pickup or the

21   damaged tractor trailer in the middle of these.  I want

22   them some kind of order, again, for me.

Case 7:15-cv-00665-GEC   Document 143-13   Filed 11/02/16   Page 26 of 75   Pageid#: 3434

1    Q.    Okay, all right.  So when you were first

2    employed, what investigation did you do?

3    A.    Oh, my gosh.  When I was first contacted --

4    Q.    And what are you looking at right now?

5    A.    Lack of a better term, I guess it's my time

6    chart.

7    MR. DUNN:  Can we have that marked as

8    Exhibit Number 7.

9    THE WITNESS:  Yeah.  Now, in addition to

10   that, I've got Virginia State Police video cam

11   recorder, where I've noted what I thought were

12   important items in the video next to the numbers that

13   it showed up on my computer.  So those two items are

14   there.

15   MR. DUNN:  Let's have this marked as Exhibit

16   Number 7.

17   (Exhibit Number 7 marked for

18   identification.)

19   BY MR. DUNN:

20   Q.    And what has been marked as Exhibit Number 7

21   for identification purposes you've described as notes

22   of your review of the video camcorder of Virginia State

1    Police officer, just important parts of that?

2         A.    Well, significant points that I felt were

3    important.

4         Q.    Okay.  And that's like page 1 of Exhibit 7.

5         A.    And then page 2 is like a time chart, when I

6    got involved.  I was contacted -- I want to say -- a

7    month ago maybe.  My notes might reflect it.  I think

8    there was maybe a deliberation.  You all were going to

9    meet, I suppose.  And Ms. White called me and said,

10   "Dave, can you add up your hours?"  And I said yeah.

11   So that's why it's kind of in a rough form.  I didn't

12   have a chance to actually type it up.

13        Q.    That's page 2 of Exhibit 7, correct?

14        A.    It is.

15        Q.    All right.  So getting back to my original

16   question.

17        A.    Yes, sir.

18        Q.    When you were employed, what investigation

19   did you do into this matter?

20        A.    Well, on 3/7, I believe, is when I was

21   contacted, a phone call, and then I may have gotten an

22   e-mail.  And then --

1    Q.    March 7th of 2016?

2    A.    2016, yeah.

3         And then on around March the 10th through

4    the 12th, I've got noted here about four hours I read

5    the file materials that were sent to me.  And of course

6    I talked to Ms. White, the plaintiff's attorney.

7         Now, the items that were sent to me, I

8    believe it's enumerated in my correspondence sheet here

9    that came with a letter from -- I believe it was

10   Ms. White.  I can read that to you and tell you what

11   was sent to me.  We haven't enumerated it yet I don't

12   think.  Maybe we have.  It's under Exhibit 1.  And it's

13   probably in the middle of this packet, well, almost

14   three-quarters past the beginning.

15        March the 8th -- and you want me to

16   enumerate what was sent to me and then what I reviewed,

17   I guess, initial?

18   Q.    My question is, what investigation did you

19   do in this matter?  And you're answering it.  And if

20   that is part of your investigation, yes, tell me what

21   you did.

22   A.    Okay.  I was sent, "I am enclosing the

29

1  following materials for your review," and they're noted

2  here number one, two, three, four, five through eight.

3  And they include what we pretty much just discussed:

4  Virginia State Police accident report, field

5  investigation, notes, witness statements, et cetera.

6  VDOT report and photographs, registration information

7  for the SMC vehicle towed received from Texas DMV, cab

8  card from the SMC vehicle, Mr. Salinas' driver -- I

9  guess his driver's logs, a copy of all initial Rule 26

10  disclosures, a copy of the online court records for

11  Mr. Martinez reflecting the charges brought against him

12  in Botetourt County, and then a copy of the transcript

13  dated January the 25th, 2016.

14       Q.    And when did you receive that letter from

15  Ms. White?

16       A.    March the 8th.  And I believe my records

17  indicate from the 10th through the 12th is when I

18  reviewed these items plus the tape, or the DVD, I

19  guess, and the photographs.

20       Q.    All right.  Can you continue on telling me

21  what investigation you did.

22       A.    Absolutely.  On 5/3 -- what is that, April?

1    I'm sorry.  May the 3rd.  I drove out from Richmond to

2    the crash site, and that was the first visit I had

3    there.  And I photographed the scene, made numerous

4    measurements, compared them with the five materials

5    that I had brought with me, and then drove back to

6    Richmond.

7            Then on 5/4 I reviewed these field notes and

8    measurements from my office in Richmond.  Then I

9    believe my next entry is 6/10 this year.  I copied my

10   field notes and my photographs.  I spoke with

11   Ms. White, and then I mailed my items to her.  These

12   are items that I generated myself.

13           Then I believe on 6/17 I contacted VDOT in

14   Richmond because they're the repository, I guess, for

15   aerial photographs and plan sheets, whatnot.  And I

16   ordered the VDOT aerial photograph.  So I drove there,

17   saw what they had, ordered it, paid for it, and then

18   they mailed it U.S. postage to my office.

19       Q.    And you're talking about Exhibit 6, correct?

20       A.    Yes.

21           And then I think July the 30th I reviewed

22   the -- well, let's see.  You want it by -- I guess,

1    chronologically.  On 7/22 --

2         Q.    By the way, you're talking all 2016?

3         A.    Yeah.  Everything I've done is 2016.

4              I read the trooper's deposition.  On

5    July 23rd through the 27th, 2016, I read the other

6    depositions that were sent to me, plus reviewed my file

7    materials that I had.

8              And then on 7 -- my notes may reflect it a

9    little bit more in-depth.  It seems like to me I

10   contacted the state trooper on July the 25th, I

11   believe.  And he was on a tac team, training exercise.

12   And we spoke briefly.  And I said, "I'm coming out to

13   Roanoke because I've got to see the pickup truck and

14   I've got to see the site at night."  I said, "Can we

15   meet?"

