1      A.    I'll point out to it.  I'm not going to mark

2   on that picture.

3      Q.    Well, let me see if I can get a copy of

4   this.

5      A.    Well, can't you see right there where it's

6   different?

7      Q.    I know.  But for the record, it's easier.

8      A.    Oh, I'm sorry.

9            Well, I tell you what, if we keep going, you

10  see even better.

11     Q.    How about this?  Does this look like another

12  print-off of Exhibit Number 10 photograph?

13     A.    Yes, sir.  I believe it is.

14           MR. DUNN:  Okay.  Let's have this marked as

15  Exhibit Number 15, this extra copy of our extra print

16  of the photograph that's Exhibit Number 10.  Let's have

17  that marked as 15.

18           (Exhibit Number 15 marked for

19           identification.)

20  BY MR. DUNN:

21     Q.    Okay.  So if you can look at what's been

22  marked for identification purposes as Exhibit 15 and

1    Exhibit 10.  Are they the same photograph?

2         A.    I believe they are.

3         Q.    All right.  And you were talking about some

4    disruption in the skid marks?

5         A.    I am.

6         Q.    And can you circle the disruption you're

7    talking about on Exhibit 15.

8         A.    (Witness complies.)

9         Q.    All right.  And what is your -- what is the

10   significance of that skid mark interruption there that

11   you circled on Exhibit 15?

12        A.    That tells me that something happened there.

13   Something -- what, are we back on 10?  Or 15, okay.

14   That tells me that something unique has happened to

15   that pickup truck.  In other words, it's sliding

16   relatively straight.  Now, it's arching somewhat, but

17   the front tire and the rear tires are tracking on top

18   of each other.

19        Q.    What could cause that to happen?

20        A.    In this case no doubt about it: impact.  Why

21   do I say that --

22        Q.    Between what and what?

1    A.    Between the Martinez tractor trailer, the

2  front of the truck, and the side right front corner of

3  the pickup truck.

4    Q.    Could there be a disruption of skid marks

5  from someone applying the brakes and taking off the

6  brakes?

7    A.    In this case, no.  And the reason being is

8  because you don't have a disruption in what we call the

9  skid tread.

10    Q.    Do you know whether the Lester pickup has

11  brakes that -- the traditional brakes or the antilock

12  breaks?

13    A.    Don't know.

14    Q.    Would that make a difference in this case?

15    A.    Not in this case, no, because the skid marks

16  are continuous.

17    Q.    All right.  And so what does that tell

18  you -- as far as using that to refer to tell me where

19  the vicinity where the impact between the Martinez

20  tractor and the Lester pickup, what is that telling

21  you?

22    A.    It tells me some external hostile event

78

1   occurred between -- what you would have to do now is

2   look at the damaged portion of the pickup truck and the

3   damaged portion of the tractor trailer.

4        Q.   Did you do that?

5        A.   I did.

6        Q.   And what did that tell you?

7        A.   It tells me that the impact, initial impact

8   was on the right front corner of the Lester pickup to

9   the center left corner front of the Martinez truck.  In

10  other words, the vehicles in relationship to each other

11  would sort of be broadside (indicating).  Not exactly

12  broadside, but they would be at some angle to one

13  another to have a contact point, to have a signature, a

14  print, showing the damages on both vehicles.  As I've

15  demonstrated here --

16       Q.   Okay.  You just pulled out a model pickup

17  truck and your glasses case.  Are you saying it's in

18  your opinion that the Martinez tractor was west of the

19  Lester pickup at the initial impact?

20       A.   West, yes.  It would be to the right.

21  That's correct; that would be west.

22       Q.   To the right -- if you're traveling down

1    I-81 southbound it would be to the right, or west, of

2    the Lester pickup?

3        A.    Correct.

4        Q.    And it would --

5        A.    The way I have it drawn here -- this just

6    shows a 90-degree angle.  If you pivot the vehicles a

7    tad, it's now no longer right angle but acute angle.

8    And again, I'm good, but I'm not that good.  I can't

9    tell you exactly the angle that the vehicles were in,

10   but they're going to be very doggone close to a

11   right-angle collision.  So if we --

12       Q.    Go ahead.

13       A.    So this is the third stage of a collision.

14   The first stage is the pre-impact.  This vehicle here,

15   the Brandon pickup truck, is skidding, and it's

16   skidding relatively straight down the road, down the

17   two lanes.  Good example.  If this right here, if this

18   separation right here was the right and the left lane,

19   right here is what we've got, more like that

20   (indicating).

21       Q.    All right.

22       A.    Now -- let me finish.  When this truck is

1    sliding on its own -- we can clearly see that from the

2    photographs -- that pickup truck is unable -- it can't

3    go laterally at all while it's sliding.  Why is that?

4    You can sit in the truck and turn your steering wheel

5    all day long.  Will your steering wheel turn?  Yeah.

6    Will your tires turn?  Yeah.  Is your truck going to go

7    to the left or the right?  The answer is no.  Why is

8    that?  It's just like ice.  When a car's sliding on

9    ice, it can't go to the left, can't go to the right,

10   unless we have an external force, which is clearly what

11   we've got here.

12           And the external force was the contact or

13   impact or collision, whatever term you want to use.

14   But something happened here to cause the Lester pickup

15   truck now to deviate.  And when it deviates, when it

16   starts to change its momentum and its direction and its

17   vector, you can see that in the tire marks.

18           Now, what I would have loved for the

19   troopers to do is have the crash scene come out here

20   and say, I know exactly where that is in relationship

21   to the edge line.  I know exactly where that is in

22   relationship to the gore area.  I know exactly where

1    that is -- now that you all brought it up -- from that

2    light over here in the parking lot.  But we don't have

3    those measurements.

4        Q.    But you can state -- it's your opinion that

5    the Lester pickup, at least a portion of it, was in the

6    right-hand southbound lane upon initial impact,

7    correct?

8        A.    Correct.

9        Q.    And you can state in your opinion --

10       A.    And again, very -- not much based upon these

11   pictures.

12       Q.    All right.  But you can also state in your

13   opinion that the Martinez tractor was not in the

14   left-hand lane of the southbound traffic at initial

15   impact, correct?

16       A.    No.  You're talking about the left lane?

17       Q.    Correct.

18       A.    Through lane?

19       Q.    Yes.

20       A.    No.

21       Q.    Is that no, you agree with me, that your

22   opinion is that the Martinez tractor was not in the

82

1    left-hand through lane on initial impact with the

2    Lester pickup?

3        A.    That's correct.

4        Q.    Okay.

5        A.    That's correct.

6        Q.    You just can't pinpoint it any more than

7    that?

8        A.    No.  You could measure the center lines

9    here.  I don't think I measured the width.  But

10   Botetourt County, that's going to use mountain

11   markings, so that's going to be wider than we use in

12   Richmond.  So these are probably 5-inch wide center

13   lines.  So if you know it's 5 inches wide -- and we're

14   talking lateral, not longitudinal -- then you can

15   approximate where in this case the right side skid

16   marks are when you have the deviation, which looks like

17   to me it's, by gosh, right at the edge of that white

18   line, which would be right on the extreme edge of the

19   left lane, the left -- I'm sorry -- the right through

20   lane of I-81.

21        Q.    Can you -- do you have an opinion whether

22   the Martinez tractor was moving forward, at a stop, or

83

1   going backwards at the time of the initial impact with

2   the Lester pickup?

3       A.    Don't know.

4       Q.    All right.

5       A.    I've heard accounts of moving, stopped.

6       Q.    All right.  All right.

7       A.    From a physical evidence standpoint, I can't

8   tell you.

9       Q.    I'm just asking what you can opine.

10          And describing the first impact between the

11  Lester -- the initial impact between the Lester vehicle

12  and the Martinez tractor, how would you compare that

13  with the impact of the bread truck with the Lester

14  pickup?  Same degree of impact?

15      A.    Oh, lord, no.

16      Q.    Lesser impact?

17      A.    Lord, no.  Let's forget the rollover.  This

18  Lester pickup truck --

19      Q.    I'm just talking about the initial impact.

20      A.    That's what I was going to say.

21  Eliminate --

22      Q.    How would you compare the two initial

1   impacts?

2       A.    You've got two contact damages on this

3   truck, Lester truck.  You've got an impact on -- my

4   notes reflect it, the measurements, whatnot.  You've

5   got impact damage -- using my model here, I reckon.

6       Q.    Go ahead.

7       A.    On the right front corner bumper, fender,

8   which crunched, lack of a better word, which deformed

9   the right front portion of the truck and the fender,

10  drove that back.  And then, of course, at the same

11  time, tore away, deformed, indented the left front

12  corner and bumper -- front of bumper of the much

13  harder, more rigid tractor trailer.  Tractor in this

14  case.  So that's our first impact point.

15          Can I assign a speed?  The answer is no.

16  Can I assign energy equations or kinetic energy,

17  foot-pound-second?  The answer is no.