16             And he said, "If I'm available, we'll meet."

17   So I said okay.  A couple hours later I think he called

18   and said, "Dave, I've been called to Smyth County.  I

19   can't meet with you."

20             I said, "Good enough."

21             So then the 28th -- July the 28th and July

22   the 29th, I believe, as my notes reflect, I went back

1    out to the accident site.  I first met up with

2    Mr. Lester, saw his pickup truck in Rockbridge County,

3    close to Natural Bridge.  I went to the accident site

4    and again reviewed it, saw it, observed it again during

5    the daylight hours.

6            Then I went to see Ms. White in her office,

7    briefly spoke with Ms. Robinson, Melissa here.  And my

8    intent was kind of twofold on those dates, the 28th and

9    29th.  I wanted to see the site again daytime.  I

10   certainly wanted to see the pickup truck, although it

11   had been moved several times by the time I saw it

12   again.  And then I wanted to see the site at nighttime.

13   That was, in my estimation, most critical and crucial.

14   So I did.  Then I drove back home.

15       Q.    When did you see the site at nighttime?

16       A.    The 28th of July after sunset.  I guess it

17   was about 9:30, 9 o'clock, 9:30.

18       Q.    You're talking about 9:30 p.m. at night of

19   course, right?

20       A.    Correct.  I'm sorry, yes.  It was dark.  And

21   I think I stayed out maybe close to an hour, I would

22   say.

1      Q.    Do you know when the sun set on July 28th --

2      A.    I don't.

3      Q.    -- of 2016?

4      A.    I don't.

5           Then on August the 1st, I came back and

6  reviewed my items.  And then on August the 6th through

7  the 11th, 2016, again I reviewed all the items in my

8  possession -- my photographs, my measurements, the

9  police items, whatnot -- and I wrote my report.  I

10  think it's dated August the 11th, I believe, 2016.

11           And then on I believe it was 9/30,

12  September 30th -- well, maybe a day or two before

13  that -- Ms. White called me and said, "Dave, have you

14  read Mr. Theriault's report?"

15           I said, "I've not."

16           She said, "All right."  She said, "You need

17  to read it."

18           And I had several other items going on.  And

19  I said, "Well, I'm away from my office in Carolina."  I

20  said, "I'll read it when I get back in on that Friday,"

21  which I think was the 30th of September.  At which

22  time, I did read a report and contacted her back via

34

1    phone, I think.

2           And then on 10/7 -- why 10/7?  Oh, that must

3    have been -- that was Friday.  Then I began reading my

4    files in prep for the case.  And that's pretty -- and

5    then I'm here.  That's pretty much it.

6        Q.    All right.  And the 10/7 prep for case,

7    you're talking about prep for deposition?

8        A.    Correct.

9        Q.    So everything done on October 7th was not

10   part of your investigation for this case; it was for

11   preparing and coming and talking to me?

12       A.    Correct.

13       Q.    All right.  Now, going back to your first

14   visit to the accident scene.

15       A.    5/3.

16       Q.    5/3 daylight time.  Do you remember what

17   time of day it was?

18       A.    It was in the afternoon.  Seems like I left

19   Richmond at 11:00-ish, 11:30, somewhere in there.

20   12:00, 1:00.  It was about 3 o'clock, I think.  2:00 to

21   4:00, somewhere in that guideline, that time frame.

22       Q.    Do you remember what kind of weather it was

1  like?

2      A.    Beautiful.  My pictures show it.  Clear,

3  bright, sunny.

4      Q.    All right.  And did you take any

5  measurements at that time?

6      A.    A slew of them, yes.

7      Q.    Tell me what kind of measurements you took

8  on 5/3, 2016.

9      A.    Those measurements are contained in my field

10 sketches under Exhibit Number 5, my Exhibit Number 5,

11 McAllister Exhibit Number 5.  And I don't know how in

12 detailed you want me to do.

13         What I typically do when I go to the scene

14 of a crash, whether it would be this one or an

15 intersection crash or whatnot, I want to get a feel for

16 the road to -- you know, what's there, if it's changed,

17 whatnot.  So I use the police photographs and other

18 photographs to kind of tell me that, well, this is the

19 right site.  You know, the roadway hasn't changed.

20 There's no flyover, no bridge, whatnot.

21         So I get a general observation of it.  I

22 walk around, see if I can see physical evidence both on

1    the road and along the side of the road, the so-called

2    vertical and horizontal design features, construction

3    features of the road.

4            Then I start my measuring that is -- I guess

5    it's pertinent to me.  And I know this is going to

6    sound like Greek to you, but I started on the edge of

7    the -- I guess that's the southbound lane of I-81, the

8    main line, and there is a mile marker sign there,

9    158.1.  That is my reference point.

10        Q.    Is that your northern reference point?

11        A.    In this case it would be the southern --

12        Q.    Southern reference point?

13        A.    -- reference point.

14            So now I've got traffic facing me, which is

15    what I want.  So then I now start walking -- I have a

16    roller tape.  So I start walking -- I guess that's

17    north -- along the edge of the road.  And then I pick

18    out items that I think are important, physical

19    evidence, beginning of the gore, where a sign might be,

20    things of this nature.

21            So I measured that.  I measured all that

22    distance.  I started, again, at 158.1, and I went back

1    as far as -- I believe my notes reflect at mile marker

2    158.3. And my measurements indicate that that's -- I

3    think I'm right -- 1,058 feet walking in a generally

4    northern fashion. And then there's items in between

5    these two points that I pointed out -- or that I could

6    see, and then I noted them.

7    Q.    All right. Let me ask you. Did the

8    Virginia State Police take any measurements of the

9    accident scene?

10    A.    It's my understanding they did not. I think

11    he was asked -- Trooper Atkins was asked that in his

12    deposition, and I don't think he -- he didn't take any.