18      Q.    I'm just asking you to compare the initial

19  impact between the Martinez tractor and the Lester

20  pickup and compare it within the initial impact between

21  the Lester pickup and the bread truck.

22      A.    I am.  First impact, Martinez and Lester

1    truck is significant.  It's significant because it

2    damages; it deforms it.  The vehicle then is burning

3    off speed as it rotates around and is thrown out

4    partially into the left lane, setting it pretty much

5    broadside to the second, much more hostile impact --

6        Q.    Okay.

7        A.    -- with the front of the bread truck.

8        Q.    That's all I'm asking is to compare those

9    two.

10       A.    Significant and hostile.

11       Q.    Okay.  You mentioned that the -- it looked

12   like with the models you were saying that the Lester

13   pickup upon first impact with the Martinez tractor,

14   that the back wheels started to turn, rotate clockwise?

15       A.    Correct.  Well, not only the back tires.

16   The whole truck's rotating.

17       Q.    Where's that on the skid marks from

18   McAllister 15 or 10?

19       A.    You don't see them.

20       Q.    Why is that?

21       A.    It could be a component of the way the

22   picture is taken.  The trooper didn't take -- he didn't

Case 7:15-cv-00665-GEC   Document 143-14   Filed 11/02/16   Page 11 of 75   Pageid#: 3494

1    take pictures at 0 and then 10 and then 20 and 30.  He

2    just took random shots.  So we don't see the movement

3    of the pickup truck when it was out to the left.  Could

4    be the rear end could have left the ground, meaning the

5    bread and pickup truck.  Chances are it just slid

6    around but didn't leave a discernible scuff mark, side

7    scuff mark.

8         Q.    Well, Exhibit 10 or Exhibit 15, it looks

9    like there are only two tracks for skid marks, correct?

10        A.    What number again?

11        Q.    Either 15 or 10.  It's the same photo.

12        A.    Ten.  Well, 10 shows the pre-impact skidding

13    from the Brandon pickup truck.

14        Q.    But it also shows skid marks after what you

15    say is the disruption skid mark.

16        A.    It shows the collision skid mark.

17        Q.    Well, where are the skid marks showing the

18    Lester pickup rotating?

19        A.    Like I said, you don't see them because of

20    how these pictures were taken.  Second, you don't have

21    them because there's a possibility the rear end

22    actually came off the ground.

1    Q.    All right.  If the rear end didn't come off

2  the ground, the rear wheels didn't come off the ground

3  with the initial impact with the Martinez tractor,

4  would you expect to see skid marks on the road?

5    A.    No.  Because no longer do you have skids.

6  You have scuffs; you have a side scuff.  A side scuff

7  is much more -- it's a lower threshold, lower

8  coefficient friction, lower drag factor, adhesion

9  qualities than a skidding tire.

10   Q.    All right.  What about the other photographs

11 that you picked out, 9 through 14, what in those

12 photographs led you to the opinions concerning where

13 the initial impact area was for the Lester pickup and

14 the Martinez tractor?

15   A.    A good example would be 11 and 12.  Do you

16 see how the camera here, the flash picked up the skids

17 here?

18   Q.    And you're talking about 12, correct?

19   A.    In 12.  But for some reason you don't see

20 them in 11.

21   Q.    Okay.

22   A.    Well, they're there.  You don't see them

88

1    there, but they're there.  And that's a component of

2    the flash, the strobe.  What's down here, I don't know.

3    I can't see.

4         Q.    I'm asking you to tell me -- and you picked

5    out 9 through 14 as a basis for coming to your opinion

6    about where the initial impact area was.  What about

7    9 through 14 that you haven't talked about already?

8         A.    Well, 13 is just a closer shot of 12.  It

9    shows the off-tracking here.  It shows something

10   hostile happened here.  See this it's like a hockey

11   stick?

12        Q.    You're looking at Number 13 now, correct?

13        A.    I am.

14        Q.    In the upper right-hand corner of 13,

15   correct?  You're pointing to the skidded mark on the

16   right-hand side, far right-hand side in the upper

17   right-hand corner, correct?

18        A.    Right.  That, in my estimation, is a

19   combination skid mark/scuff mark/collision scrub.  See

20   how abrupt it is.  If you put a pen right there, it's

21   fairly straight, and then all of a sudden, voilà.

22   Something's happening here.  Something, in my

Case 7:15-cv-00665-GEC   Document 143-14   Filed 11/02/16   Page 14 of 75   Pageid#: 3497

1    estimation, in my --

2        Q.    Where's the contact in 13?  Is it up in the

3    top portion, or is it down in the middle portion, or do

4    you know?

5        A.    I've just explained it to you.

6        Q.    I'm sorry.  I misunderstood you.

7        A.    If you can -- the contact is over these

8    tires.  That's where the impact is occurring.

9        Q.    And how do you know that?

10       A.    Because you have an off-tracking.

11       Q.    Which means what, two different skid marks

12   there?

13       A.    Well, that's right.  One's tracking no

14   longer on top of the other as we have in Item 9.

15       Q.    And that's, in your opinion, where the

16   initial impact between the Lester pickup and the

17   Martinez tractor occurred?

18       A.    Area of impact.  And you see as it goes on

19   around, it comes around further as in 14, I think I

20   picked out.

21       Q.    Well, is Exhibit 14 showing any part --

22   strike that.

1          Looking at Exhibit 12 again.  This is the

2    area that you say is the area where the first impact

3    occurred between the Martinez tractor and the Lester

4    pickup, correct?

5          A.    Yes, sir.  It's in that vicinity.  It's in

6    that area.  It could be a foot to the left, a foot to

7    the right, a foot north, and a foot south.

8          Q.    Can you tell from Exhibit 12 what direction

9    the Lester pickup was going at that time of impact?

10   Was it heading straight down the road?  Was it making a

11   lane change?  Was it going to the left or right or

12   straight?  Do you know?

13         A.    I can.  Based upon the placement of the

14   skids, it appears to me that it's fairly straight.

15   Now, it's --

16         Q.    You're talking about Exhibit 12 by the way,

17   right?

18         A.    Correct.  But now it's at an angle somewhat

19   to the road.  In other words, it's not -- it's not

20   perp -- it's not parallel; it's not directly going

21   straight, but there is a component of angle.  Hence,

22   the distance between -- this right here is a seam.

Case 7:15-cv-00665-GEC   Document 143-14   Filed 11/02/16   Page 16 of 75   Pageid#: 3499

1    It's a pavement seam where they put down one layer of

2    payment, then come in and put another layer of payment.

3    Notice -- now, again, the perspective.  You see how far

4    it is here and how close it is there.

5        Q.    Looks like it's getting closer as you go

6    down the road.

7        A.    It does.

8        Q.    And what does that tell you?

9        A.    It just tells me that there's movement.

10   There's a lateral component as well as a longitudinal

11   component.

12       Q.    So the pickup before the initial impact is

13   making a lateral movement as well as a horizontal

14   movement, correct?

15       A.    Correct.  Correct.

16       Q.    And the lateral movement in this case with

17   Exhibit 12 is from the right lane to the left lane,

18   correct?

19       A.    Perhaps.  The perspective is somewhat off.

20   You know how you look down a track, railroad tracks.

21   They're wide here, but then they go together half a

22   mile down the road.  That's what we're looking at here.

92

1   This road is narrowing as you look south.  That's going

2   to throw this off somewhat.

3        But what's critical and crucial and very

4   instrumental about these skid marks are that they are

5   straight.  There's no fishtailing.  There's no hard

6   steer to the left, hard steer to the right, because you

7   can't do that when a vehicle's sliding.

8     Q.   And why is, in your opinion, this vehicle

9   sliding?  What made those skid marks?

10     A.   The brakes are applied.  Mr. Lester

11   perceived, saw, and reacted as best he could and

12   slammed on his brakes, causing the wheels to lock up.

13     Q.   So the skid marks are caused by extreme

14   braking, correct?

15     A.   Well, braking, yeah.  Locked-up wheels.

16     Q.   All right.

17     A.   These are smears.  This is asphalt.  This is

18   a bituminous surface, which means it's tar.  When you

19   slam on your brakes, the wheels lock up, and there's

20   tremendous friction built up, and you're actually

21   melting the bituminous compound or, in this case, the

22   tar underneath the pavement.

93

1     Q.     And you're talking about Exhibit 13, the one

2  you're pointing at right now?  Or Exhibit 12?

3     A.     Well, all of them.  They're all the same

4  thing.  When a man or a woman slams on his brakes or

5  her brakes, their brakes, the car or the vehicle --

6  let's forget air brakes, hydraulic brakes.  The vehicle

7  will travel somewhat in the same direction, but it

8  won't leave any skid marks initially, and that's

9  because you don't have the friction built up.  Then

10  after a short time, depending on the speed you're

11  going, the brakes will then start to -- the tires will

12  then start to smear on the road surface causing skid

13  marks, and that's what we've got here.  In this case,

14  we've got pre-impact skids; then we've got post-impact

15  skid/scuff marks.