13    But I don't think the other troopers did. If they did,

14    I don't know of them. I don't have them.

15    Q.    All right. So any measurements that you're

16    relying upon to come to your opinions in this case are

17    in Exhibit Number 5?

18    A.    Correct.

19    Q.    And when you went out there and obtained

20    these measurements and visiting the scene there on

21    May 3rd; is that right?

22    A.    I think that's right.

1        Q.    May 3rd, 2016, did you have any physical

2   findings there?

3        A.    I did.

4        Q.    Okay.  And what were they?

5        A.    I saw no marks in the road.

6        Q.    Saw no marks in the road?

7        A.    I didn't, that I could attribute to this

8   crash.  What I mean by that are tire marks, scuff

9   marks, skid marks or any scrapes or gouges that I could

10  positively point to this crash.  However, I did note a

11  couple furrow marks in the embankment and, of course,

12  the trees and the brush that was kind of banged up and

13  the grass that was banged up by the Lester vehicle and

14  the Shifflett box truck or bread truck.  And I noted

15  where they are in this longitudinal measurement that I

16  employed, that I use.

17       Q.    Any other physical findings other than what

18  you just described in that May 3rd visit?

19       A.    That are related to the crash?  I think

20  that's the only things I saw and noted.

21             Now, I had the photographs that were taken,

22  police photographs, and I could note certain items.

1      For instance, there's a tree that's like a split tree

2      (indicating), and I noted where that was.  I can see

3      that in the photographs.

4              The exact final resting position of both

5      vehicles, Mr. Lester's pickup truck and Mr. Shifflett's

6      bread truck, I may not have isolated exactly where they

7      are, but a vicinity, within several feet of where they

8      came to rest.  Because I don't know -- these marks that

9      are still there when I was there in May of this year, I

10     don't know if they were made by the trucks going in or

11     maybe when they were pulling the trucks out.  Does that

12     make sense?

13         Q.    (Nods head up and down.)

14         A.    Frankly, I don't -- I didn't really care.  I

15     just wanted to note what I -- you know, what I could

16     see, what I saw.

17         Q.    Did you inquire with anybody or the state

18     police whether there had been any other accidents in

19     that area that may have caused the furrow marks or the

20     trees or the bushes to be banged up?

21         A.    Did not.

22         Q.    All right.

1      A.    On page 2 of my field notes, in no

2   particular order, I noted primarily the rest stop, the

3   rest area.  And what I was after here -- actually,

4   maybe two measurements.  I wanted to know from the gore

5   area.  That's the paved portion of -- I think everybody

6   refers to it as a triangle between the off-ramp and the

7   main line.  I measured how far two or three items were

8   located.

9          For instance, what I was after on this

10  particular case is, where is the "do not enter" and

11  "wrong way" signs from that gore area, from the

12  physical gore area.  And I noted those.  And then I

13  noted where the -- there's an island that separates the

14  trucks parking from the cars parking within the area

15  stop.  So I noted, you know, where the beginning of

16  that island was located at.

17     Q.    All right.  Now, the furrow marks that you

18  mentioned earlier that are in the embankment, looking

19  at Exhibit Number 5, can you point to me what you're

20  talking about?

21     A.    I can.  It looks all screwy, but if you go

22  over here to this sign, this mile marker of 158.1,

1    that's my zero.  So now I'm just walking north on the

2    edge of the road.

3        Q.    Okay.

4        A.    And it's hard to see, but this right here is

5    brush, and that's located at -- I can't read it -- 106,

6    I guess it is, feet.

7        Q.    And you're reading from the very top of that

8    Exhibit 5, correct?

9        A.    Correct.  Top left portion.  It goes from

10   top to bottom --

11       Q.    Gotcha.

12       A.    -- in my numbering scheme.

13             Then I've got I think some furrow marks

14   located on --

15             MR. FRANKL:  Would it help you to turn it

16   over so you can see it right way up?

17             THE WITNESS:  It is, but can you follow me?

18   BY MR. DUNN:

19       Q.    I follow you best I can.

20       A.    I noted the first mark -- or the first

21   reference point from my zero point is at 106 feet.

22   That was brush.  That was broken brush, disturbed

42

1    brush.

2    Q.    106 feet which way?

3    A.    North.  Everything I'm giving you now is

4    north.

5    Q.    All right.

6    A.    Then the next mark is 178 feet.  That's

7    where I see a furrow mark going into the earthen berm,

8    which is the earthen gore.

9    Q.    All right.  What are you talking about when

10    you say mark in the brush 106 feet?  What are you

11    talking about?  Is it brush that's been broken or what?

12    A.    Bingo.  It's damaged brush.

13    Q.    Okay.

14    A.    That, I related to where the bread truck

15    came to rest approximately.

16    Let's see.  What else?  There's a split tree

17    very pronounced in my measurements and my photographs,

18    as well as the police measurements.  I noted where that

19    was.  200 and -- I can't read it.  209 feet, I believe

20    it is.

21    Q.    Well, the split tree, does that have

22    anything to do with the accident, or is that just

Case 7:15-cv-00665-GEC   Document 143-13   Filed 11/02/16   Page 43 of 75   Pageid#: 3451

1    something to locate yourself in this area?

2         A.    Both.   A lot of times when I interview

3    troopers and talk to them on the phone and then meet

4    with them, a trooper will say, "Hey, you know, you're

5    not going to believe this" -- I've had it a hundred

6    times -- "I've got some measurements here that I never

7    bothered to give the trooper of record, and right

8    here's a split tree."

9              So that's what I was trying to isolate.  Had

10   these troopers made some of those notations, then I

11   could kind of relate them to what my measurements are.

12        Q.    Okay.

13        A.    Now, as we sit here today, it's my

14   understanding that none were taken.  So what I've got

15   here in Exhibit 5, my field notes, are what I saw, what

16   I observed, and what I measured and then photographed

17   when I was there in May of this year.