16     Q.     Would making an emergency maneuver, whether

17  it's a steering maneuver or braking maneuver or both,

18  would that cause skid marks to change from going

19  straight and constant?

20     A.     The answer is no.  Like I said earlier about

21  ice, once you have your brakes locked and your

22  vehicle's skidding, you can turn your steering wheel

Case 7:15-cv-00665-GEC   Document 143-14   Filed 11/02/16   Page 19 of 75   Pageid#: 3502

1    all day long, and the steering wheel will turn, the

2    wheels on the steering axle will turn, but the vehicle

3    is still going in the direction of the skid.

4        Q.    Do you have an opinion whether -- how fast

5    the Lester pickup was going at the initial impact with

6    the Martinez tractor?

7        A.    From a scientific calculation, the answer is

8    no.  I can only refer back to what he thought he was

9    traveling.

10        Q.    Okay.  Do you know what the drag factor is

11    on that particular portion of the highway?

12        A.    I know approximation.

13        Q.    What's the approximation?

14        A.    About a .70 minus the downgrade.

15        Q.    And how did you arrive at the .70

16    approximation?

17        A.    I helped write 46.2-880, Code of Virginia.

18    I bet I've tested 5,000 highways, rodeways in the

19    commonwealth and other states.  If it's a good, clean,

20    free of debris, dry roadway surface -- asphalt now, not

21    concrete -- that figure, that magical figure, that

22    calculated figure comes up to about a .70.  That's what

1    we wrote the code section for.  Before it was changed

2    in 2000, I want to say the drag factor was something

3    like a .75, which we don't make roads that good in

4    Virginia, asphalt.

5         Q.    You didn't -- you met with Mr. Lester,

6    correct?

7         A.    Yes.

8         Q.    You didn't test him for reaction-perception

9    times, did you?

10        A.    Did not.

11        Q.    You've done that with other cases, haven't

12    you?

13        A.    I have.

14        Q.    About how many?

15        A.    Where I've actually tested a driver?

16        Q.    Yeah.

17        A.    Not many.  Maybe a half a dozen.  And

18    there's a method of doing it, obviously.

19        Q.    Anytime you have a sight distance of more

20    than a thousand feet, in your line of business, it's

21    referred to as, quote, "unlimited," end quote?

22        A.    Correct.

Case 7:15-cv-00665-GEC   Document 143-14   Filed 11/02/16   Page 21 of 75   Pageid#: 3504

1      Q.      Correct?

2      A.      Correct.

3      Q.      And you say you didn't examine the Martinez

4   tractor that was involved in this accident, did you?

5      A.      Did not.  I only saw the pictures that were

6   provided here.

7      Q.      Pictures provided by Virginia State Police

8   and the VDOT?

9      A.      Correct.

10     Q.      Did you see any other pictures of the

11  Martinez tractor?

12     A.      I have not.

13     Q.      You said that there's some black paint

14  transfers, or striations from the tractor are evident

15  on the corner of the pickup in your report.  What are

16  you referring to?

17     A.      If you look at the front of Mr. Lester's

18  pickup truck, you'll see that there's defamation and

19  paint transfers and scrapes.  If you go to the

20  pictures -- of course, I saw that particular vehicle in

21  person and measured and photographed it and observed

22  it.  If you compare that, the damage, to the so-called

1    footprint damage to the Martinez truck -- it was a

2    black truck; it had a black bumper on it -- you could

3    see those transfer damages.  You could see where

4    Point A struck Point B.

5         Q.    When you say "paint transfer" on the Lester

6    pickup, you're not sure whether it's paint or rubber

7    from a pickup -- from a bumper or what?

8         A.    I don't know.

9         Q.    You don't know whether it's black paint from

10   the metal part of the body of the tractor.  You're not

11   saying that's it?

12        A.    No.  I think it's going to be a hard

13   compound rubber, the bumper is.

14        Q.    Okay.

15        A.    The cover's a very rigid bumper system on a

16   truck, so yeah.  But I'm saying inclusive: paint and/or

17   rubber.

18        Q.    What pictures of the Martinez tractor do you

19   have that you looked at, just out of curiosity?

20        A.    These are the shots, I believe, that were

21   taken by one of the troopers.  Which one, I don't know.

22   I picked out one, two, three, four, five, six pictures

1    that show the damage characteristics on the Martinez

2    truck.

3              MR. DUNN:  Can we have these marked for

4    identification of whatever the next through six,

5    please.

6              (Exhibit Number 16-21 marked for

7              identification.)

8              THE WITNESS:  Since we're talking about the

9    damage, I think you ought to have that one, and I'll

10   explain in a minute.

11             (Exhibit Number 22 marked for

12             identification.)

13   BY MR. DUNN:

14        Q.    Okay.  You just handed me another picture,

15   and it's marked for identification purposes as 22.  Was

16   this taken by the trooper as well?

17        A.    It's my understanding, yes, sir.

18        Q.    Okay, all right.  So Exhibits 16 through 22

19   are the photographs of the Martinez tractor that show

20   you the damage that was done to the Martinez tractor.

21   And no other sources of information about the Martinez

22   truck damage, correct?

1      A.      Correct.  Want me to describe them?

2      Q.      If you want.

3      A.      Because I love it.

4              MS. ROBINSON:  Just wait for a question.

5      Maybe it will speed things along a little bit.

6      BY MR. DUNN:

7      Q.      Looking at those particular photographs,

8      what is that telling you -- as far as the damage, what

9      is that telling you about the accident?

10     A.      I'll answer it starting in ascending order.

11     In McAllister Exhibit 16, that's a further shot taken

12     in this segment, I guess, or series, a little bit

13     further away.  And it shows -- again, it shows some --

14     which is the front of the truck.

15             What you see is some idiosyncrasies from the

16     center of the truck extending over to the left front

17     corner of the truck.  You also see a gaping hole where

18     the -- where the headlamp assembly should be, but it

19     was knocked out.  I believe in the collision.

20             All right.  And the next shot, which is

21     Number 17, is just a closer shot showing the bumper

22     cover, the fender, hood line -- here's the hood line,

Case 7:15-cv-00665-GEC   Document 143-14   Filed 11/02/16   Page 25 of 75   Pageid#: 3508

1    here's the fender -- and the lower cowling of the

2    bumper assembly.  And again, the damage, scuffs or

3    scratches and indentations on the left front corner of

4    the truck.  This is a shot that the strobe didn't go

5    off, the flash didn't go off, so the trooper is

6    apparently using a flashlight to indicate the contact

7    damage.  This is impact damage.

8              And then 19 and 20 show basically the same

9    thing.  They're more closer.  The trooper's shooting

10   Photograph 20, I guess, to get the tag.  But 19 shows

11   again the concentration of damage to the Martinez

12   tractor left front corner.  Now, what I point out to

13   you in 19 is we not only have scratches, but now we

14   have an indentation.  And you can see where the corner

15   is puckered.  In other words, it's bent.  It's bent in.

16   This right here is where the headlamp should be.

17   That's gone.  But that's pushed in.  Of course this is

18   popped out now, this lower portion of the bumper.

19   That's impact with the side of the Lester pickup truck.

20             Photograph 21 is important because, again,

21   it shows that corner area.  It shows defamation,

22   deforming, as you would, of that component on the

1    truck.  Now, that is contact damage.  What do you mean

2    by contact?  That's when one object hits another, a

3    baseball and a bat.  In this case side right front

4    corner of the blue truck, pickup truck, and the

5    Martinez truck.

6              Now, this picture here, what is it, 22?

7    Q.    Which one?

8    A.    This right here.

9    Q.    Twenty-two.

10   A.    This right here is shown to show the side of

11   it.  This is the opposite side.  This is going to be

12   the right front corner.  This is induced damage.  What

13   do you mean by induced?  Induced is secondary damage

14   that is caused by the primary damage, in this case

15   contact damage.  So even though we have damage here

16   from touching, we also have damage on this side showing

17   a pucker, showing a dent, showing a movement.

18             Now, you asked me earlier how could I

19   characterize or how did I figure out the damage pattern

20   from this impact versus the other, the second impact.

21   This kind of gives you some idea that it wasn't, as I

22   would tell my wife, a love tap.  This is not a parking

1  lot impact.  This is not a rear-end stoplight impact.

2  This is a pretty dadgum significant impact.

3       Q.    Exhibit 21, is that a side view of the

4  Martinez tractor?

5       A.    It's a corner shot.

6       Q.    Corner shot?

7       A.    Showing the front and the side.

8       Q.    So it's a picture showing the side of the

9  Martinez tractor?

10      A.    Correct.  Front corner.

11      Q.    All right.  Do you have an opinion whether

12  Mr. Lester was ejected from his pickup during the

13  accident?

14      A.    That's the $64 question.  I honestly don't

15  know.