18        Q.    But that split tree, that tree wasn't --

19   when you call it a "split tree," it wasn't changed or

20   affected by anything in the crash.  It's just something

21   to locate so you're able to get an idea of where you

22   are in the scene; is that correct?

1      A.    Correct.  When you see that split tree in

2  the state police pictures, you'll know where that is in

3  relationship to these items that I measured.  In other

4  words, if you were to ask me, "Dave, how far is that

5  split tree from the earthen gore?" I can tell you.

6      Q.    All right.

7      A.    Well, now, how far is that pickup truck from

8  that split tree?  Well, I don't know.  You'd have to

9  look at the pictures and then kind of estimate, because

10 those items weren't measured, and they weren't finitely

11 recorded by Trooper Atkins.

12     Q.    All right.  And the other --

13     A.    That I know of.

14     Q.    The other physical finding that you referred

15 to earlier walking north from the broken tree shrubs

16 was the furrow in the embankment, correct?

17     A.    Those are the two items that I saw that was

18 disturbed.

19     Q.    Okay.

20     A.    Now, my pictures, of course, will show that

21 it's much greater than what I -- I can't note every

22 foot.  I'm just noting where I saw a significant

1    idiosyncrasy either on a tree or a bush or the gore

2    area.

3         Q.    Okay.  But the gore area is something

4    that -- is it in your opinion that that was caused

5    by -- something disturbed some dirt there?

6         A.    It's a furrow mark.  It was a trough.  It

7    was a dig mark.

8         Q.    Okay.  From what?

9         A.    Well, in my estimation, there were two of

10   them -- or several of them.  By the pickup truck and

11   then by the bread truck.

12        Q.    Okay, all right.  What other findings going

13   north here?

14        A.    A lot.  I went back to the beginning of

15   the -- let me see.  Went back to the beginning of the

16   painted gore.  That's the V.  That's the triangle.  And

17   that's located at that 570 feet from my reference

18   point.  Then I went back as far as -- oh, let's see

19   what else?  I went back to the mile marker -- where is

20   it?  158.2.  I started at 158.1.  I walked back to mile

21   marker 158.2.  And that's at 588 feet.  You would think

22   it would be 5,200 -- you would think it would be

1    528 feet, but it's not.  And I think that's probably

2    because I went on a curve here, because this roadway is

3    on a curve.  But my diagram won't show that.

4         Q.    How are you making the measurements?  You

5    had a wheel?

6         A.    Had a roller wheel, 2-foot in diameter.  And

7    then when I start with 0, then -- it's a composite.

8    Once I start with 0, then I don't stop it and start

9    over again.  It's from 0 to 5 to 1,058.

10        Q.    Was anybody else out there with you at that

11   particular investigation of the scene?

12        A.    An assistant?  No.

13        Q.    Did anybody assist you with any of your

14   investigation in this accident?

15        A.    No.

16        Q.    All right.

17        A.    Then because I know from the photographs and

18   I know from Trooper Atkins' testimony at the court

19   hearing that Mr. Martinez didn't show up, I knew we had

20   a -- two prohibition signs from going north out the

21   entrance ramp, but I didn't know where they were.  And

22   his pictures really don't show where they are.

1          So I decided I would measure from that gore

2    area how far these signs are located, and I did.  Then

3    I wanted to know where that island was, and I did.  Now

4    why did I do that?  From the pictures -- and again,

5    it's my understanding that Mr. -- that the truck

6    combination, two tractors, was pulled back or backed

7    back.  That's my understanding.  And when these

8    pictures were taken, he's located -- or they are

9    located in the vicinity of that island.  That's all the

10   significance of that is.  It just tells me where that

11   truck was in these pictures.  So that's what I wanted

12   to know.

13          I also got other measurements, and I think

14   these were my odometer measurements.  The traffic was a

15   bear out there.  It's awful busy.  And you kind of take

16   your life in your own hands when you're out there

17   measuring.  That's why I stay on the side of the road

18   as best I can.  So I took my pickup truck, and I

19   measured with the odometer, for instance, the hillcrest

20   to where the rest area off-ramp is located.  And that's

21   about 264 feet.

22      Q.    Now, did you go on the side of the road

1    facing traffic with your vehicle to measure?

2        A.    Oh, no.  Lord, no.

3        Q.    Did you whip around --

4        A.    I turned around.  I went down to 156, I

5    think.

6        Q.    And came back around?

7        A.    Came back around.

8        Q.    And then you're on the side of the road?

9        A.    No.  I'm on the mainland, main line.  And I

10    have an odometer.  And I just punch it, and that tells

11    me, you know, within a tenth of a mile what these

12    measurements are.

13        Q.    All right.

14        A.    But the ones that are more finite, the ones

15    that are more accurate are the ones contained on page 1

16    and 2 of Exhibit 5.  Those weren't done with an

17    odometer.  They were done with a roller tape.

18            All right.  Now, you were asking me the

19    measurements that I took at the scene.  That's the

20    first stab at it.  Do you want me to keep going?

21        Q.    What other measurements did you take at the

22    scene the first time you went there?

1      A.     That's it.

2      Q.     That's it?

3      A.     That's it.  Then they can be matched with my

4  photographs.

5             All right.  Then on 7/28 and 29, 2016, I

6  went back a second time.  And what I wanted to do on

7  that particular occasion primarily is to see it at

8  nighttime after the sun set, after 7 o'clock.  And it

9  was dark.

10     Q.     How long -- excuse me.  I didn't mean to

11  interrupt you, but how long were you at the scene on

12  your first inspection on May 3rd, 2016?

13     A.     Probably two or three hours, I guess.

14     Q.     And how long were you there your second time

15  when you went back on July 28th and 29th?

16     A.     Daytime probably an hour, hour and a half,

17  somewhere in there.  Nighttime, probably an hour.  Both

18  inside the car -- both inside the rest area and in my

19  truck.