16      Q.    All right.  Now let's talk a little bit

17  about sight distance.  I understand the sight distance

18  you are stating, that the maximum approaching sight

19  distance over the crest of the hill and around the

20  curve where the Martinez truck was positioned was

21  measured at about 800 feet, correct?

22      A.    That's correct.

1    Q.    And how did you come to that conclusion?

2    A.    When I went to the site, I sited where the

3  "rest area" sign is.  You've got a blue sign in the

4  gore.  I could barely walk under that sign, which is

5  6 feet above the road surface.  I then extended out to

6  the center line of the right southbound lane.  I went

7  back to a distance where I was standing.  Now I'm

8  standing up.

9    Q.    You're outside of the vehicle on the side of

10  the road?

11    A.    I'm sorry?

12    Q.    You say you're standing up.  You're

13  outside -- you're on the side of the road?

14    A.    Oh, yeah.  I'm not doing this inside the

15  car, in my truck.  I'm standing up on the road.

16    Q.    Okay.

17    A.    And I'm sighting the area that I could see

18  to that sign.  I could see over the crest of the hill.

19  I could see around the horizontal curve.

20    Q.    I'm sorry.  What sign are you talking about

21  again?

22    A.    In photograph number -- my Exhibit

1  Number 10, you see a sign that says -- I think it says

2  "exit" or "rest area."  Looks green in that, but it's

3  actually blue.  It's in the gore area.

4       Q.    "Rest area."

5       A.    Correct.

6       Q.    The sign that's up off the ground?

7       A.    Correct.

8       Q.    Do you know how many feet off the ground the

9  bottom is?

10      A.    Well, I'm 6'2" and I walked under it, so the

11  bottom of it's probably 6'2", 6'3", something like

12  that.

13      Q.    Well, you walked under it, so it's got to be

14  higher than 6-foot-2.

15      A.    I'm sorry.  Did I say shorter?  It's higher

16  than that; that's correct.  Again, I'm talking the

17  bottom of it, not the top.

18      Q.    Right.  But do you know what the distance is

19  from the ground to the bottom of it?

20      A.    I'm 6'2".  I walked under it.  It's probably

21  6'3", 6'4".

22      Q.    You didn't take a tape measure and measure

1    it out?

2         A.    Did not, because I don't need to.  The

3    reason I don't need to is I'm not doing a nighttime

4    viability sightline measurment.  I'm doing a daytime

5    approximation of the sightline over the hillcrest,

6    smaller, and around the horizontal curve.

7         Q.    All right.

8         A.    And that measurement that I felt comfortable

9    with was about 800 feet.

10        Q.    Did you walk back from the sign until

11   800 feet and continued to look back, and as long as you

12   could see it, continue walking north?

13        A.    I did.  I did it several times.

14        Q.    And when you hit 800 feet, what happened?

15   You could not see the sign at all, or you started --

16        A.    You couldn't see the bottom of it.

17        Q.    And you were on which side of the road?

18   Were you on the westbound side or the eastbound -- east

19   side when you were walking north?

20        A.    I was in the west side.  I'm not going to

21   the east side.

22        Q.    Okay.

1          A.      That's because the traffic.

2          Q.      And how close were you to the right-hand

3     through lane southbound 81 when you were making the

4     measurement?

5          A.      I was on the edge line, the white edge line.

6          Q.      You were on the white edge line?

7          A.      Correct.

8          Q.      And you weren't on -- I guess is there a

9     median between like the shoulder and where it starts to

10    woods?  Is there a guardrail or something like that?

11         A.      That's on the left side.  That's on the

12    median side.

13         Q.      But on the side that you're on, the west

14    side, there was no guardrail?

15         A.      Well, there is a guardrail to the right.  In

16    fact, my notes reflect it.  My pictures show it.  But

17    that's over on the right side of the shoulder.

18         Q.      Okay.  And you were walking inside of that

19    on the white line?

20         A.      On the white edge line.

21         Q.      White edge line.

22         A.      Correct.  I had to dodge traffic.  That's

1   where that measuring -- that's where the calculation

2   comes from.  Again, about 800 feet.

3        Q.   And you did it which particular visit?  Was

4   it the first visit or second visit?

5        A.   Twice.

6        Q.   You did it twice?

7        A.   Twice.

8        Q.   So you did it on the first and second visit?

9        A.   I did.

10        Q.   Both in the daytime?

11        A.   Certainly, because that's what's germane

12   here.

13        Q.   And each time you did it, you got 800 feet?

14        A.   I think I measured 792 maybe, 815.  It was

15   right around 800 feet.

16        Q.   And you used the wheel measuring again?

17        A.   I did.  Now, another thing.  I measured

18   along the edge of the record.  You have an arch there.

19   In other words, I'm walking on the radius.  So if you

20   were to go like a straight-line measurement, like from

21   the center of the road, I don't think it's going to be

22   that much different.  It might be a hundred feet one

1    way or the other.

2         Q.    But you're not sure what that figure is, the

3    difference, correct?

4         A.    I'm not.  But again, what I'm doing is

5    taking a daytime sightline measurement.  What we have

6    at nighttime, dark conditions, entirely different.

7         Q.    You mentioned in your report something about

8    a designed vertical sight distance approaching the

9    crash site of only 660 feet.  What is that?

10        A.    That's a design feature when designers draw

11   a roadway, in this case I-81.  It was first conceived,

12   I want to say, in the mid to late '50s.  I think it was

13   actually opened '61, '62, somewhere in there.

14             You have various standards in which the

15   designers must build, shall build, in this case, in the

16   interstate facility.  One of the ingredients that is

17   crucial and critical is your so-called vertical

18   sightline.  That is your minimum sightline at the

19   sharpest part, in this case overlooking a crest of a

20   hill, which we have here.  And that measurement is

21   measured -- the old standards.  I think it's 3.75 feet

22   above the roadway surface to an object, I want to say,

109

1   1 1/2 foot above the road surface.

2           Now, if they measured something that's short

3   of 660, then that means the Highway Department, or

4   whoever constructed the road, would have to shave

5   off -- actually lower the vertical crest because you

6   can't have it less than that.  So it met that so-called

7   minimum standard.  Does it mean it's good, bad?  It's

8   not really a value.  It's just what they measured.  If

9   I go down the road a mile or two, you'll have different

10  sightline measurements.

11      Q.    Other than this "rest area" road sign, did

12  you use any other marker to determine the sight

13  distance available?

14      A.    I did at nighttime when I used my car -- my

15  pickup truck both in the right lane and the left lane.

16  I sighted those items that I could see both on level

17  and graded, you know, approaches to the accident site.

18  And that measurement came to be, again, around

19  150 feet, which is, again, the normal, typical, average

20  throw distance of headlamp beams to a non-reflectorized

21  item.

22          Now, can I see that sign further back than

1  150 feet?  Well, of course I can.  That's because of

2  reflectivity.  But can I distinguish -- can I see an

3  object or a person in dark clothing or a dark vehicle

4  any greater than 150 feet?  The answer is no, not on

5  low beams.

6       Q.    All right.  As far as the measuring the

7  sight distance in the daytime, you only used that "rest

8  area" exit sign as your point of reference for

9  determining how far away you can walk to get a

10  distance -- get a clear shot at that sign?

11       A.    Yes, sir.

12       Q.    All right.

13       A.    About.

14       Q.    Do you know when the sun rose on October 26,

15  2015?

16       A.    Don't know.

17       Q.    Do you know what the weather was like on

18  October 26, 2015?

19       A.    Of 2015?

20       Q.    Yes.  October 26, 2015.

21       A.    Oh, when the crash occurred.  I only know

22  what I recall reviewing in the file materials.

111

1      Q.    Okay.  What was that?

2      A.    When the trooper left Salem, it was misting,

3   kind of rainy.  His photographs -- or his camcorder

4   shows the windshield wipers activated on slow.

5      Q.    Okay.

6      A.    When he came up to the crash site, seemed

7   like to me it was dry.  The pictures showed that the

8   roadway surface then was dry, nothing falling.

9           Now, Mr. Lester said -- I think when he left

10  his grandmother's house, I think in Lexington, in

11  there, I think he said it was kind of light fog or

12  maybe some mist, some light rain; but I think when he

13  got to the site, it had stopped.  It was dry, not

14  raining.  No falling weather.

15     Q.    And just to make sure it's clear.  I may

16  have misspoke a few minutes ago.  But do you know when

17  the sun rose on October 26, 2015?

18     A.    I do not.

19     Q.    Okay.  Do you know whether the overhead

20  lights in the rest area were working on October 26,

21  2015?  In other words, were they damaged in any way or

22  not?

112

1      A.    Were they on?  You talking about the --

2      Q.    In the rest area.

3      A.    I can see several from the state police

4  pictures.

5      Q.    Right.  But I'm just saying, were they

6  damaged or were they working properly on October 26,

7  2015, the overhead lights in the rest area?  Do you

8  know either way?

9      A.    I can only refer you to what the pictures

10  tell me, the state police pictures.