20     Q.     Okay.  The second visit, did you take any

21  measurements?

22     A.     I did.

1     Q.     Why did you take additional measurements on

2     your second visit?

3     A.     I just wanted to verify some other

4     measurements.  For instance, for some reason, I failed

5     to note where the broken line started that demarked --

6     that delineates between the off-ramp and the main line.

7     So I wanted to go back and measure what that distance

8     was, which I did.

9     Q.     What are you talking about?  Look at Exhibit

10    Number 6 when you say -- can you point to me just what

11    are you talking about the markings?  Don't write on it

12    of course.

13    A.     Oh, I shan't.

14           Where this truck is -- you have to know this

15    durn truck would be there.  Right here is the beginning

16    of the right turn lane.  Actually, it's a taper.  Okay.

17    You see you've got hashmarks?  That delineates the main

18    line from the off-ramp.  This measurement here I don't

19    think I had when I first went out there, so I wanted to

20    kind of check that again.

21    Q.     You're talking from the gore area to where

22    the hashmarks went to solid white marks?

51

1      A.    Correct.  This right here is a solid line.

2 What that means to motorists is you don't cross that.

3 You don't cross the solid line.  If you want to egress

4 into the off-ramp, you do it where it's delineated by

5 dotted lines, stripes in this case.  So I wanted to

6 know that.  I wanted to know other items.  I wanted to

7 just kind of second-check where this -- some of these

8 signs are you really can't see in this aerial.

9      Q.    The hashmarks there delineating the entrance

10 ramp from the through lanes, are they the same layout

11 configuration there in Exhibit 6 as they are

12 October 26, 2016?

13      A.    Probably not.  This roadway has been

14 repaved.  This photograph here was taken in 2008.  I

15 can gauran-daggon-tee you from 2008 until 2016, eight

16 years, that roadway's been repaved.  In fact, you can

17 see the southbound lanes versus the northbound lanes.

18 See how the southbound lanes are fresh, darker than the

19 northbound lanes?

20      Q.    Okay.

21      A.    So yes, I could get some idea or some

22 approximation by using the scale.  But I had to see it

52

1    at nighttime anyway, so I said, well, heck fire, let's

2    go ahead and just --

3        Q.    Well, the second visit was a daytime visit

4    and a nighttime visit, correct?

5        A.    Both.

6        Q.    All right.  And each was about an hour?

7        A.    Hour, hour and a half, yeah.

8        Q.    Okay.  And you said the second visit you

9    took some measurements.  You talked about from the gore

10   to where that hashmark started for the entrance ramp

11   there.

12       A.    That's correct.

13       Q.    What other measurements did you take on the

14   second visit during the daytime?

15       A.    Well, where the 158.3-mile marker sign is

16   located, where the beginning of the rumble strips are

17   located, where the "rest area" sign to the right of the

18   ramp is located, where the 158.2-mile marker is

19   located.  And that's about it.

20       Q.    And those particular measurements you noted

21   on -- it's on Exhibit Number 5, page number?

22       A.    B as in boy.

53

1    Q.    And that's approximately how many pages deep

2    into this exhibit?

3    A.    One, two, three, four, five, six, seven, I

4    guess.

5    Q.    Okay.  Seven pages.

6         Any other measurements you took on the

7    second visit in the daytime?

8    A.    Yes.  Over on C, page C.

9    Q.    Which is the next page, correct?

10   A.    It is.  And what I didn't have when I went

11   out the first few times was the gradient.  I didn't

12   have the degree of -- I didn't have the percentage of

13   grade.

14   Q.    And what did you find in the measurement

15   there for the gradient?

16   A.    I measured three, I believe.  I measured the

17   downgrade at selected points on the southbound lanes.

18   One, two, three.  Seems like to me I took three

19   specific measurements.  I took a grade at the beginning

20   of the right-turn lane.  Let me show you where that is.

21   If we use Exhibit 6, which is the aerial photograph,

22   about -- I took a downgrade of measurement just about

1   where that truck is located.

2        Q.   Okay.

3        A.   So now if you were to ask me, "Dave, what is

4   the gradient at the beginning of the right-turn lane in

5   the main line?" I've got it.  And that's a half an inch

6   downgrade.  Half an inch rise or fall over an 18-inch

7   or foot and a half level carpenter's level.  And if you

8   want to know what percent grade that is, it's just rise

9   divided by run.  In this case half an inch, .5, divided

10  by 1.5.

11       Q.   What, did you get out on the roadway and put

12  a carpenter's leveler on there?

13       A.   I did.  All the while dodging traffic.

14       Q.   All right.  And that's on your second visit

15  daytime.  Any other measurements second visit daytime?

16       A.   Yeah.  Grade at the 158.2-mile marker sign.

17  And that's at -- that's right at a half an inch.  The

18  earlier -- the one that I took at the beginning of the

19  ramp, that's more than or equal to a half an inch.  In

20  other words, it's just a tad more than a half an inch.

21  At the -- you can't see it in that picture.  But at the

22  mile marker 158.2, I got exactly half an inch.  And

55

1    then I took a third grade, which is at the gore area,

2    which is again down in this area here.  I got a less

3    than equal to a half an inch grade, downgrade.

4            And what all this tells me is that we've got

5    a downgrade of about 2.7, 2.78 percent.  And what that

6    means in engineering terms is for every 100 feet you go

7    out horizontally, you drop 2.7 feet or 2.0 feet.

8        Q.    Any other measurements in the second visit

9    daytime?

10       A.    Yes.  These are not -- these are my

11   observations because I didn't do any measuring on the

12   ground other than in my pickup truck.  And that is what

13   I was -- I wanted to observe the lighting conditions.

14       Q.    I said second visit daytime.

15       A.    No.  I'm sorry.  That's all I did in

16   daytime.

17       Q.    Okay, all right.  And then so you came back

18   at 9:30 p.m. that same day?