11      Q.    And what do they tell you?

12      A.    I think there's one or two shots or maybe

13  several shots showing -- I don't think you can see

14  five.  You might be able to see two or three lights,

15  but I think that's because the angle perhaps, how the

16  camera was located.

17      Q.    All right.  Well, how about can you tell me,

18  is there any evidence whether the overhead lights in

19  the rest area were not working on October 26, 2015?

20      A.    Again, I can answer that only what the

21  photographic evidence reveals.  I know there's five

22  lights in there because I saw them a year later, not

1    quite a year later.  The photographs from the state

2    police show, I want to say, three or maybe four on.  So

3    I would answer in the affirmative that they probably

4    were on and burning and no defect.

5        Q.    Okay.  So other than these photographs of

6    the Martinez tractor, which are Exhibit Numbers 16

7    through 22, you have not seen any other photographs or

8    seen the Martinez tractor, correct?

9        A.    Only ones I've seen are what are contained

10   in the set from the Highway Department and from state

11   police that we enumerated some of them here.  That's

12   all.

13       Q.    Any other ones besides the ones we've marked

14   as Exhibits 16 through 22?

15       A.    There's several.  There's several other.

16       Q.    All right.  Can you just pick those out

17   while we're here.  What I'm trying to get at is, show

18   me all the materials -- tell me about any inspections

19   of the Martinez tractor that you've done and materials

20   that show the Martinez tractor.

21       A.    We have the photographs that we just looked

22   at --

1    Q.    That's 16 through 22, correct?

2    A.    -- that are labeled.

3          Correct.  And then there's several others.

4    Again, all state police pictures.

5    Q.    Just take your time and go through what

6    you've got and just give me all the Martinez tractor

7    photos that you have or had access to.

8    A.    I believe that's it.

9    Q.    All right.  You just handed me a bunch of

10   photographs here.

11         MR. DUNN:  And if we can have these marked

12   as exhibits, I guess it's 23.

13         (Exhibit Numbers 23-31 marked for

14         identification.)

15   BY MR. DUNN:

16   Q.    So, Mr. McAllister, you've handed me

17   additional photographs of the Martinez tractor, which

18   is Exhibits 23 through 31?

19   A.    Correct.

20   Q.    So 16 through 31 are the photographs that

21   you have of the Martinez tractor or you had to be able

22   to look at the Martinez tractor, correct?

1    MR. HEARN:  Sixteen through 21.

2    MR. DUNN:  Thirty-one.

3    MR. HEARN:  Oh, total.  Got it.  Sorry.

4 I'll just be quiet.

5    THE WITNESS:  That's all I've seen.  I don't

6 think the cam dash showed any.  These are the only

7 pictures I've seen.

8 BY MR. DUNN:

9  Q. And you haven't inspected the Martinez

10 tractor, have you?

11  A. Have not.

12  Q. And you haven't seen any video of the

13 Martinez tractor, have you?

14  A. Have not.  You're seeing what I'm seeing in

15 its entirety.

16  Q. Do you know if the pickup that Lester was

17 driving at the time of the accident, if it lost power,

18 whether you could not open the doors?

19  A. I can only rely on what Mr. Lester is

20 saying.  It's a straight five-speed I think.  He

21 said -- you know what he says; it's in his testimony --

22 that after the collision, he lost power.  Everything

1    went off.  He said he couldn't exit his vehicle.

2         Q.    All right.  So the only information you

3    relied upon said the doors -- are you saying the doors

4    were not open or doors not functioning properly, or

5    what are you saying?  Are you making an opinion on

6    whether that Toyota, if it lost power, the doors would

7    not open?

8         A.    Now, one doesn't beget the other.  Because

9    if you lose power, you can open the door.  That is if

10   it's not jammed.  You can open the door if you're not

11   traumatized.  You can open the door if you're in

12   position to open the door.

13        Q.    All right.

14        A.    You see.  I only know what Mr. Lester has

15   said.

16        Q.    Gotcha.  What if in that particular Toyota

17   Tacoma, 1995, if it lost power and that's the only

18   thing, if it lost power, would that affect the ability

19   to open that door?

20        A.    I don't believe so.

21        Q.    All right.  Did you ever see any photos of

22   the tractor being towed by the Martinez tractor?

1    A.    In the actual -- you mean in the actual act

2    of being towed?

3    Q.    Or any time, any point in time.  That

4    particular tractor that was being towed at the time of

5    the accident, did you see any photographs of that?

6    A.    All I've seen are the photographs that we've

7    got here, all the state police photographs.

8    Q.    Okay.

9    A.    Now, they show them -- they show the

10   Peterbilt and the whatever he's driving, they show both

11   of them connected.  Again, that's all I've seen is what

12   I've got here.

13   Q.    So you haven't inspected the vehicle that

14   was being towed?

15   A.    I have not.

16   Q.    And you haven't seen any video of the

17   vehicle that was being towed?

18   A.    I have not.

19   Q.    Can you pull out the pictures that you have

20   of the vehicle that was being towed so we can mark

21   those for identification purposes.

22   A.    I can.

Case 7:15-cv-00665-GEC   Document 143-14   Filed 11/02/16   Page 43 of 75   Pageid#: 3526

1                    Mr. Dunn.

2          Q.    Yes, sir.

3          A.    I think I found another picture showing the

4     front of the Martinez vehicle, which should be, I

5     guess, added to that last batch.

6                    MR. DUNN:  Okay.  We'll mark it Exhibit

7     Number 32.

8                    (Exhibit Number 32 marked for

9                    identification.)

10                   THE WITNESS:  I believe these are all that

11    I've got that show the Salinas tractor and connected to

12    the Martinez truck.

13                   MR. DUNN:  So if we can have these marked as

14    Exhibit 33 through whatever the last one is, please.

15                   (Exhibit Numbers 33-41 marked for

16                   identification.)

17    BY MR. DUNN:

18         Q.    So Mr. McAllister, the exhibits that have

19    been marked for identification purposes 33 through 41

20    are all the photographs that you've seen of the tractor

21    being towed by the Martinez tractor, correct?

22         A.    Yes, sir.

1    Q.    Now, going back, let me ask you a quick

2    question dealing with the functioning of the door in

3    the Lester pickup.  It's your opinion that simply

4    losing power from that particular Toyota Tacoma 1995

5    would not prevent somebody from opening the door, the

6    driver's door in that particular truck, correct?

7    A.    I'm trying to answer your questions how

8    they're connected.

9    Q.    All right.

10   A.    If you lose power, that would not in any way

11   that I know of inhibit the opening of the door if the

12   door could be opened.

13   Q.    That's my next question.  Do you have an

14   opinion whether something happened in that accident

15   which mechanically, mechanically prevented a driver

16   from being able to open the door?

17   A.    No.

18   Q.    You don't have an opinion?

19   A.    I don't see any evidence that would have

20   prevented the door from being opened as a result of the

21   collision.

22   Q.    Okay, all right.  Do you know whether there

1    are any lights or anything, other illuminating things

2    on the Martinez tractor that are visible when looking

3    at its side?

4        A.    Yes.  The pictures should show it.

5        Q.    And why don't you take one of these pictures

6    and just tell me about it.

7        A.    Not in this batch.

8        Q.    This is the towed vehicle.

9        A.    Don't need it.

10            I guess that picture here.  What number is

11    that?

12        Q.    Twenty-one.

13        A.    Twenty-one.  I believe 21 is the only

14    photograph that will show a portion of the side of the

15    truck.  I'll connect that picture -- what is it 21?

16        Q.    Twenty-one.

17        A.    -- to 16.  Now, that's more of the front of

18    the truck.

19        Q.    Okay.

20        A.    What this truck would have and should have

21    on the side will be an identification light, amber

22    light to the front on the side.  It should have one in

1    the center, and then it should have one on the extreme

2    rear that's a red one.  I don't see it in these

3    pictures.

4         Q.    What are you talking about, the two amber

5    lights and the red light?

6         A.    See this -- this assembly's gone.

7         Q.    You're just circling the headlight, correct?

8         A.    That's right.

9         Q.    On Exhibit 21.

10        A.    Here you go.  This is the right side that's

11   undisturbed, undamaged.

12        Q.    Exhibit 22 we're looking at.

13        A.    Correct.  You should have that same light on

14   the left side.

15        Q.    Okay.

16        A.    And that's going to be an identification

17   light.  It's a tiny little bulb that is amber, yellow.

18   Somewhere behind that bulb in the body -- you know, in

19   the body of the truck, you should have at least, I

20   believe, one more yellow light, amber light, and maybe

21   a red one on the far taillight assembly, which is to

22   the side.

Case 7:15-cv-00665-GEC   Document 143-14   Filed 11/02/16   Page 47 of 75   Pageid#: 3530

1    Q.    Okay.

2    A.    I think that's the minimum standards,

3    Federal Motor Carrier Safety standards.

4    Q.    Any other lights you're aware of?

5    A.    On the side?

6    Q.    On the Martinez tractor, that can be viewed

7    on the side.