19       A.    About.

20       Q.    Well, getting back to your second visit in

21   the daytime, any physical findings other than the

22   measurements we just discussed?

56

1    A.    I think that's it.

2    Q.    And came back 9:30, about 9:30 for a

3  nighttime visit, and what measurements did you take?  I

4  know you're describing that you took them out of your

5  pickup, correct?

6    A.    Yeah.  Yes, sir.

7    Q.    All right.

8    A.    I noted the observations that I saw, that I

9  clearly saw both standing in the rest area, standing in

10  the gore area, walking around that area, and then

11  driving my pickup truck down the road.  And I can read

12  you my observations.

13    Q.    Okay.

14    A.    Not in any particular order, but

15  observations -- and I wrote this that night.  I had my

16  light on.  Not safe to do.  Observations: Dark road.

17  That stuck out quite a bit.  Next entry: No,

18  underlined, light beams from rest area shine on the

19  main westbound lanes.  Next entry: Reflector buttons

20  are on the guardrail, and the center line delineators

21  are located in the center of the road.

22    Q.    Reflector buttons are what?

1      A.    Yeah.  Reflector buttons are delineators.

2      Q.    Okay.

3      A.    They're little -- they're like little points

4   of light.

5      Q.    Well, wait a minute.  If they're reflector

6   buttons, they reflect the light, correct?

7      A.    Exactly.

8      Q.    And what are they, little circles or

9   squares?

10      A.    Little squares.

11      Q.    And what are the dimensions?

12      A.    Oh, I don't know.

13      Q.    Less than an inch, about an inch

14   (indicating)?

15      A.    About that size.

16      Q.    And where did you locate those?

17      A.    Throughout the whole area.

18      Q.    Well, where?

19      A.    Main line.  Along the southbound lanes of

20   I-81 and also going into the entrance ramp.

21      Q.    Is this on the paved portion, on the --

22      A.    On the guardrails and on the pavement,

1    center line, center line delineators that separates the

2    right lane from the left lane.

3           Next entry: White center lines and fog lines

4    bright and highly reflectorized.  Another entry:

5    Numerous big reflectorized highway signs, blue ones,

6    parentheses, at site and approaching site.  Next entry:

7    Can see -- that's what I can see -- two overhead sodium

8    vapor lightbulbs above the parking area.  Then, as you

9    go by gore area, you can see two more lights, overhead

10   lights, that are in the parking area.  Then I have a

11   notation here: They only give off light downward/not

12   outward.

13          Then I noted: Numerous tractor trailers

14   parked there.  What I mean by that, hells bells, they

15   were even on the off-ramp.  Very reminiscent, I guess,

16   of what Mr. Martinez said was there at the time of the

17   wreck.  Then I noted again another notation: Dark road,

18   dark area throughout.

19          Then I noted my observation from my pickup:

20   Sightline limited to the throw distance of the

21   headlamp's beams, which is about 150 feet out on low

22   beams.  How I did that or how I made that particular

1    observation -- it's more observation than

2    measurement -- is how far my beams on my pickup truck

3    would show out to how many center lines I could see,

4    which is pretty standard on low beams has been any

5    experience.  And I think the research has indicated

6    this.

7              And I believe that's all I did that night.

8        Q.    All right.  And you're reading from notes

9    that are on what page of Exhibit 5?  What page is that?

10        A.    One, two, three, four, five, six.  And it's

11    got a big A, circle A on the top of the page.

12        Q.    Okay, all right.  Any other times that you

13    have visited that scene and taken any measurements or

14    had any physical findings that you used to come to your

15    opinions?

16        A.    Yes.  The next day, which was what, the

17    29th, I reckon.  On the 29th of July, I decided to

18    ride, again, through the rest area down the road.  I

19    think I did two drive-bys that particular day.  That

20    was on my way back home to Richmond.  At that time I

21    contacted Mr. David Lane with VDOT, and that's where I

22    asked him -- well, I requested the highway construction

60

1   plan and profile sheets, which I subsequently got,

2   which I've got here.

3           And what I wanted to do with those plan

4   sheets is I wanted to incorporate them or compare them

5   with the measurements that I took out at the site,

6   which I did do.

7       Q.    All right.  July 29th, I guess you called it

8   drive-bys, was that done in the daytime or nighttime?

9       A.    Daytime.

10      Q.    Do you know approximately what time of day?

11      A.    Probably 10, 11 o'clock in the morning.

12      Q.    And did you take any measurements?

13      A.    Did not.  I felt like I had exhausted the

14   measurements that I really wanted or needed at that

15   particular time.  Subsequently, I see now that I should

16   have maybe taken a couple more, which I will do before

17   trial.

18      Q.    All right.  Any physical findings there at

19   the 7/29 daytime visit?

20      A.    Other than just observations that were

21   similar to what I found on the other two occasions that

22   I saw it during daylight hours.

61

1          Q.    Any physical findings associated with the

2    accident itself?

3          A.    No.

4          Q.    And you mentioned that you're telling us

5    that you should have taken some measurements that

6    you're going to take later on?

7          A.    That's right.

8          Q.    What other measurements that you think you

9    should have taken?

10         A.    In my professional opinion, the roadway is

11   dark out there beyond the gore area, in the gore area,

12   and in the main lines of southbound 81.  After reading

13   Mr. Theriault's expert report, I guess, he says that

14   there is lighting that spills out onto the southbound

15   lanes.  I disagree.  But what I want to do now is I

16   want to know how far those light poles are from the

17   main line and how farther from the gore area.

18         Q.    All right.

19         A.    And perhaps how high they are.  They, to me,

20   were relatively short standards, luminaires.  So

21   they're probably 30 to 50 feet tall.

22         Q.    How many lighting fixtures are there in the

62

1    rest area?

2         A.    Interesting.  You've got two that are

3    designed to face -- actually, they kind of hang out.