8    A.    I think that's it.

9    Q.    And looking at Exhibit 21, if the headlight

10   the way it's put onto that tractor, would any of the

11   headlight light be visible from the side?

12   A.    No.

13   Q.    Are you sure about that?

14   A.    I am.

15   Q.    Have you tried to see whether that's

16   possible for a Freightliner, 2003 Freightliner

17   Columbia?

18   A.    No.

19   Q.    All right.  How do you know it's not

20   possible to see the headlight from the side?

21   A.    Because I've worked too much crashes

22   involving all types of tractor trailers and trucks,

1   pickup trucks, cars.  When a vehicle's broadside, you

2   cannot see any light at all.  The closer you get away

3   from the broadside angle is when you start picking up

4   the so-called beam.

5       Q.    You'll agree that it's easier to see lights

6   at the nighttime as opposed to daylight, correct?

7       A.    Yes.

8       Q.    Do you know if any reflectors are

9   illuminated on the side of the Martinez tractor when

10  there's light shown onto them?

11      A.    Again, looking at these pictures, no.  But

12  if it's properly designed and properly outfitted, which

13  I assume it probably was, then yes, you've got to have

14  reflectors on the side as well.  And those reflectors

15  would incorporate, you know, the beams of lights

16  hitting it.

17      Q.    Do you know how many reflectors are on this

18  particular Martinez tractor?

19      A.    Don't know.  Remember earlier when we were

20  talking about the button delineators --

21      Q.    Yes.

22      A.    -- and signs along the road?  Remember

Case 7:15-cv-00665-GEC   Document 143-14   Filed 11/02/16   Page 49 of 75   Pageid#: 3532

1    earlier we were talking about the lights in the rest

2    area?  It's my opinion that all of these in concert

3    with each other are going to make any type of

4    reflectorization on the Martinez truck

5    indistinguishable.  They would blend into the

6    background.  Because for one thing, they're tiny

7    anyway.

8        Q.    And you're talking about button reflectors;

9    is that what you're talking about?

10       A.    Correct.

11       Q.    Do you know how many -- as you're

12   approaching the rest area 800 feet away, do you know

13   how many button reflectors are visible to someone

14   driving in a pickup truck like Mr. Lester was driving?

15       A.    I don't, but there's going to be numerous.

16   They're going to -- it's referred to as roadside

17   furniture.  They're going to blend in.  They're going

18   to be like the signs, the reflectorized signs, the

19   "rest area" signs, the mileage signs, the directional

20   signs, the mile -- the delineators in the roadway, the

21   white reflector buttons on the guardrail on the right

22   side, the yellow reflectors on the median guardrail.

125

1    They're all a hodgepodge of points of light for a

2    motorist.

3        Q.    You talked about headlights would shine a

4    maximum of about 150 feet?

5        A.    Correct.

6        Q.    Is that what you referred to?  Is that

7    accurate what I just said?

8        A.    That is.

9        Q.    And how did you arrive at that 150 feet?

10       A.    Again, using my headlamp on my truck as an

11   example, looking at various research, various items

12   that I've used, gosh almighty, for the last 30 years in

13   AI, accident investigation, accident reconstruction, as

14   well as testing of bulbs.  Again, primarily low beams.

15   And I didn't consult the code.  I think the code says

16   100 feet on low beams, 200 maybe on high beams.  I'm

17   just aware of those.  Again, in my testing and

18   experience and other crashes and whatnot.

19       Q.    Do you know whether Mr. Lester had his low

20   beams or high beams on right before the accident

21   happened?

22       A.    I don't.  Seems like to me, though -- I

1   don't know if it was asked of him in his deposition, so

2   I don't know.

3       Q.    All right.  And did you ever test the

4   headlights for Mr. Lester's Toyota Tacoma 1995 vehicle?

5       A.    Did not.

6       Q.    Did you ever test the headlights for a

7   similar, you know, Toyota Tacoma 1995 vehicle to see

8   how far the headlights shown out?

9       A.    I'm sure I have in my research with the

10  state's crash investigation team and my private

11  practice.  I retired in 2005, I guess it was.  So I

12  tested both in classroom instruction -- I used to teach

13  this accident investigation -- both in classroom and

14  actual tests.  Again, the numbers that I've seen and

15  that I've measured, regardless if it's a Chevrolet,

16  Toyota, Chrysler, they're all in that area of about

17  150 feet.

18          Now, if you put halogens, if you put the

19  blue lights that you see now on the road, if you in

20  addition put a fog light, then those of course change

21  those items.  But again, the average distance that I've

22  seen that I've used that I think Mr. Theriault,

1  Mr. Chewning, Mr. Atherton, J. Stannard Baker, you name

2  the researchers and the reconstructionists, that figure

3  is about 150 feet low beams.

4      Q.    All right.  But I'm not sure -- have you

5  tested the headlights for a 1995 Toyota Tacoma to see

6  how --

7      A.    Again, I may have in my past studies with

8  the state's crash team.  But sitting here today, I've

9  done so many, I don't know what they are.

10     Q.    Okay.  Do you know what condition the

11  headlights were on Lester's Toyota Tacoma before the

12  accident happened?

13     A.    I'm sorry.  Say that one more time.

14     Q.    Do you know what condition the headlights

15  were for the Toyota Tacoma, Mr. Lester's Toyota Tacoma,

16  before the October 26, 2015, accident?

17     A.    Don't know.

18     Q.    Do you know whether he had any fog lights on

19  the front end of his Toyota Tacoma?

20     A.    I don't believe I saw any fog lights when I

21  saw it.

22     Q.    Do you know --

Case 7:15-cv-00665-GEC   Document 143-14   Filed 11/02/16   Page 53 of 75   Pageid#: 3536

1    A.    And I believe he had a valid state

2    inspection sticker, so I'm assuming it's in good

3    condition.

4    Q.    Do you know whether he had any particular

5    specialized headlights in his headlamps?

6    A.    No, but I didn't see any evidence of that.

7    Q.    Okay.  So you're telling me that if a

8    deer -- a herd of deer had come out and stopped on I-81

9    where that accident happened, that Mr. Lester would

10   only have 150 feet of stopping distance --

11   A.    No.

12   Q.    -- to avoid hitting those deer?

13   A.    Well, you're going into another calculation.

14   What you have is 150 feet of visibility.

15   Q.    Right.

16   A.    That's all you've got.

17   Q.    Okay.

18   A.    Now, when you see -- let's throw the deer

19   out of the equation.  Let's see what he's got here.

20   He's coming over the crest of a hill.  He's in a gore

21   area.  He's already passed numerous reflectors all up

22   and down the road, which is typical.  He's now

129

1    confronted with something in front of him that he's not

2    expecting to see.  He doesn't know what it is until he

3    gets close enough to it.  The closest he can see it is

4    the throw distance of his headlamps.  He can't see the

5    headlamps from the tractor trailer.  He can only see

6    what his headlamps, you know, shine onto.

7            He even says that in his deposition, in his

8    testimony, that when my lights saw it, I realized what

9    it was.  I saw it.  And then he attempted to stop.  He

10   attempted to avoid it.

11       Q.    All right.  Well, whether it's a tractor or

12   a person or a herd of deer, you're saying he only had

13   150 feet of visibility to be able to avoid whatever it

14   was on that road, correct?

15       A.    He's got 150 feet of sight distance.  Within

16   that 150 feet is where the human factors variable has

17   to come in.

18       Q.    Right.

19       A.    You've got to identify it.  Oh, my gosh,

20   what is it?  Then you've got to decide, is it a hazard

21   to me or not?  Then you've got to decide, how do I

22   avoid it?  Then you've got to say, oh, my gosh, I've

1    got to hit my brakes.

2        Q.    Right.

3        A.    But the magic number that he's confronted

4    with is at 150 feet.

5        Q.    So again, if he had a herd of deer in front

6    of him, he only had 150 feet -- traveling at 60,

7    70 miles an hour, he only had 150 feet to avoid hitting

8    a herd of deer if they stayed right there in the road?

9        A.    I'm being facetious.  The herd of deer could

10   jump off, jump out of the road.

11       Q.    I understand.

12       A.    Let's go back to this vehicle here.

13       Q.    I'm asking this hypothetical.

14       A.    Well, then I can't answer a hypothetical.

15   His visibility is 150 feet whether it's a pedestrian,

16   whether it's a child in the road, or whether it's this

17   Martinez truck.

18       Q.    Or whether it's a herd of deer, right?

19       A.    To pacify you, whether it's a herd of deer.

20       Q.    Mr. McAllister, you agree to safely operate

21   a vehicle on a highway like I-81, one must be prepared

22   if a vehicle in front of that vehicle you're driving

1     makes a sudden stop to make evasive maneuvers, correct?

2          A.    If you can see it and determine it.

3          Q.    Right.  If somebody puts on their brake

4     lights -- you know, puts on their brakes, brake lights

5     come on, they suddenly stop.