4    My pictures show them.  Incidentally, they show them

5    because I didn't take them on purpose.

6         Q.    Well, before you get into that, can you just

7    tell me how many lights are there -- light fixtures are

8    there in the rest area?

9         A.    Five.

10        Q.    Okay.  And what type of fixtures are they?

11        A.    They're sodium vapor.  What that means is

12   they're pink, kind of peachy pink.

13        Q.    And they're located on a pole, right?

14        A.    Correct.

15        Q.    And where are they in the rest area; do you

16   know?

17        A.    Well, that's what I said I didn't measure.

18   But my observations and my photographs show some of

19   them.  I'm going to have to -- this is not -- certainly

20   not to scale.  Look at Exhibit 6.  This is the aerial

21   photograph, VDOT photograph.  You can see it as well as

22   I can, I guess.  I'll turn it upside down.  There's a

63

1    pole with a light fixture here, which is next to the

2    truck parking slots.  There's another one, I believe,

3    right there.

4         Q.    Let me just try and describe that.  On

5    Exhibit 6 it looks like there are three trucks that are

6    parked in the trucking rest area that are on the east

7    side of the truck resting area.  Would you agree with

8    that?

9         A.    I would.

10        Q.    And then between -- when I say first, the

11   one that's farthest south in that line, between the

12   first and the second one, it looks like there's one of

13   these light fixtures, correct?

14        A.    It doesn't look like it.  It is.

15        Q.    It is, okay.

16        A.    There it is.  In fact, right there's the

17   shadow.  And the second one is harder to look at and to

18   find, but right here is the shadow.

19        Q.    So it's near the third tractor on the east

20   side of the rest area, correct?

21        A.    Correct.  So those are the two that I saw

22   that are closest to the main line.

64

1     Q.     Is that what you saw on July 29th, 2016, or

2  28th?

3     A.     Twenty-eighth, I believe, 28th.

4     Q.     Okay.  Where are the other light fixtures?

5     A.     Well, we've got one -- I believe one located

6  right here between the two cars positioned in the car

7  parking lot.

8     Q.     Okay.  Looks like two light-colored cars

9  because it looks like there's more than two cars

10  positioned there.

11     A.     Correct.  It looks like to me it's

12  positioned between the two cars.

13     Q.     Two light ones, okay.

14     A.     And I believe that's the light standard

15  there.  There's a fourth one up in this area, but I

16  can't see it in this picture.  And then the fifth and

17  last --

18     Q.     And the fourth one is in -- looks like the

19  parking spaces in front of the rest area building,

20  correct?

21     A.     Correct.

22     Q.     Okay.

1      A.    And then it seems like to me there was one

2  behind the actual physical location of the building

3  itself.

4      Q.    Kind of south of the physical building?

5      A.    South --

6      Q.    Southeast?

7      A.    Southwest, I guess.

8      Q.    Southwest?

9      A.    And these items, when you come around the

10  curve going southbound on I-81 main line -- and I drove

11  it both in the right lane and the left lane -- you can

12  see the points of light.  You can see -- can you see

13  the bulbs?  Yeah.  The answer is yes, you can see the

14  bulbs.  But do the bulbs throw out light on the main

15  line and on the gore area?  The answer is no.

16      Q.    How far away are those two light fixtures

17  that we just discussed for the eastbound tractors from

18  the gore area; do you know?

19      A.    I don't know.  I haven't measured that.

20      Q.    That's what you want to do later on; is that

21  what you said?

22      A.    I do.  Because I anticipate testifying to

1    that.

2         Q.    Okay.

3         A.    Now, as I told Ms. Robinson earlier or

4    whenever I was there with her -- of course I had my

5    camera, 35 -- actually, digital 35-millimeter, you

6    know, camera.  And I also had a video camera.  It's

7    been my experience that if you take pictures at

8    nighttime, the film -- not the film -- but the camera

9    and the video -- of course, I'm old school, so I do

10   have a video camera -- they enhance the visibility.  In

11   other words, if I took pictures at nighttime, you would

12   see better than what the human eye could see.  In other

13   words, it would be another fly in the ointment of this

14   case.  So that's why I chose not to do that.

15        Q.    And you didn't have a light meter with you

16   at all when you were out at these inspections, did you?

17        A.    Did not.  I wouldn't -- it wouldn't be of

18   any good because you couldn't read it.

19        Q.    Why is that?

20        A.    There's not -- there's insufficient light to

21   go out to the road.

22        Q.    But you didn't take light meter with you and

1    try to measure the lighting?

2        A.    No, no.  That's obscure in and of itself.

3        Q.    Let's switch gears a little bit here.  And

4    let me ask you, what are the opinions you're going to

5    be offering in this case?

6        A.    With exception of one, perhaps, that we just

7    spoke about, would be contained in my report dated

8    August 11, I think.  One, two, three, four, five, six,

9    seven, eight, nine, ten.  My accident investigation and

10   reconstruction conclusions, if allowed to testify to,

11   would be contained on page 10, 11, 12, 13, and 14.  And

12   they are Items 1 through 9.

13       Q.    Okay.  Can we make that -- is that a part of

14   one of the exhibits already, that report you're just

15   referring to?

16       A.    It is not.  But I'm sure you all have got a

17   copy.

18            MR. DUNN:  Let's make this -- Exhibit

19   Number 7?

20            THE COURT REPORTER:  Eight.

21            (Exhibit Number 8 marked for

22            identification.)

BY MR. DUNN:

Q.    Okay.  It's been marked as Exhibit 8 as the report you just referred to.  By the way, it's got all sorts of -- it's got, I guess, a fax cover sheet on it along with a --

A.    Postage.

Q.    -- post office receipt or invoice?

A.    Yes, sir.

Q.    Are you going to offer an opinion as to what you believe where the initial impact between the Martinez tractor and the Lester pickup occurred?