6          A.    You're asking two different questions.  Are

7     you hitting your brakes first and then coming to a

8     stop, or are you just hitting your brakes?  Two

9     different things.

10          Q.    Hitting your brakes, come to a stop.

11          A.    Okay.  Two different things.  When the brake

12     lights come on, a driver will see those.

13          Q.    Right.

14          A.    He may not or she may not respond to what

15     that means.

16          Q.    Right.

17          A.    That person won't know what it is until they

18     get closer to that vehicle.

19          Q.    Right.

20          A.    It would be folly to see somebody brake --

21     try it when you go home tonight.  When you see a

22     vehicle in front of you hit the brakes, you see the

1    brake lights come on, you sure as heck are not going to

2    slam on your brakes.

3        Q.    Unless you're following too closely,

4    correct?

5        A.    Well, now you're adding a different caveat

6    to this equation --

7        Q.    I am.

8        A.    -- to this question.

9        Q.    I am.

10       A.    It's a run-on, run-on, run-on.

11       Q.    Well, let me ask it this way.  You agree

12   with me that a driver must stay a reasonable and

13   prudent distance between his vehicle and a vehicle in

14   front of him.  Now, in the likelihood that a vehicle in

15   front of him may stop suddenly, correct?  You can agree

16   with me on that?

17       A.    I do.  And I think that goes back to what,

18   the two-second rule?

19       Q.    Okay.  What if Brandon Lester were following

20   another vehicle at that time in that area of the road

21   on I-81 in such a close proximity that could not stop

22   without rear-ending it, so he deemed to have to make a

1    maneuver to veer away from it and then hit the Martinez

2    tractor?

3         A.    You're asking me things that I have not

4    considered because --

5         Q.    I didn't ask a question --

6         A.    -- I don't see any evidence.

7         Q.    I was giving you a hypothetical.

8         A.    Well, let's go back to the deer.

9         Q.    Well, my question with the hypothetical is

10   Lester would be at fault for the accident?

11        A.    How far was he?

12             MS. ROBINSON:  Let me object to that.  There

13   were so many different aspects of facts that were not

14   contained.  How far back he was, whether the car

15   suddenly slammed on its brakes, all those things.

16   BY MR. DUNN:

17        Q.    Car slams on his brakes.  It's dark.  In

18   that same area, there's a car in front of Mr. Lester.

19   Mr. Lester's driving a distance away from that car such

20   that he could not stop without rear-ending it, so he

21   makes an evasive maneuver to avoid that particular car

22   stopping in front of him.  Evasive maneuver then

1  requires him to hit the Martinez tractor.

2       A.    That's so damn hypo --

3       Q.    Would that be safe --

4       A.    Would that be so hypo --

5       Q.    Wait a minute.  I'm not finished.  Would he

6  be at fault for the accident?

7       A.    Hypothetically, I can't answer.  For the

8  simple reason, you say a car slams on its brakes and

9  comes to a slide -- comes to a stop.  If that happened,

10  we would have physical evidence showing a skid mark.

11  There's nary a mark there except what we're dealing

12  with.  So that hypothetical goes out the window.

13       Q.    Well, what if it -- person in front of

14  Mr. Lester is driving a vehicle that just put on its

15  brakes and Mr. Lester thinks he doesn't have enough

16  time to stop, and so he makes an evasive maneuver, goes

17  to the right, and then runs into the Martinez tractor?

18       A.    Runs to the right.  Well, we know where the

19  point of impact is.

20       Q.    Veers to the right.

21       A.    Well, we know where the point of impact is.

22  He doesn't veer to the right.

1    Q.    My hypothetical is as it stands.  Would that

2    be a cause of the accident?

3    A.    No.

4    Q.    Would Mr. Lester be a cause of the accident?

5    A.    I can't answer it because there's too many

6    hypotheticals here.

7    Q.    Okay.  You can have more than one cause of

8    an accident, can't you?  You can have more than one

9    person as a cause of an accident, right?

10    A.    You can theoretically.

11    Q.    You mentioned that you want to do some more

12    work after this deposition.  I understand you want to

13    go out and take measurements of where the lights are in

14    the rest area to the pavement of I-81?

15    A.    To the right lane.

16    Q.    To the right lane.

17    A.    To the point of impact.

18    Q.    Okay.  You want to take that measurement.

19    You also want to take the measurement of how tall that

20    pole is, so how far that light is sitting up in the

21    air?

22    A.    Correct.  Among other things.

1  Q. What other things?

2  A. Well, I don't know yet.  I'm going to have

3 to see it at nighttime.

4  Q. Well, I'd like to know.

5  A. Hypothetically, I'd like to see if it's a

6 cantilever -- on a cantilever hinge point on the

7 luminaire.  I'd like to know the wattage of the bulb.

8 I'd like to know the facing of the bulb.  These are

9 hypothetical.

10  Q. Because as you sit here today, you don't

11 know whether that particular light in the rest area, no

12 matter how small amount, does provide some light for

13 the travel lane in I-81?

14  A. Oh, I do know the answer to that.  I've been

15 there.

16  Q. Why do you want to go back and do these

17 measurements?

18  A. Because when you ask me at trial, I can tell

19 you it's 85 feet from the right lane.  It's X amount of

20 feet high.  And I'll see it again at night.

21 Mr. McAllister, you've already seen it before at night.

22 I have.  Do the lights spill on to the road?  It does

Case 7:15-cv-00665-GEC   Document 143-14   Filed 11/02/16   Page 62 of 75   Pageid#: 3545

1    not. I'm going to verify that again.

2        Q.    Well, how would those distances confirm or

3    disaffirm what you're telling me?

4        A.    It's going to -- it's going to, I think,

5    refute Kevin's -- Mr. Theriault's report.

6        Q.    I know. But how would it do that? I mean,

7    you're just saying it's a hundred feet away. Ah,

8    therefore, hey, it doesn't light up that I-81

9    southbound lane. What are you referring to? What are

10   you relying on to come up with that?

11       A.    Wouldn't you agree with me that the closer

12   the poles are, the light poles are to the surface of

13   the road, it would be brighter? Do you agree to that?

14       Q.    Yes, sure.

15       A.    Okay. Now I'm going to be facetious. If

16   that light pole was a half a mile away, is it going to

17   have any spillage? The answer is no.

18       Q.    Perhaps, perhaps.

19       A.    Oh, come on.

20       Q.    What do you -- what are you relying on to

21   come up with that conclusion?

22       A.    I've been there. I've seen it.

Case 7:15-cv-00665-GEC   Document 143-14   Filed 11/02/16   Page 63 of 75   Pageid#: 3546

1        Q.    Okay.  So I understand now.

2        A.    That's firsthand knowledge.

3        Q.    I know.  But I'm just trying to figure out

4    what you're going to use with this subsequent

5    investigation, inspection, data to rely on saying, hey,

6    this confirms my eyes not seeing any light there?

7        A.    I just told you.  I just told you.

8        Q.    What's that?

9        A.    Right now if the judge were to ask me,

10   "Well, Mac, did you go measure it?  No, sir.  Now, by

11   gosh, I will have it.

12       Q.    I know.  What you want to do is show the

13   judge or the fact-finder that you've done an

14   investigation and what that investigation is.  But

15   there's some reason that investigation will allow you

16   to say, hey, look, I've looked at textbooks that say

17   for this particular wattage for this light for

18   luminance from this distance from this heighth, I

19   calculated out that there's no foot candles of that

20   area.  Is that what you're going to do?  Or are you

21   just saying, I just want to do it for purposes of

22   perception to the trier-of-fact?

1      A.    Yeah.  You give me too much credit.  The

2    former --

3      Q.    Which one is it?  First one or the second?

4      A.    The former, no.  The latter, yes.

5      Q.    Okay.  So for perception purposes.

6      A.    Exactly.

7      Q.    All right.  Perception in the sense of

8    perception of your particular opinion.

9      A.    Absolutely.

10      Q.    Okay, all right.  Gotcha.

11      A.    I want to say I considered it.

12      Q.    You ever worked with Melissa Robinson on a

13    case before?

14      A.    I have.

15      Q.    How many cases?

16      A.    I knew you were going to ask me that.

17      Q.    This is not a surprise question.

18      A.    Probably half dozen.  Perhaps, seven, six,

19    seven, eight, somewhere in that.

20      Q.    Okay.  How about with her law firm?  How

21    many cases have you worked on with her law firm?

22      A.    The same.  I think with Ms. Robinson maybe

140

1    two directly, and then maybe four or five with --

2    Ms. White I believe is the only other attorney in her

3    law firm.

4         Q.   So about 10 to 12 altogether?

5         A.   No, no, no.  About six to seven.

6         Q.   Altogether?

7         A.   Correct.

8         Q.   Whether it's --

9         A.   That I know of.

10        Q.   Whether it's Ms. Robinson or somebody in her

11   law firm?

12        A.   Yes, sir.

13        Q.   Okay.  Have you had to rely on or refer to

14   any authoritative texts in order to come up with any

15   opinions in this case?