A.    I can -- based upon the physical evidence that I've seen in the photograph that the trooper took, a vicinity.  I don't think anybody can pinpoint exactly where the first impact point is.  But the area of impact, the answer is yes.  And that is out --

Q.    Wait a minute.  All right.  So the answer is yes.  And what is the opinion?

A.    I think this is contained in Item Number 1 of my conclusions, which obviously are my opinions.  If you don't mind me reading it, specifically the first impact occurred near the center of two southbound lanes

1    of I-81 directly out from the paved gore area.

2        Q.    All right.  And that's your opinion as to

3    where you believe the initial impact between the

4    Martinez tractor and the Lester pickup occurred?

5        A.    I do.

6        Q.    And can you state whether the first impact

7    between the Martinez tractor and the Lester impact --

8    Lester pickup occurred in the right lane or the left

9    lane or a combination?

10       A.    Combination.  In other words, the left side

11   of the Lester vehicle would be over in the left lane

12   barely, and its whole right side would be pretty much

13   in the center of the right lane.  That's where I think

14   the first harmful event occurred.

15       Q.    So left side Lester vehicle in right lane or

16   left lane?

17       A.    Left lane.  If I said right, I mean left.

18       Q.    And the right side of the Lester vehicle in

19   the right lane?

20       A.    Correct.  Actually, just over into the right

21   lane.

22       Q.    And how do you come to that conclusion?

1        A.    We have pre-impact skid marks, skid and

2    scuff marks.

3        Q.    Where do you get those pre-impact skid marks

4    or scuff marks?  Where do you find those?  You didn't

5    see it when you went out there to look at the scene.

6        A.    Photographs.

7        Q.    Photographs of?

8        A.    From the trooper.  My understanding, the

9    trooper.

10       Q.    Why don't you pick out those particular

11   photographs you're relying on to come up with this

12   opinion that we just talked about.

13       A.    There's several.

14       Q.    Go ahead and pick out what you used to come

15   up with your opinion on where the initial impact

16   between the Martinez tractor and the Lester pickup

17   occurred.

18       A.    I shall.

19       Q.    And right now just go through the

20   photographs and pull them out.  You don't have to

21   comment right now, but just pull those out.

22            MR. DUNN:  Let's have these marked as

71

1    Deposition Exhibit Numbers 9 through whatever.  Looks

2    like six color prints of photographs.

3             MR. HEARN:  Did you say 9 through 16 or 9

4    through --

5             MR. DUNN:  Nine through 15.

6             (Exhibit Numbers 9-14 marked for

7             identification.)

8    BY MR. DUNN:

9        Q.    And for the record, we've had marked for

10   identification purposes Exhibits 9 through 14.  And

11   these are the photographs that you used to come up with

12   your opinion concerning where the initial impact

13   between the Martinez tractor and the Lester pickup

14   occurred, correct?

15       A.    In the area of impact, that's correct.

16       Q.    Area of impact.

17             Did you rely on anything else to arrive at

18   an opinion concerning the area of the impact where the

19   Martinez tractor and the Lester pickup came in contact,

20   initial contact?

21       A.    From physical evidence, no.

22       Q.    No other physical evidence, all right.

1          So why don't you explain to me by using

2    those photographs and just point out what in those

3    photographs led you to this conclusion.

4          A.    All right.  On Exhibit Number 9 --

5          Q.    Let me get behind you here.

6          A.    I apologize.

7          Q.    That's all right.

8          A.    Remember I said earlier that I put them in

9    an order that this is for me that I can work with.  In

10   this particular case, I started from the photographs

11   that were taken the farthest back -- in this case

12   north -- of the area of impact, the hostile event.  As

13   far as I know, these are the only photographs that we

14   have that are -- this is the furthest shot, Number 9,

15   looking south.  This is the furthest shot taken north

16   looking south.

17          What we've got here are clearly discernable

18   skids.  And I think it's from the Lester pickup truck.

19          Q.    And this is Exhibit 9, correct?

20          A.    Exhibit 9.  You can see where they're

21   located at this point.  Barely into the right lane for

22   the right side tires, pretty much in the middle of the

1    left side or the left lane southbound.

2         Q.    And you believe these are the Lester tires

3    that made this?

4         A.    I do.

5               And if you look at this, you see something

6    very conspicuous.  You'll see very -- they're straight.

7    They're relatively straight.  There's no off-tracking.

8    There's no idiosyncrasy.  They're just like white lines

9    or straight edge median line or edge line or fog line.

10   They're continuous, and they're consistent.

11        Q.    You mean they're equally apart, or do you

12   know?

13        A.    That's correct.

14        Q.    Can you tell?

15        A.    That's correct.  That's a way of describing

16   it.

17               All right.  In Item Number 10, I believe

18   we're a little bit further south.  How far, I'm not

19   really certain because I -- you can't see this shot

20   in 10 that's in 9.  At least I can't.  So this Item

21   Number 10 is a little bit further south.

22               Now, you start seeing the remnants of --

1  something pops out.  Notice in 9 how they're

2  consistent; they're the same.  But right in here

3  there's something not quite right.  It changes.

4      Q.    You mean it breaks up the skid mark is what

5  you're talking about?

6      A.    Yeah.  There's something there that we don't

7  have here.

8           Now, this is what is important about

9  dynamics of a vehicle that's sliding.  A truck or a car

10  or a motorcycle or bicycle -- you pick it -- when a

11  vehicle is sliding, you cannot change its direction of

12  travel unless you take your foot off the brake, and

13  then you won't have a skid mark anymore.  The only time

14  that would change in this case lateral movement of a

15  skidding vehicle is if you go back, I think, to

16  Newton's second principle of motion.  That is, if

17  you're acted upon by external force, that will change

18  it.  That will cause some idiosyncrasy to change in

19  appearance.

20      Q.    Now can we mark on Exhibit 10 the appearance

21  change and I guess in the skid marks that you're

22  talking about?