16        A.   Well, you haven't asked about the turning

17   radius.  So yes, I went back and looked at various

18   turning radii for the truck to have made the turn.  Cut

19   through the chase, it appears that it's marginal.  He

20   probably could have made it, but I'm not 100 percent

21   sure, because I've not tested the configuration that

22   this truck was in at the time of the wreck.

1    Authoritative.

2         Q.    But any other opinions, any authoritative

3    texts that you've relied upon to come up with any other

4    opinions other than the turning radius?

5         A.    Yes.  My notes reflect it.  I consulted

6    Mr. Limpert.

7         Q.    I'm sorry.  Who?

8         A.    L-I-M-P-E-R-T, Limpert.  It's a green book

9    on obstacle avoidance, passing distances.

10        Q.    What's the title of it?

11        A.    Got it.

12        Q.    Is that part of what you provided in

13    designation?

14        A.    It is.  In my designation, no.

15        Q.    I mean, you might not know that, but I just

16    got a nod from --

17              MS. ROBINSON:  Well, no.  I was --

18              THE WITNESS:  It's in my calculations.  It's

19    in McAllister 5.  L-I-M-P-E-R-T.  Did I say the name?

20    Hold on.  Let me see.  Maybe I didn't.  This section's

21    all coming undone.  It's -- oh, what's the name of it?

22    It's entitled Motor Vehicle Accident Reconstruction.

1    It's referred to as the green book.

2    BY MR. DUNN:

3        Q.    Is that -- I'm sorry.  Was that part of one

4    of your exhibits?

5        A.    It is.

6        Q.    Which one?  Which exhibit?

7        A.    Five.

8        Q.    Okay, all right.  Other than that, any other

9    authoritative texts you relied upon --

10       A.    Yes.

11       Q.    -- to come up with your opinions?

12       A.    I'm wrong.  I'm sorry.  I've got it.  Motor

13   Vehicle Accident Reconstruction and Cause Analysis by

14   Rudolf Limpert, 1978.

15            What else?  I consulted with a policy on

16   geometric design of rural highways, 1965.  It's

17   published by the American Association of State Highway

18   Officials.

19       Q.    And what part of -- what exhibit is that a

20   part of?

21       A.    The turning radius.

22       Q.    I know.  But what exhibit is that a part of,

143

1    exhibit number?

2         A.    Oh, it's all contained in 5.

3         Q.    Okay.

4         A.    And this is referred to as the blue book.

5               I also consulted with the Transportation and

6    Traffic Engineering Handbook, which is also published

7    by AASHTO, 1976 edition.  And they're on the geometric

8    design.  Again, I wanted to know --

9         Q.    That's related to the turning radius,

10   correct?

11        A.    Based upon the measurements that I used,

12   correct.  What else?

13        Q.    If you want to take a break, that's fine.

14        A.    I'm fine.  I'll let you know in a minute.

15              Let's see.  What else?  I didn't consult

16   with, but I'm aware of the State Code 46.2-88.  I

17   helped write that, amended in 2000.

18        Q.    Okay.

19        A.    I also -- I can't pick out perhaps the page,

20   but I consulted with J. Stannard Baker's accident

21   investigation reconstruction manual, handbook, on

22   stopping of distances.

144

1      Q.    Is that part of any of your exhibits here?

2      A.    It is not, although maybe the equation could

3    be.  I think I may have put that in here.

4      Q.    What edition did you consult for the J.

5    Stannard --

6      A.    We're talking physics.  So I go back to the

7    earliest book, which would be, I think, 1975.  It's

8    referred to as the red book -- I'm sorry -- the orange

9    book, Baker.

10            What else?  And then again, my background,

11    training, experimentation, testing that I've done all

12    my life practically.

13      Q.    Yes, sir.

14      A.    On headlights, friction properties, stopping

15    distances, driver reaction times, whatnot.

16            MR. DUNN:  Give me a second to look over my

17    notes here.  Unless somebody wants to go ahead.

18            MR. FRANKL:  Let's just take a break for a

19    minute.

20            (Break from 3:29 p.m. to 3:37 p.m.)

21            MR. DUNN:  I'd also like to make an exhibit

22    what is part of the file for Mr. McAllister.  It's a

145

1    police crash report.  It's the first page, and it's 42.

2              (Exhibit Number 42 marked for

3              identification.)

4                   E X A M I N A T I O N

5    BY MR. HEARN:

6         Q.    Mr. McAllister, a couple extra questions.

7    What is the basis for your conclusion that Mr. Martinez

8    was engaged in the process of turning onto the highway

9    when the first impact occurred?

10        A.    Primarily from what I think the trooper

11   contained in his report.

12        Q.    What specifically?

13        A.    He got the information -- it's my

14   understanding -- through Mr. Martinez.

15        Q.    Okay.  Did you review Mr. Martinez's

16   deposition?

17        A.    I did.

18        Q.    Okay.  Did you see in that deposition

19   testimony any indication that Mr. Martinez was doing

20   anything different than turning out onto the highway?

21        A.    No.  He said he was trying to make a U-turn

22   or back and fill, but I couldn't really follow that.

1     Q.    Okay.

2     A.    The main gist, as I understand, was he was

3 going up the wrong way, going to take a right at the

4 apron and continue on is my understanding.

5     Q.    And that comes from what the trooper

6 concluded?

7     A.    Yes.

8     Q.    Okay.  Why are you choosing to believe what

9 the trooper concluded over what Mr. Martinez himself

10 said?

11    A.    Because I think Mr. Martinez was -- knew he

12 was caught doing something wrong, and I think he wanted

13 to mitigate it by saying, yeah, I'm trying to get back

14 in there.  Plus, too, the trooper's investigation, I

15 think, revealed that, or at least that was his

16 conclusion.

17    Q.    As we sit here today, you haven't identified

18 any physical evidence that supports either one version

19 or the other?

20    A.    No.  And as far as I'm concerned, I know

21 approximately where the area of impact is.  So frankly,

22 I could -- for the purposes of the reconstruction

Case 7:15-cv-00665-GEC   Document 143-14   Filed 11/02/16   Page 72 of 75   Pageid#: 3555

147

1   aspect -- could care less if he was in the process of

2   pulling out, backing up, what his intent after that

3   was.  I could care less.

4       Q.    Okay.  What's your factual basis for

5   concluding that the skid marks that we talked about in

6   the first series of photos came from Mr. Lester's

7   vehicle?

8       A.    The placement of them, the consistency of

9   them, the fact that Mr. Lester hit his brakes.  I think

10  he said he felt the truck -- or the pickup truck skid

11  or heard it skidding.  I believe Mr. Martinez -- seems

12  like to me he heard squealing of tires.  And they're

13  conveniently located where the items placed him.

14      Q.    What about the placement of the skid marks?

15  When you say "placement," you mean placement on the

16  roadway?

17      A.    Correct.  And the configuration.

18      Q.    What specifically about where they're placed

19  on the roadway supports your conclusion that they were

20  created by Mr. Lester's vehicle?

21      A.    I just answered it.

22      Q.    Okay.

Case 7:15-cv-00665-GEC   Document 143-14   Filed 11/02/16   Page 73 of 75   Pageid#: 3556

1       A.      All those items in concert with each other.

2       Q.      Okay.  So everything together?

3       A.      Everything together.

4       Q.      All right.

5       A.      Correct.

6       Q.      Did you consider and exclude any possibility

7  that another vehicle created some or all of those skid

8  marks?

9       A.      The ones that we're talking about now that

10  we've already gone through?

11       Q.      Yes, sir.

12       A.      Detail ad nauseam?  I did not.

13       Q.      Okay.

14       A.      Now, I know this testimony or the specter of

15  a phantom unknown white -- take your pick -- van, car.

16  I just don't see any basis for those.

17       Q.      Any basis for what?

18       A.      That it existed.

19       Q.      That it existed?

20       A.      Correct.

21       Q.      And you didn't make any effort to exclude

22  that type of vehicle as creating the skid marks because

1    in your opinion there was no such vehicle?

2        A.    That's correct.

3        Q.    Okay.  So I want to belabor just a little

4    bit this colloquy about the headlights and the

5    visibility.

6        A.    Gotcha.

7        Q.    So is it your testimony that -- let me back

8    up.

9             Is your testimony that the headlights on

10   Mr. Lester's vehicle are substantially the same as any

11   other passenger -- I mean private personal automobile

12   like that, right?

13       A.    I do.  Passenger vehicle, pickup truck.

14   They're all of the same unless -- until you start

15   getting into the so-called modern lights that you can

16   buy today.

17       Q.    All right.

18       A.    They increase the visibility or the throw

19   distance marginally, maybe 25, 30 feet.

20       Q.    And the headlights illuminate approximately

21   150 feet in front of the moving vehicle?

22       A.    Correct.

Case 7:15-cv-00665-GEC   Document 143-14   Filed 11/02/16   Page 75 of 75   Pageid#: 3558