150

1    Q.    Is it your testimony that at the time of

2   this accident a motorist driving on Interstate 81

3   southbound in the dark could only see 150 feet in front

4   of them?

5    A.    I'm not saying that.

6    Q.    Okay.

7    A.    You could see the lights.  You can see the

8   balls of the lights over in the parking lot, which is

9   further.

10    Q.    Okay.

11    A.    They're higher.  You could see the points of

12   light.  You may be able to see the taillights or

13   headlamps of vehicles inside of the rest area.  But

14   that's independent of the throw distance.

15    Q.    Let's take the rest area out of it.

16    A.    Okay.

17    Q.    A motorist traveling down Interstate 81

18   South is going to go through stretches where there's no

19   rest stops, correct?

20    A.    Correct.

21    Q.    And there's no sources of ambient light,

22   correct?

1      A.    Correct.

2      Q.    Is it your testimony that a motorist driving

3  down Interstate 81 South can only see 150 feet in front

4  of them and no more?

5      A.    If you take out all the points of light, if

6  you take out houses in the background, all he or she

7  can see is the throw distance of that vehicle.

8      Q.    150 feet?

9      A.    150 feet.  Now, again, I'm throwing out also

10  reflectorized signs, things of that nature.

11      Q.    Okay.  So what's the speed limit on 81

12  South?

13      A.    Seventy.

14      Q.    Seventy?

15      A.    Maximum.

16      Q.    And at 70 miles per hour, how many feet per

17  second is that?

18      A.    Well, half of 70 is what, 35?  So that's

19  roughly, what, 105 feet per second?

20      Q.    105 feet per second?

21      A.    Correct.

22      Q.    So you would travel the distance -- at

152

1    highway speeds, you would travel the distance that your

2    headlight illuminates in about what, a second, second

3    at a half?

4         A.    Some component after a second.  If you shine

5    at 150 --

6         Q.    Right.  Between one and two seconds?

7         A.    Correct.

8         Q.    All right.  Without getting into the

9    calculations, do you agree with me that that would

10   exceed the stopping distance for that vehicle at

11   70 miles per hour?

12        A.    It would.  In fact, that's the calculations

13   that I did in this analysis.

14        Q.    And you're a former police officer?

15        A.    I'm not.

16        Q.    Oh.  What did you do before you started

17   doing this?

18        A.    I'm a highway engineer --

19        Q.    Oh, that's right.

20        A.    -- with the Highway Department.

21        Q.    That's right.

22        A.    Then I headed up the state's crash team in

1    which troopers worked under me.

2        Q.    Is it your testimony it's safe for a

3    motorist to drive down the highway in the dark at

4    70 miles per hour when they only have one to two

5    seconds to perceive anything in front of them that

6    comes into their headlights and don't have the ability

7    to stop in time to avoid it?

8        A.    Do I think it's safe?

9        Q.    Yes.

10        A.    No.  That's why people -- when we used to

11    write out highway safety literature, one of the

12    findings that we found for years is people tend to

13    overdrive their headlamps.  That's what that means.

14    Should you drive on a rural area like this with your

15    high beams on?  You better believe it.  I do.

16        Q.    Okay.  Do you know if Mr. Lester had his

17    high beams on?

18        A.    I don't.  I'm under the impression he had it

19    low.  Now, he said he was going 60.  So even though

20    it's a little bit different from the 70, I calculated

21    the stopping distances, I think, in my -- I don't know

22    if I put that in my report or not.  But I've got the

1    calculations here.  At 60 and at 70, assuming high beam

2    versus low beam, he's still not going to have enough

3    distance in which to stop.  In this situation now.

4        Q.    Well, same would be true for anything in the

5    roadway, correct?

6        A.    I'm sorry.  He couldn't see anything in the

7    roadway?

8        Q.    No, no.  I'm sorry.  If you can only see

9    150 feet in front of you at 70 miles per hour and you

10   only have between one and two seconds to do something

11   once you see it and that distance is not sufficient

12   time based on the machinery and the person operating

13   the machine to have any chance of stopping, anything in

14   the roadway would cause an accident, correct?

15       A.    Well, if it's not moving.

16       Q.    Right.

17       A.    If it doesn't try to get out of the way.

18       Q.    Or if it's slower than you.

19       A.    If it's slower than you, yeah.

20            MR. HEARN:  That's all my questions.

21                 E X A M I N A T I O N

22   BY MR. FRANKL:

1      Q.    Mr. McAllister, my name's Dan Frankl.  I

2  represent Salinas Express.

3            Initially when you were listing everything

4  that you reviewed, you said you saw the daily driver

5  logs of Mr. Martinez.  Did you see Mr. Martinez's daily

6  driver's logs, or did you only see the daily driver's

7  log for Roy Salinas?

8      A.    I think I saw Salinas.  What is included

9  with the police data is what I reviewed.

10     Q.    So as we sit here today, you haven't seen

11  the Martinez daily driver's logs?

12     A.    Let me see what I've got --

13     Q.    All right.

14     A.    -- Dan, and then I can tell you.

15     Q.    When you find them, if you could tell me

16  what exhibit they're in, that would be greatly

17  appreciated.

18     A.    Got it.  That is if I can find it.  That's

19  not it.  That's not it.  Maybe it's here.  That's not

20  it.

21     Q.    Take your time.

22     A.    Found them.  You'll love this.  It's not

1    even noted as an exhibit yet, but it will be.

2            The one I've got here is daily -- I'm sorry.

3    Driver's daily log, Salinas Express.  And I don't

4    know -- I don't know who wrote it.  I don't see a name

5    on it.  Here's the front page or the first one I got.

6        Q.    Roy Salinas.

7        A.    Roy Salinas, okay.  That's all I've seen.

8        Q.    You took that out of what packet?  This

9    here?

10        A.    The packet that hasn't been exhibited yet.

11            MR. FRANKL:  Let's go ahead and mark that as

12    Exhibit 43.

13            (Exhibit Number 43 marked for

14            identification.)

15    BY MR. FRANKL:

16        Q.    Those are the only daily driver's logs that

17    you've seen?

18        A.    That's correct.

19        Q.    Okay.

20        A.    I think -- Salinas' driver's log is what I

21    put in my report, so that's all that I've seen.

22        Q.    Now, in looking at -- and I think you -- in

1    looking at Exhibit 15.

2        A.    Yes, sir.

3        Q.    And you circled where there was a disruption

4    of the tires tracking from one another.

5        A.    Correct.

6        Q.    And that is more clearly shown in

7    Exhibit 13?

8        A.    It is.

9        Q.    All right.  And I think you indicated

10   earlier in looking at Exhibit 9 the right track of skid

11   mark is going from a greater distance from the scene

12   between the two lanes toward the middle where that

13   disruption takes place?

14       A.    That's correct.  There's a noticeable

15   movement, although slight.  But there's a movement from

16   right to left in that picture.

17       Q.    Okay.  And --

18       A.    In these pictures.

19       Q.    Okay.  And you were indicating that there

20   could be no lateral movement because of the, I guess,

21   centrifugal force taking him down the roadway in a

22   straight pattern?

158

1      A.    Well, it's the inertia of going forward.

2  Once you're in a sliding mass or sliding movement, you

3  can't deviate left and right unless two things occur.

4  Unless you let off your brake.  Then you won't have the

5  skid, and then you can steer.  We don't have that here.

6  The second explanation is you have to have an external

7  force that changes the vector or changes the direction.

8  That, in my estimation, is the contact or impact.

9      Q.    Okay.  Now, having said that, do you know

10  which tire, looking at Exhibit 13, made the skid mark

11  to the right of the center white marking or lane

12  dividing marking versus which one made the marking to

13  the left?

14      A.    I can't be certain, but I believe the longer

15  ones are going to be the rear, which is typical of a

16  vehicle that's braking.  So this is rear.  This is

17  rear.  This right here, I believe, is going to be

18  front.  But I can't be a hundred percent certain

19  because I don't have an end point up here.

20      Q.    Okay.  And in looking at Exhibit 13, you can

21  see there's -- on the upper right-hand side, there's a

22  red glow of probably a taillight in the distance?

1    A.    It's an emergency vehicle, you know,

2  flashing.

3    Q.    Okay.  But if the front wheels are the ones

4  going off to the right into the right-hand lane, the

5  one that is going down the middle still would be the

6  rear wheels?

7    A.    At that point in time, correct.  In other

8  words, it's off-tracking.

9    Q.    I understand.

10        And in looking at 14, does it appear that

11  the rear wheel, at least the one you have presumed to

12  be the rear wheel, stops?

13    A.    Well, I can't see in this picture how far it

14  goes beyond that.  Clearly in the picture it stops.

15  But if you see something here that's important.  If we

16  assume that this is the rear wheel, this right here

17  corresponding to the left, further to the left, would

18  be the rear wheel as well.  This is the front on the

19  far right.  This is the front left.  So the truck,

20  pickup truck -- it's not to scale -- is sort of

21  doing -- after impact was made, it was sort of doing

22  this (indicating).  It's in the process of rotating

Case 7:15-cv-00665-GEC   Document 143-15   Filed 11/02/16   Page 10 of 75   Pageid#: 3568

1    clockwise and then comes down here.  You can't see

2    here.  You can't see in any of these.  But then comes

3    to rest down here -- again, this is not to scale --

4    somewhere like -- again, it's not 100 percent.  But

5    somewhere in this fashion here (indicating).

6         Q.    Now, do the photographs allow you to

7    determine where the second collision took place?

8         A.    They do.  You'll love this.  We haven't got

9    to them yet, so they're not exhibits, but they will be.

10   Five, 6, 4.  Put them in some kind of order.  This is

11   7.  Where's my 6?  This, I think, is the next shot

12   after 14, okay.  In fact, you can see the cap there

13   from the pickup truck, which I think's there.

14        Q.    Do you know whether that cap's been moved?

15        A.    I do not.  I don't know.

16              Now, we were talking earlier -- and I'm glad

17   you pointed this out to me.  We were talking about the

18   little buttons on the guardrail.  Bam, bam, bam, bam.

19        Q.    Well, there's are actually buttons along the

20   right-hand side of the road too, are there not?

21        A.    Absolutely.  On the guardrail.

22        Q.    No, no, no.  Right-hand side of the road.

1    Looking at Exhibit 14, you can see buttons along the

2    right-hand side?

3         A.    No.  That's different.  These right here are

4    delineators, embedded delineators.  These up here are

5    buttons.

6         Q.    Okay.  So the designated lane or delineators

7    also reflect light?

8         A.    Absolutely.  That's the purpose of them.

9    And that's the purpose of them -- I'm talking about the

10   embedded ones -- to tell drivers during inclement

11   weather which lane is which because at nighttime -- I

12   mean, when it's wet, you can't pick up the beads inside

13   the paved line on the pavement stripes.

14        Q.    Okay.  So is it your Number 8 that we're

15   going to 44, does that delineate where the second

16   collision took place?

17        A.    It does.  In fact, that's going to be in the

18   vicinity of the most harmful event, which is the second

19   crash.  That's indicated by -- of course you lose it

20   down here because of the fluid.  See, you've got fluid

21   here that's contaminated the roadway service.  Now, I

22   don't know if it's radiator fluid or the firemen washed

1    it down, but you can see it.  You can see gouges.  You

2    can see what might be a collision scuff or a collision

3    scrub here.

4                (Exhibit Number 44 marked for

5                identification.)

6    BY MR. FRANKL:

7         Q.    And so Exhibit 44 shows where the markings

8    in the roadway where the second collision took place?

9         A.    It's my firm opinion, yes.  And my next, 9,

10   should be beyond that.

11        Q.    Now, do you have any opinion as to whether

12   or not the driver's door to Lester's pickup truck was

13   open at the time of the second collision?

14        A.    I don't know if it was or not.  He says it

15   wasn't.  He says he couldn't get out.  I know

16   Mr. Theriault thinks that -- again, I don't know

17   precisely what he -- he thinks there's a gouge or a

18   scrape in the road from the -- from the driver's lower

19   door when it came open.  I don't know if that's a fact.

20   I don't know at what point in time that occurs at.  So

21   I don't honestly know.

22        Q.    Did you inspect Mr. Lester's pickup truck

1    and that door as to whether or not it was open or

2    closed when you inspected it?

3         A.    Well, but this is after -- yes.  It was

4    partially open when I inspected.  In fact, it was

5    wrapped up with the driver's seat belt.  But --

6         Q.    To keep it from --

7         A.    Staying open all the time.

8         Q.    Okay.

9         A.    But you have to realize, when this truck --

10   when the pickup struck was struck broadside, I think I

11   measured 3 1/2 inches of static penetration, crush.  If

12   this thing were made out of clay, I could demonstrate.

13   That sucker was just bent; it was bowed (indicating).

14   That's why the front tire -- the right front and the

15   right rear tires are a little bit closer than the left

16   side because the whole unit is bowed.

17              So when in time that happened -- and again,

18   I assume that's what Kevin's talking about,

19   Mr. Theriault is talking about -- I can't tell you if

20   that was -- more than likely it occurred at impact from

21   the bread truck because that took one heck of a wallop.

22   And then it was forced down the road south.  And then

1    when it encountered the soft shoulder, that's when that

2    sucker rolled.  It rolled three-quarters of a turn.

3        Q.    But if it didn't roll until it was off the

4    side of the roadway on the right, what would have

5    caused that door to open?

6        A.    The bowing (indicating).  You have to

7    realize what we're looking at here is stop action.

8    We're seeing the initial impact.  Well, milliseconds

9    after that initial impact, that pickup truck is now

10   starting to contort.  It's starting to bend; the bed is

11   starting to warp (indicating).  Its elasticity is such

12   that it is just elongated.  It no longer has its form

13   or design that it had prior to impact.  Then you add on

14   top of that the pushing of the pickup truck.  And this

15   is happening just in milliseconds.  And then it goes on

16   down the road and does what it wants to do.

17       Q.    And so, but it's your opinion that it

18   doesn't flip until after it leaves the right shoulder

19   of the roadway?

20       A.    Well, when I say "flip" -- actually, if I

21   said "flip," I'm wrong.  A flip typically is that

22   (indicating).  A rotation or --

165

1       Q.    A barrel roll as compared to an

2  end-over-end.

3       A.    Bingo.  Now, more than likely that truck

4  began to do this (indicating) because of all the weight

5  shift, because of all the intrusion, because of the

6  tires.

7       Q.    All right.  Just so I can describe for the

8  record.  When you say it's getting to do this, the

9  weight of the pickup truck would be transferred from

10  the right side toward the left side?

11       A.    Correct.

12       Q.    At an angle toward the roadway?

13       A.    Correct.

14       Q.    All right.  And if in fact the door was

15  open, you would expect the door to make a gouge in the

16  roadway?

17       A.    Yeah.  It wouldn't make it over there, I

18  don't think, unless you have sod on it.

19       Q.    And if in fact the bottom left-hand side of

20  the driver's door is in fact bent under, that would be

21  indicative of the door digging into something hard,

22  curling it up on that left side?

1        A.    I went back after I read -- not necessarily.

2    I went back and read Mr. Theriault's report.  I went

3    back and looked at my pictures.  The door -- it's hard

4    to explain, especially as she's taking this down.  The

5    door is open at some point as my pictures clearly show.

6    The corner, the left lower corner of the back edge of

7    the door, the driver's door, is curled under.  I didn't

8    go underneath there to see if that was curled under as

9    a result of asphalt or sod or gravel because I saw the

10   truck, pickup truck, what, ten months, nine months

11   after the crash.  It had already been moved several

12   times.  I'm not so sure if I could find that evidence.

13        If Kevin's got pictures that shows asphalt

14   under there, then, yeah, it could be in the road.  It

15   could be on the shoulder.  Where?  I don't know.  That

16   is if in fact it did happen.

17        Q.    So I guess to put what you just -- in your

18   opinion, at this point in time, you can't say whether

19   or not the door was open at the time of the second

20   impact or not?

21        A.    I can't.  That's what I was saying earlier.

22        Q.    That's fine.

1      A.    I know from Mr. Lester, he said he couldn't

2   open the door; he couldn't get out.  Well, if the door

3   was open, that begs the question, well, heck fire, if

4   the door was open, why couldn't you get out?  I don't

5   know.  I'm speculating on top of speculation, which I

6   don't want to do.

7      Q.    Do you have photographs of Mr. Lester's

8   pickup truck?

9      A.    I do.

10     Q.    And can you show me where in those

11  photographs it shows some kind of a transfer of either

12  paint or black rubber onto the front right corner of

13  his bumper.

14     A.    Well, I'll try my best.  If we look at

15  item -- my Exhibit Number 5, which we haven't gotten

16  into this yet, but y'all have got it.

17     Q.    You're looking at approximately the fifth

18  page.

19     A.    That sounds about right.  I'm looking at a

20  vehicle damage equipment record.  This is what I've

21  noted on the pickup truck when I inspected it whenever.

22  July, I reckon, of this year.

168

1     Q.    That's when you met Mr. Lester out there

2   that day?

3     A.    Right.  He took me.

4     Q.    Okay.

5     A.    I followed him to where the truck was stored

6   at.  A friend's house, I think, in a field.

7            We've got contact damage that I measured at

8   almost 3 feet -- almost 3 1/2 feet to the front of the

9   truck, pickup.  We've got 2 foot of collapse from front

10  to rear.  We've got the hood bowed down.

11    Q.    But I'm asking you where you have a

12  photograph showing transfer of black paint or rubber on

13  the front right corner.  Do you have anything to

14  indicate that?

15    A.    I'm trying to answer your question.  If you

16  look up here, you'll see in my notation, black color

17  bumper, his.  Then impact scuffs on bumper.

18    Q.    Okay.  There's scuffs, but are there any

19  paint transfer that you can equate to the front of the

20  SMC tractor that he made initially contact with?

21    A.    Well, let me look.  It's going to be awful

22  difficult to have black on black.  This right here

1    probably is the best shot.  See the scuffing here?

2        Q.    I understand there's scuff.  But if I

3    remember correctly, you indicated that there was a

4    paint transfer, and I was wondering if you could point

5    out any physical evidence of a paint transfer.

6        A.    Yes.  Right here.  Right there on that

7    fender.  Voilà.  That's black.  Here's another shot.

8    Voilà.  It looks like to me it's right -- it's crumpled

9    now, but it's in the vicinity of the right -- the right

10   front headlamp, in that vicinity.  So that's what I was

11   meaning -- that's what I meant when I said that in my

12   report.

13       Q.    And you're referring to --

14       A.    Let's go to this one first.  Right there.

15   Up there.  See there?

16       Q.    And same on this one?

17       A.    Yeah.  I thought we had a better one.  Right

18   here.

19       Q.    You see that's above the -- that's above the

20   bumper line?

21           MR. FRANKL:  Let's go ahead and mark these

22   two as 45 and 46.

170

```
1              (Exhibit Numbers 45-46 marked for
2              identification.)
3              THE WITNESS:  What did we use, two?
4              MR. FRANKL:  Yes.
5              THE WITNESS:  My 17 and 18.
6              (Exhibit Number 47 marked for
7              identification.)
8    BY MR. FRANKL:
9         Q.    Looking at what we're going to mark as 47,
10   that shows the significant crush on the lower left of
11   the driver's door that you had indicated earlier?
12        A.    Yes, sir.  And I believe that's going to
13   be -- that's going to be contact damage with something.
14   It's not induced damage.
15        Q.    Right.  So that would have been contact with
16   the ground at some point in time.  And you can't say
17   whether it was pavement, gravel, or soil?
18        A.    Correct.
19        Q.    Okay.
20        A.    Pavement, shoulder, or gravel or soil.
21        Q.    Now.  Again, to belabor this 150 feet
22   visibility.  Even if you -- in some of your opinions,
```

1    you rely on the testimony of Mr. Lester; is that true?

2         A.    In the totality of my report and

3    conclusions, the answer is yes.

4         Q.    Okay.

5         A.    As it specifically relates to the

6    headlights, I'm not so sure that was asked.

7         Q.    I'm jumping around.  I wasn't asking about

8    the headlights.

9         A.    Oh.

10        Q.    Did you find any physical evidence to

11   support that the SMC tractor being driven by

12   Mr. Martinez was across both lanes of the roadway when

13   the impact took place?

14        A.    No, sir.

15        Q.    So from that statement, you know that

16   what -- Mr. Lester's recollection of this accident is

17   not entirely correct?

18        A.    As it pertains to that, correct.

19        Q.    Okay.  But on other areas, you have elected

20   to accept his testimony as being correct.  On other

21   opinions, in the totality that you've mentioned

22   earlier, you've accepted his statement as being

1    correct?

2           MS. ROBINSON:  Objection to the form.

3           THE WITNESS:  It's just like I do with any

4    of these witnesses or, actually, any of the two

5    drivers.  I consider what they say, and then I look at

6    the physical evidence to try to help me -- I guess you

7    might say -- prove or disprove what they say.  So yes,

8    some of the items -- I would guess that Mr. Lester said

9    just like Mr. Martinez -- I think some are more valid

10   than others.

11   BY MR. FRANKL:

12       Q.    And that's a discretionary finding that you

13   have made in reaching your opinions?

14       A.    Well, I wouldn't say discretionary.  Act

15   like that's just maybe a whim.  It's based upon the

16   physical evidence that I examined.  The impact clearly

17   was to the left front of the truck, the tractor

18   trailer, and the right front corner of the Lester

19   truck.  The tire marks show me the area of the impact.

20   Now, can I conclude that the truck, tractor trailer,

21   was completely across?  The answer is no.

22       Q.    Did you measure the skid marks from where

Deposition of David O. McAllister
Conducted on October 10, 2016

173

1    the Lester vehicle -- where they began to the point of

2    impact that you've marked on Exhibit 15?

3         A.    No.  Because I couldn't see them when I was

4    there.  Secondly, the photographs that the troopers

5    took are into the skid, so I don't know how much is

6    behind me, or in other words, north of Photograph

7    Number 1 that the trooper took.

8         Q.    Okay.  Using the headlight analysis of being

9    150 feet --

10        A.    Yes, sir.

11        Q.    -- and assuming Mr. Lester was traveling

12   60 miles an hour --

13        A.    Correct.

14        Q.    -- he would be doing approximately 90 feet a

15   second -- I'm sorry.

16        A.    Eighty-eight.

17        Q.    88 feet a second?

18        A.    Well, 90 feet is close enough.

19        Q.    And so if they -- you have a perception and

20   reaction time of a second and a half.

21        A.    You do under normal average circumstances.

22        Q.    And didn't you make reference to that in

174

1    your report?

2         A.    I do.

3         Q.    Okay.

4         A.    I do, but --

5         Q.    Assuming --

6         A.    Let me expand.

7         Q.    But let me -- I haven't finished my

8    question.

9         A.    I'm sorry.

10        Q.    Assuming he's doing 60 miles an hour and

11   assuming an average reaction time of a second and a

12   half, if, as you say, you couldn't see what was in the

13   roadway unless it is within your 150 feet of

14   headlights, that would leave you approximately 15 feet

15   before impact for you to apply your brakes?

16             MS. ROBINSON:  With a dead solid object in

17   the roadway?

18   BY MR. FRANKL:

19        Q.    With a stopped object in the roadway.

20        A.    I haven't approached it from that angle.

21        Q.    I understand that, and that's why I'm asking

22   you the question.

175

1      A.    I don't know.  I'd have to look at the math.

2  I'd have to look at the figures.

3      Q.    You would agree that the skid marks before

4  that point of impact are greater in length than

5  15 feet?

6      A.    Oh, absolutely.  Sure.

7      Q.    So he had to have been able to have seen

8  this vehicle in the roadway to have applied his brakes

9  before this 150 feet that you've alleged is all he

10 could see?

11     A.    No.  The reason being is he doesn't know

12 what he's seeing.  He sees something.  Now, he didn't

13 say that.  I'm just going on cases that I've worked,

14 human factors data.  When a driver sees something when

15 it's unexpected, which this is, when he's not expecting

16 it, which Mr. Lester was not, that he doesn't have the

17 liberty of having all this driver reaction time to

18 react.  So he doesn't -- he sees something.  He's not

19 going to tell you this, but this is how the mind works.

20 You see something that is abnormal.  You don't know

21 quite what it is until you get closer to it.  Well, the

22 closer you get, you're taking -- you're spending

1    critical distance and you're spending critical reaction

2    time.

3         Q.    So it would take more time?

4         A.    Oh, in my estimation, absolutely.

5         Q.    Okay.  But again, if it took more time than

6    a second and a half, that would have eaten up more of

7    the 150 feet.

8         A.    That's correct.

9         Q.    So -- but the skid marks before the point of

10   impact are greater than 15 feet.  So he had to have

11   seen something to have applied his brakes when he did.

12        A.    That's right.  He could have seen what's

13   over in the -- in that ramp, that ramp going into the

14   rest area.  He could have seen the flicker of what's

15   there, you see.

16        Q.    But if he saw those, would you -- if it's a

17   flicker or off the road in the ramp, you wouldn't

18   expect him to slam on his brakes, would you?

19        A.    No.  But he's got to connect what he's

20   seeing over there to what's in the road.  He was

21   confronted with something that was blocking his

22   perception of the road.  Once he got closer to it, he

177

1    could, apparently -- he didn't say this -- apparently

2    see the angle or the positioning of the truck.  I think

3    it's normal for a driver then to say, okay.  If he's

4    broadside to me, I don't know what he's doing.  Is he

5    pulling out, is he stopped, or is he backing up?  And

6    then he reacts.

7         Q.    But you agree with me that he had reacted,

8    allowing there to be skid marks of greater than 15 feet

9    before impact?

10        A.    No doubt about it.

11        Q.    Okay.

12        A.    Probably the length of two trucks, two

13   vehicles.  30 feet perhaps.

14        Q.    Okay.  So at least 30 feet?

15        A.    About.

16        Q.    Okay.  And going back to -- well, before I

17   go back.  If there was this white car that you have

18   indicated in your opinion didn't exist, if it had been

19   slowing on the highway, not an emergency stop, but

20   slowing and he was following behind it, wouldn't the

21   existence of skid marks leading into the point of

22   impact of greater than 15 feet, up to as many as

1    30 feet be support that there was another vehicle

2    there?

3         A.    You're trying to prove a negative.  You're

4    trying to prove that a vehicle that's not there that

5    nobody can identify, this phantom vehicle, you can't

6    prove a negative.

7         Q.    I'm not asking you to prove a negative.

8         A.    Yes, you are.

9         Q.    Isn't that support for he knew something was

10   happening before he could see what was in the roadway?

11            MS. ROBINSON:  Objection to the form.  It

12   calls for speculation.

13            You can answer.

14            THE WITNESS:  I can't answer that with the

15   idea that there could have been a white vehicle.  Could

16   have been a flying saucer.  Could have been a

17   helicopter.

18   BY MR. FRANKL:

19        Q.    In looking at 45 and 46, there are other

20   places on the vehicle, like you can see on this fender,

21   where the paint has come off.  Do you see on where I'm

22   pointing?

1    A.    I do.

2    Q.    Can you say that what you have previously

3    indicated is paint, or is it paint having been removed,

4    or if it's rubber, or can you say with a reasonable

5    degree of certainty as an accident reconstructionist

6    that those two indications are paint transfers or

7    rubber transfers from this collision?

8    A.    I don't believe it's rubber.  I think it is

9    paint.

10   Q.    So it's your opinion based on reasonable

11   degree of certainty that that's paint --

12   A.    I do.

13   Q.    -- at those locations and not just the

14   removal of the blue paint?

15   A.    I do.

16   Q.    Okay.  And it's my understanding you don't

17   know or haven't considered whether or not Mr. Lester

18   was changing lanes prior to this accident?

19   A.    The physical evidence doesn't say that.  I

20   don't know what he was doing prior to where the skid

21   marks begin.  But I think he did say he was initially

22   in the right lane, then went to the left lane, but I

1    don't know if that's during this movement.  But he

2    clearly -- after skidding, he clearly is going toward

3    the left.

4        Q.    And if he were in the left-hand lane

5    completely, he would have driven by this accident scene

6    without impact?

7            MS. ROBINSON:  Objection to form.  Calls for

8    speculation.

9            Go ahead.

10           THE WITNESS:  If he left five minutes

11   earlier, five minutes later.

12   BY MR. FRANKL:

13       Q.    That's not what I'm asking you, though.

14       A.    I'm answering it that way.  If he had gone

15   into the ramp, he wouldn't be.

16       Q.    You testified earlier that there's no

17   physical indication that the SMC tractor was in the

18   left-hand lane.

19       A.    Correct.

20       Q.    So had he been driving completely down the

21   left-hand lane, can you say in your opinion there would

22   have been a collision?

1    A.    Probably not.  However, he's committed to

2  skidding.  He's committing to the presence of that --

3  as I understand it, that truck.  That's why he slides

4  into the truck.

5    Q.    And as we sit here today, do you have an

6  opinion as to how much time elapsed from the first

7  collision with the SMC tractor and the second collision

8  with the box truck?

9    A.    Don't know.

10    Q.    Okay.

11    A.    If you look at the testimony, you can glean

12  some idea as to the probable time frame.

13    Q.    By looking at what?

14    A.    By examining the testimony.

15    Q.    Okay.

16    A.    Of the people involved.

17    Q.    Now, was there any pre-impact skidding by

18  the box truck?

19    A.    I didn't see -- I can't say he wasn't

20  braking, Mr. Shifflett, but I can say he left no skid

21  marks prior to impact.

22    Q.    Did he leave scuff marks, yaw marks after

1    impact before he overturned onto the right shoulder of

2    the roadway?

3         A.    Absolutely.

4         Q.    And do you have photographs showing that?

5         A.    I certainly do.

6         Q.    And is it your opinion that also that

7    vehicle turned -- the box truck turned

8    counterclockwise, but did not overturn until it went

9    off onto the shoulder of the roadway?

10        A.    That's correct.  That truck also was in a

11   broadside movement after impact with the pickup truck.

12   And then because of the physics of the truck, it

13   continued to come around clockwise until it was just

14   about 180 degrees from where he was originally

15   traveling and then encountering the downslope ditch

16   line softer shoulder and whatnot, the trees and all

17   that through there, that's what rolled him over.

18        Q.    All right.  I'm looking at page 6 of your

19   report.  I believe it's in your section Exhibit 5, the

20   first full paragraph about a third of the way down.  It

21   says, "At a post estimated at least 50 to 75 feet into

22   the two skid mark lengths, a third and fourth skid

1   scuff begins to show up on the payment."

2       A.    Wait a minute.  What page again?

3       Q.    Page 6.

4       A.    I'm sorry.

5       Q.    First full paragraph about a third of the

6   way down.  Now, you just testified a few minutes ago

7   that it was 15 to 30 feet, but your report indicates

8   that it's 50 to 75 feet before that divergence of

9   impact.

10      A.    And I would defer to my report.

11      Q.    So that means he had -- even further back,

12  he had started braking, indicating he had to have had

13  some notice that there was something in the roadway

14  before his headlights hit it.

15      A.    Interesting comment.  You're exactly right.

16  Which may indicate that he had his beams on high beam,

17  which would have increased your sight distance.

18      Q.    By 20 feet?

19      A.    No.

20      Q.    That's what you testified.

21      A.    From 150 to about 200 feet.  It would

22  increase it by about 50 feet.

1    Q.    But if he testified he doesn't recall

2    whether they were on high beam or low beam.

3    A.    I'm answering it the way you're asking me

4    the question.

5    Q.    So does this -- you defer to your report

6    that those skid marks existed 50 to 75 feet before the

7    point of impact?

8    A.    Yes, sir.  And that's based upon my looking

9    at the state police pictures and estimating or

10   approximating that distance.

11   Q.    And you indicated that it was a significant

12   impact because of the induced damage on the right side

13   of the SMC tractor?

14   A.    Correct.  Well, and the contact damage to

15   the left front corner.

16   Q.    But can you tell the contact damage to the

17   left-hand corner, if that was what actually caused in

18   the impact between the SMC truck and the Lester's

19   pickup truck, or could that damage have been enhanced

20   during the vehicle flipping over, barrel rolling over?

21   A.    Wait a minute.  Are you talking about the

22   Lester vehicle?

1    Q.    Yes.

2    A.    I don't see where any of the damage on the

3    right front corner of the Lester vehicle was enhanced

4    by the barrel rollover.

5    Q.    So you're saying in your opinion the damage

6    to the right front of Lester's vehicle as indicated on

7    Exhibits 44 and 45 was solely caused by the impact with

8    the SMC tractor?

9    A.    I do.

10    Q.    Okay.  Now, your report on page 7, bottom

11    paragraph, four or five lines up from the bottom.  "He

12    saw" -- and "he" referring to Mr. Lester -- "a truck

13    across both lanes of the interstate."

14          But your own physical evidence debunks the

15    testimony; isn't that correct?

16          MS. ROBINSON:  Objection to the form.  Calls

17    for speculation in terms of point of impact versus

18    point of sight.

19          THE WITNESS:  What I'm saying is what

20    Mr. Lester testified to here.

21    BY MR. FRANKL:

22    Q.    Okay.  You've indicated at the bottom of

1  page 8, again four lines up, "Mr. Martinez's accounts

2  of the events leading up and immediately after the

3  collision are in direct contradiction of the statements

4  from the witnesses."

5          And I think that was dealing with the time

6  between the collisions.

7      A.    It does.

8      Q.    Are you aware of any of the four witnesses

9  seeing or being aware of the first collision between

10 SMC and Lester's vehicle?

11     A.    No.

12     Q.    So how would they be able to contradict

13 Martinez with regard to the time between collisions?

14     A.    Well, I think I'm dealing here not only with

15 time but what Mr. Martinez said he saw.  For instance,

16 somebody running over to help Mr. Lester out of his

17 truck.  I don't think the other people said they saw

18 that at all.  If they were trying to help him out of

19 the truck and the door was open, why would they try --

20 it doesn't jive as I see it.

21     Q.    So in your opinion, no one ran out to help

22 him?

1    A.    I don't see any evidence of that now.

2    Q.    Again, that's one of the items that you've

3  read about in testimony but then you've discounted

4  because you saw no physical evidence of that?

5    A.    Well, you wouldn't have any physical

6  evidence of that, but you would certainly have

7  evidence.  I've worked too many wrecks similar to this

8  in which a person is involved tangentally that after

9  the wreck, they would come up and tell the

10  investigating trooper, I went out to help him.  I moved

11  him.  I did this and that.  We've gotten nary account

12  of that at all.

13    Q.    Now, from the top of the hill --

14    A.    And that I think is very important for

15  someone to be materially not involved with the first

16  collision but certainly right after that collision.

17    Q.    Have you read the deposition of Arturo

18  Gutierrez?

19    A.    I haven't, no.

20    Q.    Okay.  Now, you say there's a slight rise

21  before the roadway starts a slight downhill grade.

22    A.    There's a crest.

188

1    Q.    Okay.  From the crest of the hill to the

2  beginning of the ramp where the dotted lines start

3  where you said there was the white truck was in the way

4  of the overhead shot.

5    A.    Yes, sir.

6    Q.    That's 400 feet?

7    A.    Did I say that?

8    Q.    Page 9, last paragraph of your report.

9    A.    Correct.

10    Q.    Now, you then indicate the ramp is

11  1,045 feet in length?

12    A.    No.  The curve.

13    Q.    All right.  The curve.

14    A.    Start with first sentence there.  "The

15  horizontal curve, which is about 1 degree in sharpness

16  and turns to the left, begins about 400 feet before the

17  off-ramp and is about 1,045 feet in length."

18          That's entirety.  From PC to PC, point of

19  curvature to point of curvature.

20    Q.    Did you measure from the crest of the hill

21  to where the ramp starts?

22    A.    I think I did.  Whether I wrote it in my

1   report, I don't know.  Looks like I didn't.

2        Q.    Well, let me ask you this.

3        A.    Wait a minute.  On Exhibit 5 on my field

4   notes, the hillcrest to the rest area ramp, off-ramp is

5   about 5/100 of a mile, which is about 264 feet long.

6        Q.    The crest of the hill to the start of the

7   ramp is 264 feet?

8        A.    That's what I've got noted here.

9        Q.    Okay.  Now, the point of impact based on

10  what you've indicated and circled on Exhibit 15 is

11  located north of the "rest area" sign?

12       A.    You're going to have to show me.  Was this

13  the aerial shot or the ground shot?

14       Q.    Look at your exhibit notes.  You've

15  indicated that there's a sign somewhere in this area --

16  in the gore area, as you put it -- that's blue that was

17  6 feet 3 inches high.

18       A.    About.  That's the bottom of it.

19       Q.    All right.  But the point of impact would

20  have been further north of that sign.

21       A.    That's right, but not far.

22       Q.    Did you measure the distance between the

Case 7:15-cv-00665-GEC   Document 143-15   Filed 11/02/16   Page 40 of 75   Pageid#: 3598

1    point of impact to that sign?

2        A.    We can't pinpoint the point of impact.

3        Q.    Well, based on the marks that you've

4    indicated that show that something happened causing

5    lateral movement of the skid marks, which is what you

6    say is the area of the collision --

7        A.    Correct.

8        Q.    -- did you measure from that area of the

9    collision south to where that sign was?

10        A.    Again, I don't have enough physical evidence

11    to tell me that.  I can put it in a vicinity or an

12    area, which I've done.

13        Q.    Well, but you can even look at Exhibit 15

14    and see that the sign that looks green that you say is

15    blue that says "rest area" is further south deeper into

16    the photograph on Exhibit 15?

17        A.    It is.  No doubt about it.

18        Q.    And you also know, do you not, the distance

19    of each white line?

20        A.    I do.

21        Q.    How long are they?

22        A.    10 feet.

Q. And what is the distance in between the white lines?
A. 30 feet.
Q. And so if you were to move across, you've got 80, 90 feet north?
A. You may. You may.
Q. All right. So your sight distance --
A. But the trouble with that approximation is if you come laterally out from that blue sign that looks green, you don't know where it is out here. See, that's the fallacy of going laterally from this type of analysis or approximation.
Q. If you look at what is going to be marked as Exhibit 48.
(Exhibit Number 48 marked for identification.)
BY MR. FRANKL:
Q. You can see that that sign is further south than the first full stripe in the middle of that photograph.
A. Okay. I agree.
Q. All right. And if you then take that back,

1    it gives you where that -- what is the third full

2    stripe that you can see on Exhibit 15.

3        A.    It may or may not.  What I'm telling you is

4    we don't know where that sign is in relationship to

5    those stripes.  We do here, but we don't have a

6    continuation of another picture showing each and every

7    stripe back.

8        Q.    Okay.  So you're saying you didn't attempt

9    to determine how far back that was?

10       A.    I did not.

11       Q.    Okay.  But --

12       A.    Because any attempt I would do would only be

13   approximation.

14       Q.    Well, but you've only given an approximation

15   as to the point of impact.

16       A.    That's because that's more finite.  And

17   that's because based upon the skid marks and the

18   deviation of the skid marks.  I don't have to do or

19   anyone doesn't have to do very much approximating to

20   come up with the point of impact laterally as opposed

21   to longitudinally.

22       Q.    But I guess looking at Exhibit 10, you'll --

1    there's no question that again, it's at least the third

2    stripe that would be the one that we've just marked as

3    48?

4         A.    Are you saying that that line --

5         Q.    This one.

6         A.    Okay.  Then where's the next line after

7    that?

8         Q.    I don't know, but it's further north.

9         A.    That's my point.  You don't know.

10        Q.    In this photograph, what would be the third

11   full stripe corresponds with the stripe that's in the

12   middle of 48?

13        A.    It may.

14        Q.    And assuming -- just assume that that's the

15   case, that you're looking at 40, 80, approximately

16   90 feet to where the area of the collision, assuming --

17        A.    If we assume that, that's right.

18        Q.    All right.  And so your sight distance

19   analysis, using that "rest area" sign, is going to

20   be -- using the assumption of 90 feet -- it's going to

21   be a difference of 90 feet north is where the initial

22   point of collision is?

1      A.    I don't know what the world you're talking

2  about.

3      Q.    All right.

4      A.    I know where the point of impact is, and I

5  know the center lines where they're marked in these

6  pictures.  But when you start to dissect this picture,

7  dissect this picture, when you don't have an end point

8  and a beginning point, good luck.

9      Q.    Okay.  But when you did your sight distance

10  analysis and you said, I can see -- I can't see the

11  bottom of the sign 660 feet, or whatever you --

12      A.    800 feet.

13      Q.    800 feet.  Okay.  But you were looking and

14  using the bottom of the sign as your fixed point for

15  sight distance.

16      A.    And I said it before.  I'm doing a daylight

17  sightline.

18      Q.    Okay.  But my point is --

19      A.    What the daylight sightline -- daytime

20  sightline and what's there at the time of the crash,

21  which is dark, is the difference between a house and a

22  horse.

1      Q.    But if, assuming we were to agree that the

2  point of impact was 90 feet north of the sign, my

3  question is, would that change your daylight sight

4  distance?

5      A.    It may.

6      Q.    Thank you.

7      A.    It may.  But it makes no difference to me if

8  it's 800, a thousand feet, because we're dealing with a

9  nighttime situation.  Plus too, I'm standing up.  I'm

10  6-foot-2 tall.

11      Q.    Do you know what the height of Mr. Lester's

12  vision would have been as he sat in the vehicle he was

13  driving at the time of this accident?

14      A.    Yeah.  It's going to be a little bit shorter

15  or a little bit lower than my standing sightline.

16      Q.    And how much lower?

17      A.    Probably 6 inches.

18      Q.    So your sightline is what height?

19      A.    I'm 6'2" so my eyes are about 5'10".

20      Q.    So you're saying about 5'4".

21      A.    5'4", 5'5", 5'6", somewhere in there,

22  approximating.

1      Q.     That is an estimate on your part.

2      A.     Exactly.

3      Q.     Now, on page 11 of your report, you said the

4  second collision, very top line, full sentence, "The

5  second collision resulted in the probable ejection of

6  Mr. Lester."

7      A.     Correct.

8      Q.     Do you still hold the opinion that he was

9  ejected?

10     A.     Again, I'm going to have to defer back to

11 Mr. Lester.

12     Q.     So is the answer to that question yes?

13     A.     The answer is yes.

14            MR. DUNN:  What was the question?  I'm

15 sorry.  Can you read back that question.

16            MR. FRANKL:  Was it still his opinion that

17 Mr. Lester was ejected?  And he ultimately said he

18 defers to Mr. Lester and that the answer is therefore

19 yes.

20 BY MR. FRANKL:

21     Q.     Did you talk to Mr. Lester personally about

22 this accident?

1     A.     Did not.

2     Q.     And did you conduct any actual testing,

3  physical testing of any kind with regards to your

4  investigation?

5     A.     Did not other than my observations, my field

6  measurements, and the measurements that I observed in

7  my pickup truck when I drove the site.

8     Q.     But as far as actually testing in any

9  physical type of testing, did you conduct any?

10    A.     Did not.

11    Q.     You've indicated that you're going to do

12 this additional measurements of the height and type and

13 luminescence of the lights that are at the rest stop.

14 Do you anticipate any other investigation in this case?

15    A.     I won't know until after the deposition.

16    Q.     Other than the opinions that you've already

17 delineated in your report, have you reached any other

18 conclusions or opinions about this accident?

19    A.     No, sir.  I think they're enumerated here.

20 Plus, what I already testified to.

21    Q.     And you indicated, I believe, earlier in

22 your testimony, that Mr. Lester, in your opinion, was

1    in the right-hand lane prior to this accident?

2        A.    Clearly the beginning of the skids indicate

3    that the portion of his car was in the right -- pickup

4    truck was in the right lane.  What he did before, I can

5    only relate to what he says.

6        Q.    And what did he say?

7        A.    I think he says he was in the right lane.

8    Or whatever his testimony is.  I'm thinking right lane.

9        Q.    I'm thinking he said he was in the

10   right-hand lane.

11       A.    Okay.

12       Q.    So assuming that, those skid marks, though,

13   90 percent of his vehicle would have been in the

14   left-hand lane.

15       A.    Correct.

16       Q.    So that's inconsistent with his prior

17   testimony.

18       A.    I'm not so sure it's inconsistent.  It

19   depends on what point in time he's saying that.  When

20   he got on the interstate a mile back, what lane was he

21   in?  Was he in the left or right?  I can't tell you.

22   When he says he was in the right lane 100 feet prior to

Case 7:15-cv-00665-GEC   Document 143-15   Filed 11/02/16   Page 49 of 75   Pageid#: 3607

1     the beginning of the skid marks, I can't tell you that

2     either.

3         Q.    But if his testimony --

4         A.    I can only tell you where he was at the

5     instant his skid started to smear the road surface.

6         Q.    If his testimony was he entered the

7     interstate in the right-hand lane and he never left the

8     right-hand lane, the skid marks beginning in the

9     left-hand lane would contradict that testimony, would

10     they not?

11         A.    They would not.  For the simple reason they

12     begin in the right lane.  Don't you understand?  Go

13     back to my pictures, and you can see the skid marks

14     begin -- the right side tire marks are in the right

15     lane.  They're angling to the left lane.  Now, where he

16     was before that, he's got to travel some distance

17     before you have the adhesion melting the rubber

18     surface, which would put him in the right lane even

19     further back, okay?

20         Q.    But the skid marks that you indicated in

21     your prior testimony show a very gradual movement

22     toward the left-hand lane.

1        A.     And that's the product of a skidding

2    vehicle.

3        Q.     Okay.  But 90 percent of his vehicle would

4    have been in the left-hand lane.

5        A.     When?

6        Q.     At the time the skid marks started.

7        A.     I can't tell you where they start because we

8    don't have pictures where they start.

9        Q.     At the time --

10        A.     We have pictures, what the trooper took,

11    after the beginning of the skid.  At the beginning of

12    the skid, you can approximate what portion of his car

13    is in the right lane.  And that's clear in the

14    photographs.

15        Q.     Well, do the angle of the skid marks show he

16    was not making a sudden lane change?

17        A.     I can't say that because he's skidding.

18        Q.     I understand that, but do the skids indicate

19    a sudden lane change from the right lane to the left

20    lane?

21        A.     Answered it earlier.  When you're in a skid,

22    you can do all you want do in that car.  It's not going

1   to make any difference.

2       Q.    But the skid marks in fact show a very

3   slight change from the right lane toward the left lane.

4       A.    It shows a movement from the right to the

5   left, and it's gradual.

6       Q.    Okay.

7       A.    But that's a component of the skidding of

8   the vehicle.

9       Q.    But so doesn't that reflect that he was not

10  making a sudden lane change when he started to skid?

11          MS. ROBINSON:   Asked and answered.

12          THE WITNESS:   I don't know what's before

13  this picture that was taken.

14  BY MR. FRANKL:

15      Q.    But you just said you can't change laterally

16  once you started to skid.  And once he started to skid,

17  he was continuing to go south and slightly, a very

18  slight curve -- or not curve, but a slight angle from

19  the right lane to the left lane.

20      A.    That's correct.

21      Q.    So doesn't that negate a sudden lane change?

22      A.    It does not.  I'm going to answer it

1    hypothetically here kind of facetiously.  Let's say

2    he's in an unbelievable steer to the left, an obstacle

3    avoidance maneuver, that he's just cutting it as hard

4    as he can to the left.  And then within a millisecond

5    after he steers hard to the left, he slams on his

6    brakes.  What you would expect to find on the roadway

7    surface are not two defined skid marks with the rear

8    wheels tracking over top of the front one, but you

9    would see an arching and you would see more than two

10   skids.

11       Q.   But do you see that in this case?

12       A.   We don't.  Absolutely not.

13       Q.   So doesn't that negate a sudden lane change?

14       A.   Again, what he did before that, I can't say.

15       Q.   All right.  Did you actually test the

16   coefficient of friction on that roadway?

17       A.   Did not.

18       Q.   So that's, again, an estimate based on your

19   prior experience, but not what was there that day?

20       A.   Yes and no.  It's based upon my multi years

21   with the state measuring the coefficient of friction.

22   It's based upon the observations that I saw on the

1    pavement when I was there.  It's also related on

2    46.2-88.

3        Q.    If a vehicle is running down the road and

4    it's involved in an accident and the engine cuts out,

5    since it's a standard transition like Mr. Lester's

6    vehicle, does that turn the headlights off?

7        A.    Wait a minute.  You're just saying just

8    running down the road?

9        Q.    In this accident.

10       A.    Oh, so now you have to interject collision.

11       Q.    In this accident with this collision, would

12   that, in your opinion, cause all of the headlights and

13   taillights on this vehicle to go off?

14       A.    It would certainly -- the right front would

15   go out because it's knocked out.

16       Q.    Right.

17       A.    I can't answer -- no, the lights should not

18   go off.

19            MS. ROBINSON:  Dan, we're at 4:55.

20            MR. FRANKL:  Do we have to be out of here at

21   5:00?

22            MS. ROBINSON:  That's what I told you all

204

1    when I set this up.

2            MR. FRANKL:  I'm almost done.

3    BY MR. FRANKL:

4        Q.    You indicated that you haven't seen anything

5    that leads you to believe that this other white car

6    existed.  Have you found anything to negate the

7    presence of the white car completely?

8        A.    This phantom car.

9        Q.    You call it a phantom car.  I don't call it

10   a phantom car.  I'm saying a white car that other

11   individuals have testified existed.  Can you, in your

12   opinion, say it was not there with a reasonable degree

13   of probability or certainty?

14       A.    Based upon everything that I've reviewed,

15   based upon all the testimony, the people that I have

16   seen, based upon the physical evidence on the road, I

17   see nary a thread of evidence that there was a phantom

18   white car there.

19           MR. FRANKL:  Thank you.  I have no further

20   questions.

21                E X A M I N A T I O N

22   BY MR. DUNN:

205

1    Q.    Mr. McAllister, you said you defer to

2 Mr. Lester on the issue about an ejectment from the

3 pickup truck during the accident, correct?

4    A.    Yes, sir.  He said he didn't know how he got

5 out.  He says he thought he was ejected.  He thought he

6 was thrown over there.

7    Q.    If I understand your testimony earlier,

8 you're deferring to any other source of evidence about

9 that because you yourself don't have an opinion on

10 whether this collision caused him to be ejected from

11 the pickup, correct?

12    A.    Correct.  I don't see any evidence that

13 would have -- when I examined the truck, although it

14 was later, I was trying to find an ejection point.  Of

15 course I couldn't.  Of course I was there some months

16 after the fact.  So yes -- or I should say no, I don't

17 see any physical evidence that he was in fact ejected

18 other than what he says.

19    Q.    Okay.  So as you sit here today, you don't

20 have an opinion whether he was ejected from the pickup

21 during this collision, correct?

22    A.    Not from a physical evidence standpoint, no.

Case 7:15-cv-00665-GEC   Document 143-15   Filed 11/02/16   Page 56 of 75   Pageid#: 3614

206

1      Q.    Okay.  And when did Mr. Lester take you to

2  go look at the pickup?  What date was that?

3      A.    It was July --

4            MR. FRANKL:  28th.  At the top of that.

5            THE WITNESS:  Right.  July 28th.

6  BY MR. DUNN:

7      Q.    And where did you guys meet?

8      A.    The Natural Bridge exit.  And I don't know

9  what number that is on Route 11, because I think

10  there's an Exxon station there, service station.

11      Q.    And when you met --

12      A.    And then I followed him.

13      Q.    And Mr. Lester was driving another car?

14      A.    He was.

15      Q.    Was he driving a pickup or what?  Do you

16  know or do you remember?

17      A.    I don't remember.

18      Q.    But in any case, you met --

19      A.    It wasn't his.  I think it's the people he

20  was living with.

21      Q.    And you met him there.  And then was

22  Mr. Lester with anybody driving, or was he by himself?

1    A.    By himself.

2    Q.    And then you drove -- how did you get from

3  where you met to where the pickup was?  Did you go on

4  the highways or what?

5    A.    We went down Route 11 south.  Then we

6  crossed over to a secondary road.  We went over the

7  interstate.  And then I think we picked up a frontage

8  road and then continued south.  And then we took a hard

9  right on another state secondary road.  And I think we

10 went from one county to the next county.  I forget what

11 that was.  Rockbridge maybe Botetourt, I forget.  But

12 then we went into a -- it really wasn't a subdivision,

13 but there's some houses on this secondary road, and

14 that's where his pickup truck was.  It was kind of

15 behind a house, kind of in a little field next to a

16 service -- unimproved gravel dirt road.

17   Q.    And I guess you got out, and you stopped.

18 You got out of your vehicle, and Mr. Lester got out of

19 his vehicle, and you went and looked at the Lester

20 pickup?

21   A.    I did.

22   Q.    Okay.  And how long did that take?

1    A.    From the first time I saw him, I guess, or

2  the only time I saw him, until the time I left his car,

3  not long, maybe 35 minutes, 40 minutes perhaps.

4  Because then -- from there, then I was going on down, I

5  think, to meet with Ms. White.

6    Q.    And did Mr. Lester stay with you while you

7  were looking at the pickup truck?

8    A.    A few minutes.

9    Q.    Okay.  And then what did he do?

10    A.    Well, I think he had an appointment with

11  counsel as well, so I think he had to go.  I don't know

12  how he got down there, but he -- you know, he was going

13  on down to Roanoke to the attorney's office.

14    Q.    As far as you know, he left you after a few

15  minutes at the pickup -- at the scene where the -- the

16  site where the pickup was being stowed, right?

17    A.    Correct.

18    Q.    He left you after a few minutes, he got into

19  his vehicle and drove off?

20    A.    No.  I think he went in the house.

21    Q.    Okay.

22    A.    Because I think when I left, I think there

209

1    was only one vehicle there. I don't remember it being

2    there when I left. In fact, I think it was there when

3    I left, so I guess he came in after me. I mean he left

4    after I left.

5        Q.    Okay.

6        A.    Probably 35, 40 minutes later, I'm guessing.

7        Q.    All right. And that was his grandmother's

8    house -- or excuse me. Yeah, his grandmother's house;

9    do you know?

10        A.    No. That's where the -- that's where the

11    rub came. When I was told to go see the truck or asked

12    to go see the truck, I was told it was at the

13    grandmother's house, directions and all. So I -- bless

14    her heart, I called the grandmother. And she said, "We

15    got rid of the truck. Darn it. Stop calling here,"

16    and all this stuff.

17             And I said, "Well, do you know where it is?"

18             "I don't know where it is. It's been

19    crushed."

20             So I said, "Holy mackerel. Here I come all

21    the way to Lexington."

22             So I called the attorney's office, and they

210

1    said, "We gave you the wrong information.  We need to

2    go to -- we need to go to --" I guess where Mr. Lester

3    was staying at.  So she gave me the name and number

4    there.  So I called.  It was bad cell phone service in

5    that area.

6              So that's how we hooked up because when he

7    tried -- she tried to explain -- I think the lady that

8    lived there with him or his friend or whatnot, when she

9    was trying to give me directions, oh, my gosh.  I said,

10   "Wait a minute."

11             She said, "We'll come out and get you."

12             I said, "Fantastic."

13   Q.    So Brandon Lester came out and got you?

14   A.    He did.

15             MR. DUNN:  Thank you.

16             THE WITNESS:  Yes, sir.

17             MS. ROBINSON:  He will read.

18             THE COURT REPORTER:  Can I get your order on

19   the record, please.

20             MR. DUNN:  Yeah, we're going to order.  I

21   guess we'll -- what do you want to do, split it?  Yeah,

22   split it.

1          MS. ROBINSON:  And I'll get a copy of that

2     one.

3          MR. HEARN:  And I'll take a copy of that

4     one.

5          MR. DUNN:  Can you put this on the record

6     that you're going to be taking original exhibits and

7     making copies.  The copies will be provided with the

8     deposition transcripts, and the originals sent back to

9     Mr. McAllister.

10          (Deposition concluded at 5:01 p.m.)

11          (Signature reserved.)

12

13

14

15

16

17

18

19

20

21

22

212

1    COMMONWEALTH OF VIRGINIA AT LARGE, to wit:

2          I, Shawna Hum Browne, RMR, CRR, Notary Public in

3    and for the Commonwealth of Virginia at Large, and whose

4    commission expires on August 31, 2018, do certify that the

5    aforementioned appeared before me, was sworn by me, and

6    was thereupon examined by counsel; and that the foregoing

7    is a true, correct, and full transcript of the testimony

8    adduced. Reading and signing was requested.

9          I further certify that I am neither related to nor

10   associated with any counsel or party to this proceeding,

11   nor otherwise interested in the event thereof.

12         Given under my hand and notarial seal at

13   Charlottesville, Virginia, this 17th day of October, 2016.

14

15

16

17

18

19   _____

20         Shawna Hum Browne, RMR, CRR

21     Notary Public Registration No. 302535

22        Commonwealth of Virginia at Large

**A**

**AASHTO**
143:7
**ability**
116:18 153:6
**able**
43:21 112:14 114:21
119:16 129:13 150:12
175:7 186:12
**abnormal**
175:20
**about**
13:17 19:1,8,15 28:4
30:19 32:17,18 34:7
34:20 40:20 42:9,11
47:21 50:9,11 52:6,9
52:19 53:22,22 55:5
55:19 56:2 57:13,15
58:21 67:7 70:12
74:5,8,22 75:11 76:3
76:7,20 81:16 83:19
87:10,18 88:6,6,7
90:16 92:4 93:1,20
94:14,22 95:14 98:8
98:21 99:9 102:17,21
103:20 105:9 107:2
108:7 110:13 112:1
112:17 113:18 120:6
121:4 122:13 123:20
124:1,8,9 125:3,4
126:16 127:3 139:20
140:4,5,16 147:5,14
147:18 148:9 149:4
152:2 160:17 161:9
163:18,19 167:19
171:7 177:10,15
182:14,20 183:5,21
183:22 184:21 187:3
188:15,16,17 189:5,5
189:18 190:17 194:2
195:19,20 196:21
197:18 205:2,8
**above**
58:8 103:5 108:22
109:1 169:19,19
**abrupt**
88:20

**absolutely**
20:17 29:22 139:9
160:21 161:8 175:6
176:4 182:3 202:12
**accept**
171:20
**accepted**
171:22
**access**
114:7
**accident**
4:19 10:3 29:4 32:1,3
34:14 37:9 42:22
46:14 61:2 67:9 96:4
99:9 102:13 109:17
115:17 117:5 119:14
125:13,13,20 126:13
127:12,16 128:9
133:10 134:6 135:2,4
135:8,9 141:22
142:13 143:20 150:2
154:14 171:16 179:5
179:18 180:5 195:13
196:22 197:18 198:1
203:4,9,11 205:3
**accidents**
39:18
**account**
187:11
**accounts**
83:5 186:1
**accurate**
48:15 125:7
**across**
171:12 172:21 185:13
191:4
**act**
117:1 172:14
**acted**
74:17
**action**
164:7
**activated**
111:4
**actual**
65:2 117:1,1 126:14
197:2

**actually**
8:17 18:7 27:12 40:3
50:16 62:3 66:5
69:20 86:22 92:20
95:15 104:3 108:13
109:5 160:19 164:20
172:4 184:17 197:8
202:15
**acute**
79:7
**ad**
148:12
**add**
27:10 164:13
**added**
15:14,14 118:5
**addendums**
15:14
**adding**
132:5
**addition**
11:5 13:8 14:1 15:16
15:17 16:13 18:10
26:9 126:20
**additional**
50:1 114:17 197:12
**address**
8:14
**adduced**
212:8
**adhesion**
87:8 199:17
**aerial**
4:17 15:18,18 16:2,10
16:18 24:16 30:15,16
51:8 53:21 62:20
189:13
**affect**
116:18
**affected**
43:20
**affirmative**
113:3
**aforementioned**
212:5
**after**
32:16 40:3,9 49:8,8

61:12 86:14 93:10
115:22 135:12 147:2
152:4 159:21 160:12
163:3 164:9,18 166:1
166:11 180:2 181:22
182:11 186:2 187:8
187:16 193:6 197:15
200:11 202:5 205:16
208:14,18 209:3,4
**afternoon**
34:18
**again**
13:10 14:12 15:20
19:14 25:22 32:4,4,9
32:12 33:7 36:22
46:9 47:4 50:20 55:2
58:17 59:18 79:8
81:10 86:10 90:1
91:3 99:13 100:2,11
100:20 103:21 104:16
107:2,16 108:4
109:18,19 112:20
114:4 117:11 123:11
125:10,14,17 126:14
126:21 127:7 130:5
136:20 137:1 143:8
144:10 151:9 160:3,4
162:16 163:17 170:21
176:5 183:2 186:1
187:2 190:10 193:1
196:10 202:14,18
**against**
29:11
**ago**
27:7 111:16 183:6
**agree**
22:6 63:7 81:21 123:5
130:20 132:11,15
137:11,13 152:9
175:3 177:7 191:21
195:1
**Ah**
137:7
**ahead**
24:7 52:2 70:14 79:12
84:6 144:17 156:11
169:21 180:9

**AI**
125:13
**air**
93:6 135:21
**all**
8:19,22 9:6,11 10:8,10
14:14,18 11:3,4,15
12:3,19,20 15:16
17:14 18:5 19:5,13
20:2 21:22 22:20,22
23:1 24:15,22 26:1
27:8,15 29:9,20 31:2
33:7,16 34:6,13 35:4
36:21 37:7,15 39:22
40:17,21 42:5,9 44:6
44:12 45:12 46:16
47:9 48:13,18 49:5
52:6 54:13,14 55:4,15
55:17 56:7 59:7,8,12
60:7,18 61:18 66:16
67:16 68:3,17 69:2
71:22 72:4,7 73:17
76:3,9 77:17 79:21
80:3,5 81:1,12 83:4,6
83:6 85:8 87:1,10
88:21 92:16 93:3,3
94:1 98:18 99:20
102:11,16 105:7,15
110:6,12 112:17
113:12,16,18 114:4,6
114:9 115:5 116:2,13
116:21 117:6,7,11
118:10,20 119:9,22
122:19,22 123:2
124:2 125:1 126:3,16
127:4 128:16,21
129:11 133:15 139:7
139:10 141:21 142:8
143:2 144:11 148:1,4
148:7 149:14,17
151:5,6 152:8 154:20
155:13 156:7,21
157:9 163:7 165:4,5,7
165:14 175:9,17
182:16,18 186:18
187:12 188:13 189:19
191:7,22 193:18

194:3 200:22 202:15
203:12,22 204:15
209:7,13,16,20
**alleged**
175:9
**allow**
138:15 160:6
**allowed**
67:10
**allowing**
177:8
**almighty**
125:12
**almost**
28:13 168:8,8 204:2
**along**
24:12 36:1,17 57:19
68:5 99:5 107:18
123:22 160:19 161:1
**already**
9:16 19:6 67:14 88:7
128:21 136:21 148:10
166:11 197:16,20
**also**
11:6,17 12:15 13:11
21:12 47:13 57:20
66:6 81:12 86:14
99:17 101:16 135:19
143:5,6,19 144:21
151:9 161:7 182:6,10
190:18 203:1
**although**
15:11 32:10 144:2
157:15 205:13
**altogether**
20:11 140:4,6
**amber**
120:21 121:4,17,20
**ambient**
150:21
**amended**
15:13 18:2 143:17
**amendments**
17:21
**American**
142:17
**Among**

135:22
**amount**
136:12,19
**analogy**
17:4
**analysis**
142:13 152:13 173:8
191:12 193:19 194:10
**ANDERSON**
3:8
**and/or**
9:20 18:21 97:16
**angle**
78:12 79:6,7,7,9 90:18
90:21 112:15 123:3
165:12 174:20 177:2
200:15 201:18
**angling**
199:15
**another**
21:14,19 58:4,17 63:2
66:13 75:11 78:13
91:2 98:14 101:2
107:17 118:3 128:13
132:20 148:7 157:4
169:7 178:1 192:6
206:13 207:9
**answer**
9:17 65:13,15 68:16,17
80:7 84:15,17 93:20
94:7 99:10 110:4
112:20 113:3 119:7
130:14 134:7 135:5
136:14 137:17 168:15
171:3 172:21 178:13
178:14 196:12,13,18
201:22 203:17
**answered**
147:21 200:21 201:11
**answering**
28:19 180:14 184:3
**anticipate**
65:22 197:14
**antilock**
77:11
**any**
9:22 10:4 15:14 17:15

18:22 35:4 37:8,12,15
38:1,9,17 39:18 46:13
49:20 53:6 54:15
55:8,11,21 56:14 59:4
59:12,13,14 60:12,18
61:1 66:18 82:6
89:21 93:8 96:10
109:12 110:4 111:21
112:18 113:7,13,18
115:6,12 116:21
117:3,3,5,16 119:10
119:19 120:1 122:4
122:10 123:2,8 124:3
127:18,20 128:4,6
133:6 137:17 138:6
140:14,14 141:2,2,3
142:8 144:1 145:19
146:18 148:6,16,17
148:21 149:10 154:13
160:2 162:11 168:18
169:5 171:10 172:3,4
181:17 185:2 186:8
187:1,5 192:12 197:2
197:3,8,9,14,17 201:1
205:8,12,17 206:18
212:10
**anybody**
39:17 46:10,13 68:14
206:22
**anymore**
74:13
**anyone**
192:19
**anything**
18:20 42:22 43:20
71:17 120:1 145:20
153:5 154:4,6,13
168:13 204:4,6
**Anytime**
95:19
**anyway**
52:1 124:7
**apart**
73:11
**apologize**
72:6
**apostrophe**

8:13
**apparently**
100:6 177:1,1
**appear**
159:10
**appearance**
74:19,20
**APPEARANCES**
2:10 3:1
**appeared**
212:5
**appears**
90:14 140:19
**applied**
92:10 175:8 176:11
**apply**
174:15
**applying**
77:5
**appointment**
208:10
**apportioned**
14:3
**appreciated**
155:17
**approached**
174:20
**approaches**
109:17
**approaching**
58:6 102:18 108:8
    124:12
**approximate**
82:15 200:12
**approximately**
24:11 42:15 53:1 60:10
    146:21 149:20 167:17
    173:14 174:14 193:15
**approximating**
184:10 192:19 195:22
**approximation**
51:22 94:12,13,16
    105:5 191:8,12
    192:13,14
**April**
29:22
**apron**

146:4
**arch**
107:18
**arching**
76:16 202:9
**area**
12:7 14:20 15:21 16:13
    39:19 40:3,5,11,12,14
    43:1 45:2,3 47:2,20
    49:18 50:21 52:17
    55:1,2 56:9,10,10,18
    57:17 58:8,9,10,18
    59:18 61:11,11,17
    62:1,8,15 63:6,7,20
    64:15,19 65:15,18
    68:15 69:1 71:15,16
    71:18 72:12 80:22
    87:13 88:6 89:18
    90:2,2,6 100:21 103:3
    103:17 104:2,3,4
    109:11 110:8 111:20
    112:2,7,19 124:2,12
    124:19 126:16 128:21
    132:20 133:18 135:14
    136:11 138:20 146:21
    150:13,15 153:14
    172:19 176:14 189:4
    189:11,15,16 190:6,8
    190:12,15 193:16,19
    210:5
**areas**
171:19
**aren't**
20:20 22:18
**around**
23:1 28:3 35:22 48:3,4
    48:6,7 56:10 65:9
    85:3 86:6 89:19,19
    102:19 103:19 105:6
    107:15 109:18 171:7
    182:13
**arrive**
71:17 94:15 125:9
**Arturo**
187:17
**ascending**
99:10

**asked**
17:13 37:11,11 59:22
    101:18 126:1 140:16
    171:6 201:11 209:11
**asking**
23:21 48:18 83:9 84:18
    85:8 88:4 130:13
    131:6 133:3 168:11
    171:7 174:21 178:7
    180:13 184:3
**aspect**
147:1
**aspects**
133:13
**asphalt**
92:17 94:20 95:4 166:9
    166:13
**assembly**
99:18 100:2 121:21
**assembly's**
121:6
**assign**
84:15,16
**assist**
46:13
**assistant**
46:12
**associated**
61:1 212:10
**Association**
142:17
**assume**
10:10 123:13 159:16
    163:18 193:14,17
**assuming**
128:2 154:1 173:11
    174:5,10,11 193:14
    193:16 195:1 198:12
**assumption**
193:20
**Atherton**
127:1
**Atkins**
11:3,18 12:2 13:6
    37:11 44:11 46:18
**attempt**
192:8,12

**attempted**
129:9,10
**attorney**
28:6 140:2
**attorneys**
11:10
**attorney's**
208:13 209:22
**attribute**
38:7
**August**
4:19 15:13 33:5,6,10
    67:8 212:4
**authoritative**
140:14 141:1,2 142:9
**automobile**
149:11
**available**
31:16 109:13
**Avenue**
2:14
**average**
109:19 126:21 173:21
    174:11
**avoid**
128:12 129:10,13,22
    130:7 133:21 153:7
**avoidance**
141:9 202:3
**aware**
122:4 125:17 143:16
    186:8,9
**away**
33:19 65:16 84:11
    99:13 110:9 123:2
    124:12 133:1,19
    137:7,16
**awful**
47:15 168:21
**axle**
94:2

───────────────
            **B**
───────────────
**B**
4:11 52:22 97:4
**back**
13:4 17:13 20:15 21:6
    23:10,16,19 24:16,18

25:1,4 27:15 30:5
31:22 32:14 33:5,20
33:22 34:13 36:22
45:14,15,18,19,20
47:6,7 48:6,7 49:6,15
50:7 55:17,20 56:2
59:20 72:11 74:15
76:13 84:10 85:14,15
94:8 103:7 105:10,11
109:22 119:1 130:12
132:17 133:8,14
136:16 140:17 144:6
145:22 146:13 149:7
166:1,2,3,6 177:16,17
183:11 191:22 192:7
192:9 196:10,15
198:20 199:13,19
211:8
**backed**
47:6
**background**
124:6 144:10 151:6
**backing**
147:2 177:5
**backwards**
83:1
**bad**
109:7 210:4
**Baker**
127:1 144:9
**Baker's**
143:20
**balls**
150:8
**bam**
160:18,18,18,18
**banged**
38:12,13 39:20
**barely**
69:12 72:21 103:4
**barrel**
165:1 184:20 185:4
**baseball**
101:3
**based**
9:20 68:12 81:10 90:13
143:11 154:12 172:15

179:10 184:8 189:9
190:3 192:17 202:18
202:20,22 204:14,15
204:16
**basically**
100:8
**basis**
15:7 88:5 145:7 147:4
148:16,17
**bat**
101:3
**batch**
20:20,21,22 118:5
120:7
**batches**
20:21
**beads**
161:12
**beam**
123:4 154:1,2 183:16
184:2,2
**beams**
56:18 58:21,22 59:2,4
109:20 110:5 123:15
125:14,16,16,20,20
127:3 153:15,17
183:16
**bear**
47:15
**Beautiful**
35:2
**because**
22:19 30:14 31:13 39:8
44:9 46:2,2,17 55:11
62:5 64:9 65:22
66:18 73:19 77:8,15
85:1 86:19,21 87:5
89:10 92:6 93:9 99:3
100:20 105:2 106:1
107:11 109:5 110:1
112:15,22 116:8
122:21 124:6 133:4
135:5 136:10,18
140:21 146:11 148:22
157:20 158:19 161:11
161:20 163:16,21
165:4,5,5 166:9 173:3

182:12 184:12 187:4
192:12,16,17 195:8
200:7,17 203:15
205:9 206:9 208:4,22
210:6
**bed**
164:10
**been**
8:6 10:22 14:22 19:6
26:20 31:18 32:11
34:3 39:18 42:11
51:13,16 59:4 66:7
68:2 75:21 118:19
136:14 137:22 156:10
160:14 166:11 170:15
175:7 177:18 178:15
178:16,16 179:3
180:20,22 184:19
189:20 195:12 198:13
200:4 209:18
**before**
2:2 33:12 60:16 62:6
91:12 95:1 125:20
127:11,16 136:21
139:13 152:16 174:15
175:3,9 176:9 177:9
177:16 178:10 182:1
183:8,14 184:6
187:21 188:16 194:16
198:4 199:16,17
201:12 202:14 212:5
**began**
34:3 165:4 173:1
**beget**
116:8
**begin**
179:21 199:12,14
**beginning**
28:14 36:19 40:15
45:14,15 50:15 52:16
53:19 54:4,18 188:2
194:8 198:2 199:1,8
200:11,11
**begins**
183:1 188:16
**begs**
167:3

**behalf**
2:2
**behind**
65:2 72:5 121:18 173:6
177:20 207:15
**being**
6:6,7,9,10,12,13,15,16
6:18 77:7 116:22
117:2,4,14,17,20
118:21 119:16,20
130:9 171:11,20,22
173:8 175:11 186:9
208:16 209:1
**belabor**
149:3 170:21
**believe**
9:9 11:3 12:18 13:19
15:13,20 16:21 18:12
18:16 27:20 28:8,9
29:16 30:9,13 31:11
31:22 33:10,11 37:1
42:19 43:5 53:16
59:7 63:2 64:3,5,14
68:10 69:3 73:2,17
75:13 76:2 97:20
99:19 114:8 116:20
118:10 120:13 121:20
127:20 128:1 140:2
146:8 147:11 153:15
158:14,17 170:12
179:8 182:19 197:21
204:5
**bells**
58:14
**belt**
163:5
**bend**
164:10
**bent**
100:15,15 163:13
165:20
**berm**
42:7
**besides**
113:13
**best**
13:9 23:11 41:19 47:18

92:11 167:14 169:1
**bet**
94:18
**better**
11:19 16:8 17:4 26:5
66:12 75:10 84:8
153:15 169:17
**between**
4:20,21 5:2,3,5,6 37:4
40:6 50:6 63:10,11
64:6,12 68:10 69:3,7
70:16 71:13 76:22
77:1,19 78:1 83:10,11
84:19,20 89:16 90:3
90:22 106:9 132:13
152:6 154:10 157:12
184:18 186:6,9,13
189:22 191:1 194:21
**beyond**
61:11 159:14 162:10
**bicycle**
74:10
**big**
58:5 59:11
**billed**
9:3
**billing**
9:2 10:21
**Bingo**
42:12 165:3
**bit**
16:7,8 31:9 56:17 67:3
73:18,21 99:5,12
102:16 149:4 153:20
163:15 195:14,15
**bituminous**
92:18,21
**black**
96:13 97:2,2,9 167:12
168:12,16,22,22
169:7
**blend**
124:5,17
**bless**
209:13
**blocking**
176:21

**blue**
58:5 101:4 103:3 104:3
126:19 143:4 179:14
189:16 190:15 191:9
**blueprint**
17:5
**blueprints**
17:6
**body**
97:10 121:18,19
**book**
141:8 142:1 143:4
144:7,8,9
**Botetourt**
13:11,14 29:12 82:10
207:11
**both**
35:22 39:4 43:2 49:17
49:18 52:5 56:9
65:11 78:14 93:17
107:10 109:15,16
117:10 126:12,13
171:12 185:13
**bothered**
43:7
**bottom**
41:10 104:9,11,17,19
105:16 165:19 185:10
185:11,22 189:18
194:11,14
**bowed**
163:13,16 168:10
**bowing**
164:6
**box**
38:14 181:8,18 182:7
**boy**
52:22
**brake**
74:12 131:3,4,11,20
132:1 158:4
**brakes**
77:5,6,11,11 92:10,12
92:19 93:4,5,5,6,6,11
93:21 130:1 131:4,7,8
131:10,22 132:2
133:15,17 134:8,15

147:9 174:15 175:8
176:11,18 202:6
**braking**
92:14,15 93:17 158:16
181:20 183:12
**Brandon**
1:4 11:2,12 79:15
86:13 132:19 210:13
**bread**
38:14 39:6 42:14 45:11
83:13 84:21 85:7
86:5 163:21
**break**
143:13 144:18,20
**breaks**
74:4 77:12
**bridge**
32:3 35:20 206:8
**briefly**
31:12 32:7
**bright**
35:3 58:4
**brighter**
137:13
**broadside**
78:11,12 85:5 123:1,3
163:10 177:4 182:11
**broken**
41:22 42:11 44:15 50:5
**brought**
10:9 15:3 29:11 30:5
81:1
**Browne**
1:22 2:3 212:2,20
**brush**
38:12 41:5,22,22 42:1
42:10,11,12
**build**
108:15,15
**building**
17:5 64:19 65:2,4
**built**
17:6 92:20 93:9
**bulb**
121:17,18 136:7,8
**bulbs**
65:13,14,14 125:14

**bumper**
84:7,12,12 97:2,7,13
97:15 99:21 100:2,18
167:13 168:17,17
169:20
**bunch**
10:9 114:9
**burning**
85:2 113:4
**bush**
45:1
**bushes**
39:20
**business**
95:20
**busy**
47:15
**button**
123:20 124:8,13
**buttons**
56:19,22 57:1,6 124:21
160:18,19 161:1,5
**buy**
149:16
**B-O-R-O-U-G-H**
8:16

**C**

**C**
53:8,8
**cab**
14:3 29:7
**calculated**
94:22 138:19 153:20
**calculation**
94:7 107:1 128:13
**calculations**
15:6,6 21:14,22 141:18
152:9,12 154:1
**call**
11:9 17:15 19:7 22:2
27:21 43:19 77:8
204:9,9
**called**
9:7 17:3 27:9 31:17,18
33:13 60:7 209:14,22
210:4
**calling**

209:15
**calls**
12:4 178:12 180:7
185:16
**cam**
12:1 26:10 115:6
**camcorder**
4:18 12:18 13:6 26:22
111:3
**came**
13:5 22:21 28:9 33:5
39:8 42:15 48:6,7
55:17 56:2 71:19
86:22 109:18 111:6
147:6 162:19 209:3
209:11 210:13
**camera**
66:5,6,6,8,10 87:16
112:16
**Campbell**
12:12
**candles**
138:19
**cannot**
74:11 123:2
**cantilever**
136:6,6
**can't**
14:7 31:19 41:5 42:19
44:21 51:8 54:21
64:16 73:19,20 75:5
79:8 80:2,9,9 82:6
83:7 88:3 92:7 109:6
129:4 130:14 134:7
135:5,8 143:19 158:3
158:14,18 159:13
160:1,2 161:12
163:19 166:18,21
170:16 178:5,14
181:19 190:2 194:10
198:21 199:1 200:7
200:17 201:15 202:14
203:17
**cap**
160:12
**capability**
17:10

**cap's**
160:14
**car**
12:2,2 49:18 64:6 74:9
93:5 103:15 109:14
133:14,17,18,19,21
134:8 148:15 177:17
198:3 200:12,22
204:5,7,8,9,10,10,18
206:13 208:2
**card**
14:3 29:8
**care**
20:17 39:14 147:1,3
**Carolina**
33:19
**carpenter's**
54:7,12
**Carrier**
122:3
**cars**
40:14 64:6,8,9,12
123:1
**car's**
80:8
**case**
1:7 9:1 10:11 11:13
13:12 17:12 18:22
34:4,6,10 36:11 37:16
40:10 51:5 54:9
66:14 67:5 72:10,11
74:14 76:20 77:7,14
77:15 78:17 82:15
84:14 91:16 92:21
93:13 101:3,14
108:11,15,19 139:13
140:15 193:15 197:14
202:11 206:18
**cases**
95:11 139:15,21
175:13
**CATHEY**
2:12
**caught**
146:12
**cause**
74:18 76:19 80:14

93:18 135:2,4,7,9
142:13 154:14 203:12
**caused**
39:19 45:4 92:13
101:14 164:5 184:17
185:7 205:10
**causing**
92:12 93:12 190:4
**caveat**
132:5
**CD**
11:22
**cell**
210:4
**center**
56:20,21 58:1,1,3 59:3
68:22 69:13 78:9
82:8,12 99:16 103:6
107:21 121:1 158:11
194:5
**centrifugal**
157:21
**certain**
38:22 73:19 158:14,18
**certainly**
9:21 32:10 62:19
107:11 182:5 187:6
187:16 203:14
**certainty**
179:5,11 204:13
**certify**
212:4,9
**cetera**
29:5
**chance**
27:12 154:13
**Chances**
86:5
**change**
74:11,14,17,18,21
80:16 90:11 93:18
126:20 195:3 200:16
200:19 201:3,10,15
201:21 202:13
**changed**
35:16,19 43:19 95:1
**changes**

**74:3 158:7,7
changing**
179:18
**characteristics**
98:1
**characterization**
22:12
**characterize**
101:19
**charges**
13:16 29:11
**Charlottesville**
1:17 2:7 212:13
**chart**
4:18 9:4 10:21 26:6
27:5
**chase**
140:19
**check**
50:20
**Chesterfield**
8:18
**Chevrolet**
126:15
**Chewning**
127:1
**child**
130:16
**choosing**
146:8
**chose**
66:14
**chronologically**
31:1
**Chrysler**
126:16
**circle**
59:11 76:6
**circled**
76:11 157:3 189:10
**circles**
57:8
**circling**
121:7
**circumstances**
173:21
**classroom**

126:12,13
**clay**
163:12
**clean**
94:19
**clear**
35:2 110:10 111:15
200:13
**clearly**
56:9 72:17 80:1,10
157:6 159:14 166:5
172:16 180:2,2 198:2
**clockwise**
85:14 160:1 182:13
**close**
24:14 32:3,21 79:10
91:4 106:2 129:3
132:21 173:18
**closed**
163:2
**closely**
132:3
**closer**
88:8 91:5 99:21 100:9
123:2 131:18 137:11
163:15 175:21,22
176:22
**closest**
63:22 129:3
**clothing**
110:3
**code**
15:10 94:17 95:1
125:15,15 143:16
**coefficient**
87:8 202:16,21
**collapse**
168:9
**collision**
6:22 79:11,13 80:13
86:16 99:19 115:22
119:21 160:7 161:16
162:2,2,8,13 179:7
180:22 181:7,7 186:3
186:9 187:16,16
190:6,9 193:16,22
196:4,5 203:10,11

205:10,21
**collisions**
186:6,13
**colloquy**
149:4
**color**
71:2 168:16
**Columbia**
122:17
**combination**
47:6 69:9,10 88:19
**come**
17:15 18:22 37:16
59:14 65:9 69:22
70:11,14 71:11 80:19
87:1,2 91:2 103:1
128:8 129:17 131:5
131:10,12 132:1
137:10,19,21 140:14
141:3 142:11 178:21
182:13 187:9 191:9
192:20 209:20 210:11
**comes**
89:19 94:22 107:2
134:9,9 146:5 153:6
160:1,2
**comfortable**
105:8
**coming**
10:2 22:19 31:12 34:11
88:5 128:20 131:7
141:21
**commencing**
2:6
**comment**
70:21 183:15
**commission**
212:4
**committed**
181:1
**committing**
181:2
**commonwealth**
2:4 12:6 94:19 212:1,3
212:22
**compare**
60:4 83:12,22 84:18,20

85:8 96:22
**compared**
30:4 165:1
**Complaint**
11:6,7,10,12
**completely**
172:21 180:5,20 204:7
**complies**
76:8
**component**
85:21 88:1 90:21 91:10
91:11 100:22 152:4
201:7
**composite**
46:7
**compound**
92:21 97:13
**computer**
26:13
**conceived**
108:11
**concentration**
100:11
**concerned**
146:20
**concerning**
71:12,18 87:12
**concert**
124:2 148:1
**conclude**
172:20
**concluded**
146:6,9 211:10
**concluding**
147:5
**conclusion**
69:22 72:3 103:1
137:21 145:7 146:16
147:19
**conclusions**
67:10 68:20 171:3
197:18
**concrete**
94:21
**condition**
127:10,14 128:3
**conditions**

55:13 108:6
**conduct**
197:2,9
**configuration**
51:11 140:21 147:17
**confirm**
137:2
**confirms**
138:6
**confronted**
129:1 130:3 176:21
**connect**
120:15 176:19
**connected**
117:11 118:11 119:8
**consider**
148:6 172:5
**considered**
10:16 133:4 139:11
179:17
**consistency**
147:8
**consistent**
73:10 74:2
**conspicuous**
73:6
**constant**
93:19
**constructed**
109:4
**construction**
16:14 17:2,4,17 36:2
59:22
**consult**
9:2 125:15 143:15
144:4
**consulted**
141:5 142:15 143:5,20
**contact**
71:19,20 78:13 80:12
84:2 89:2,7 100:6
101:1,2,15 158:8
168:7,20 170:13,15
184:14,16
**contacted**
9:7,12 26:3 27:6,21
30:13 31:10 33:22

59:21
**contained**
35:9 48:15 67:7,11
  68:19 113:9 133:14
  143:2 145:11
**contaminated**
161:21
**continuation**
192:6
**continue**
29:20 105:12 146:4
**continued**
105:11 182:13 207:8
**continuing**
201:17
**continuous**
73:10 77:16
**contort**
164:10
**contradict**
186:12 199:9
**contradiction**
186:3
**conveniently**
147:13
**convoluted**
19:5
**copied**
16:16 23:22 30:9
**copies**
211:7,7
**copy**
4:17 5:8 10:20 11:22
  15:12 16:6,19 18:7,13
  29:9,10,12 67:17 75:3
  75:15 211:1,3
**corner**
24:13 77:2 78:8,9 84:7
  84:12 88:14,17 96:15
  99:17 100:3,12,14,21
  101:4,12 102:5,6,10
  166:6,6 167:12
  168:13 172:18 184:15
  184:17 185:3
**correct**
14:18 23:8 24:4 25:10
  27:13 30:19 32:20

34:8,12 37:18 41:8,9
43:22 44:1,16 51:1
52:4,12 53:9 56:5
57:6 62:14 63:13,20
63:21 64:11,20,21
69:20 71:14,15 72:19
73:13,15 78:21 79:3
81:7,8,15,17 82:3,5
85:15 86:9 87:18
88:12,15,17 90:4,18
91:14,15,15,18 92:14
95:6,22 96:1,2,9
98:22 99:1 102:10,21
102:22 104:5,7,16
106:7,22 108:3 113:8
114:1,3,19,22 118:21
119:6 121:7,13 123:6
124:10 125:5 129:14
131:1 132:4,15
135:22 140:7 143:10
143:12 147:17 148:5
148:20 149:2,22
150:19,20,22 151:1
151:21 152:7 154:5
154:14 156:18 157:5
157:14 159:7 165:11
165:13 170:18 171:17
171:18,20 172:1
173:13 176:8 180:19
182:10 184:14 185:15
188:9 190:7 196:7
198:15 201:20 205:3
205:11,12,21 208:17
212:7
**correctly**
169:3
**correspondence**
4:12,13,14,15 10:13
  14:16 20:7,8 22:2
  28:8
**corresponding**
159:17
**corresponds**
193:11
**could**
25:15 37:5 38:7,9,22
  39:15 43:11 51:21

59:3 66:12 76:19
77:4 82:8 85:21 86:3
86:4 90:6 92:11 97:2
97:3 101:18 103:4,17
103:18,19 105:12,15
109:16 115:18 119:12
130:9 132:21 133:20
140:20 144:2 146:22
147:1,3 150:3,7,11
155:15 157:20 163:12
166:12,14,15 169:4
175:10 176:12,14
177:1 178:10,15,15
178:16 184:19
**couldn't**
66:18 105:16 116:1
  145:22 154:6 162:15
  167:1,2,4 173:3
  174:12 205:15
**counsel**
2:10,17,22 3:1,6,12
  19:12 208:11 212:6
  212:10
**count**
14:18 23:3
**counterclockwise**
182:8
**county**
8:18 13:14 19:10 29:12
  31:18 32:2 82:10
  207:10,10
**couple**
22:18 31:17 38:11
  60:16 145:6
**course**
9:17 17:21 19:11 28:5
  32:19 38:11 44:20
  50:12 66:4,9 84:10
  96:20 100:17 110:1
  126:20 161:19 205:15
  205:15
**court**
1:1 2:5 13:12,15,16
  21:4 29:10 46:18
  67:20 210:18
**cover**
68:4 99:22

**cover's**
97:15
**cowling**
100:1
**crash**
6:19 10:4 11:18,22
  15:19 25:18 30:2
  35:14,15 38:8,10,19
  43:20 80:19 108:9
  110:21 111:6 126:10
  127:8 145:1 152:22
  161:19 166:11 194:20
**crashes**
122:21 125:18
**created**
147:20 148:7
**creating**
148:22
**credit**
139:1
**crest**
102:19 103:18 108:19
  109:5 128:20 187:22
  188:1,20 189:6
**critical**
32:13 92:3 108:17
  176:1,1
**cross**
51:2,3
**crossed**
207:6
**CRR**
1:22 2:3 212:2,20
**crucial**
32:13 92:3 108:17
**crumpled**
169:8
**crunched**
84:8
**crush**
7:4 163:11 170:10
**crushed**
209:19
**curiosity**
97:19
**curled**
166:7,8

curling
165:22
curvature
188:19,19
curve
46:2,3 65:10 102:20
103:19 105:6 188:12
188:13,15 201:18,18
Cut
140:18
cuts
203:4
cutting
202:3
CV
15:3

**D**

D
4:1
dadgum
102:2
daily
6:20 14:10 155:4,5,6
155:11 156:2,3,16
damage
5:9,10,11,12,13,14,15
84:5 96:22 97:1 98:1
98:9,20,22 99:8 100:2
100:7,7,11 101:1,12
101:13,14,15,15,16
101:19 167:20 168:7
170:13,14 184:12,14
184:16,19 185:2,5
damaged
25:21 42:12 78:2,3
111:21 112:6
damages
15:2 78:14 84:2 85:2
97:3
damn
134:2
Dan
2:21 155:1,14 203:19
dark
32:20 49:9 56:16 58:17
58:18 61:11 108:6
110:3,3 133:17 150:3

153:3 194:21
darker
51:18
Darn
209:15
dash
115:6
data
138:5 155:9 175:14
date
19:3 23:21 206:2
dated
15:12 29:13 33:10 67:7
dates
32:8
Dave
20:12 27:10 31:18
33:13 44:4 54:3
David
1:14 2:1 3:11 4:3 8:5
8:12 59:21
day
33:12 34:17 55:18
59:16,19 60:10 80:5
94:1 168:2 202:19
212:13
daylight
32:5 34:16 60:22 123:6
194:16,19 195:3
daytime
32:9 49:16 52:3,14
53:7 54:15,15 55:9,14
55:16,21 60:8,9,19
105:4 107:10 108:5
110:7 194:19
dead
174:16
dealing
119:2 134:11 186:5,14
195:8
debris
94:20
debunks
185:14
decide
129:20,21
decided

47:1 59:17
deemed
132:22
deep
53:1
deeper
190:15
deer
128:8,8,12,18 129:12
130:5,8,9,18,19 133:8
defamation
96:18 100:21
defect
113:4
Defendant
2:2,22 3:6,12 14:12
Defendants
1:11
defense
14:13
defer
183:10 184:5 196:10
205:1
deferring
205:8
defers
196:18
defined
202:7
deformed
84:8,11
deforming
100:22
deforms
85:2
degree
53:12 83:14 179:5,11
188:15 204:12
degrees
182:14
deliberation
27:8
delineate
161:15
delineated
51:4 197:17
delineates

50:6,17
delineating
51:9
delineators
56:20 57:1 58:1 123:20
124:20 161:4,4,6
demarked
50:5
demonstrate
163:12
demonstrated
78:15
dent
101:17
Department
16:12 24:9 109:3
113:10 152:20
depending
93:10
depends
198:19
depos
11:3
deposition
1:14 2:1,6 11:1 15:15
20:11 31:4 34:7
37:12 71:1 126:1
129:7 135:12 145:16
145:18 187:17 197:15
211:8,10
depositions
31:6
describe
18:3 22:1 63:4 99:1
165:7
described
18:21 26:21 38:18
describing
56:4 73:15 83:10
design
36:2 108:10 142:16
143:8 164:13
designated
161:6
designation
14:14 141:13,14
designed

62:3 108:8 123:12
**designers**
108:10,15
**Detail**
148:12
**detailed**
35:12
**details**
12:3 13:12
**determine**
9:19 109:12 131:2
160:7 192:9
**determining**
110:9
**deviate**
80:15 158:3
**deviates**
80:15
**deviation**
82:16 192:18
**dfrankl@franklmill...**
2:21
**dhearn@sandsande...**
3:11
**diagram**
46:3
**diameter**
46:6
**difference**
77:14 108:3 193:21
194:21 195:7 201:1
**different**
75:6 89:11 107:22
108:6 109:9 131:6,9
131:11 132:5 133:13
145:20 153:20 161:3
**difficult**
168:22
**dig**
45:7
**digging**
165:21
**digital**
66:5
**dimensions**
57:11
**dinosaur**

17:11
**direct**
186:3
**direction**
74:11 80:16 90:8 93:7
94:3 158:7
**directional**
124:19
**directions**
19:5 209:13 210:9
**directly**
18:9 69:1 90:20 140:1
**dirt**
45:5 207:16
**disaffirm**
137:3
**disagree**
61:15
**discernable**
72:17
**discernible**
86:6
**disclosures**
13:9 14:11,13 29:10
**discounted**
187:3
**discretionary**
172:12,14
**discussed**
29:3 55:22 65:17
**dispatch**
12:4
**disprove**
172:7
**disruption**
76:4,6 77:4,8 86:15
157:3,13
**dissect**
194:6,7
**distance**
36:22 50:7 58:20 90:22
95:19 102:17,17,19
103:7 104:18 108:8
109:13,20 110:7,10
126:21 128:10 129:4
129:15 132:13 133:19
138:18 149:19 150:14

151:7,22 152:1,10
154:3,11 157:11
158:22 176:1 183:17
184:10 189:22 190:18
191:1,7 193:18 194:9
194:15 195:4 199:16
**distances**
15:9 137:2 141:9
143:22 144:15 153:21
**distinguish**
110:2
**District**
1:1,1 13:11,14
**disturbed**
41:22 44:18 45:5
**ditch**
182:15
**divergence**
183:8
**divided**
54:9,9
**dividing**
158:12
**DIVISION**
1:2
**DMV**
14:5 29:7
**documents**
13:10
**dodge**
106:22
**dodging**
54:13
**doggone**
79:10
**doing**
95:18 103:14 105:3,4
108:4 145:19 146:12
152:17 159:21,21
173:14 174:10 177:4
179:20 194:16
**Domestic**
13:14
**done**
5:9,10,11,12,13,14,15
25:5 31:3 34:9 48:16
48:17 60:8 95:11

98:20 113:19 127:9
138:13 144:11 190:12
204:2
**door**
7:4 116:9,10,11,12,19
119:2,5,6,11,12,16,20
162:12,19 163:1
164:5 165:14,15,20
165:21 166:3,5,7,7,19
167:2,2,4 170:11
186:19
**doors**
115:18 116:3,3,4,6
**dotted**
51:5 188:2
**doubt**
76:20 177:10 190:17
**down**
17:16 39:13 48:4 55:2
56:11 59:18 62:22
78:22 79:16,16 88:2
89:3 90:10 91:1,6,20
91:22 109:9 128:22
150:17 151:3 153:3
157:21 159:5 160:1,3
161:20 162:1 163:22
164:16 166:4 168:10
180:20 182:20 183:6
203:3,8 207:5 208:4
208:12,13
**downgrade**
53:17,22 54:6 55:3,5
94:14
**downhill**
187:21
**downslope**
182:15
**downward/not**
58:11
**dozen**
95:17 139:18
**drag**
87:8 94:10 95:2
**draw**
108:10
**drawn**
17:21 79:5

**drive**
19:8 153:3,14
**driven**
171:11 180:5
**driver**
29:8 95:15 119:15
155:4 175:14,17
177:3
**drivers**
161:10 172:5
**driver's**
6:20 7:4 29:9 119:6
155:6,6,11 156:3,16
156:20 162:12,18
163:5 165:20 166:7
170:11
**drive-bys**
59:19 60:8
**driving**
14:10 17:13 56:11
115:17 117:10 124:14
124:14 130:22 133:19
134:14 150:2 151:2
180:20 195:13 206:13
206:15,22
**drop**
55:7
**drove**
30:1,5,16 32:14 65:10
84:10 197:7 207:2
208:19
**dry**
94:20 111:7,8,13
**duly**
8:6
**Dunn**
3:5 4:4,7 8:9 19:21
20:4,10,16,22 21:4,8
21:11 22:4,16 23:12
24:2,9,18,21 25:3,6
26:7,15,19 41:18
67:18 68:1 70:22
71:5,8 75:14,20 98:3
98:13 99:6 114:11,15
115:2,8 118:1,6,13,17
133:16 142:2 144:16

144:21 196:14 204:22
206:6 210:15,20
211:5
**duplicates**
23:5
**during**
32:4 52:14 60:22
102:12 161:10 180:1
184:20 205:3,21
**durn**
50:15
**DVD**
16:9 18:12 29:18
**dynamics**
74:9

---

**E**

**E**
4:1,11 8:8 145:4
154:21 204:21
**each**
20:22 52:6 76:18 78:10
107:13 124:3 148:1
190:19 192:6
**earlier**
23:13,21 40:18 44:15
54:18 66:3 72:8
93:20 101:18 123:19
124:1 157:10 160:16
166:21 170:11 171:22
180:11,16 197:21
200:21 205:7
**earliest**
144:7
**early**
17:22
**earthen**
42:7,8 44:5
**easier**
75:7 123:5
**east**
3:9 63:6,19 105:18,21
**eastbound**
65:17 105:18
**eaten**
176:6
**edge**
36:6,17 41:2 73:9,9

80:21 82:17,18 106:5
106:5,6,20,21 107:18
166:6
**edition**
143:7 144:4
**effort**
148:21
**egress**
51:3
**eight**
17:10 29:2 51:15 67:9
67:20 139:19
**Eighty-eight**
173:16
**either**
45:1 86:11 112:8
146:18 167:11 199:2
**ejected**
102:12 196:9,17 205:5
205:10,17,20
**ejection**
196:5 205:14
**ejectment**
205:2
**elapsed**
181:6
**elasticity**
164:11
**elected**
171:19
**electronically**
16:16
**Eliminate**
83:21
**elongated**
164:12
**else**
14:18 18:20 42:16
45:19 46:10 71:17
142:15 143:12,15
144:10
**embankment**
38:11 40:18 44:16
**embedded**
161:4,10
**emergency**
93:16 159:1 177:19

**employed**
8:22 9:6 26:2 27:18
38:16
**employment**
9:15
**Enclosed**
24:10
**enclosing**
28:22
**encountered**
164:1
**encountering**
182:15
**end**
86:4,21 87:1 95:21
127:19 158:19 194:7
**end-over-end**
165:2
**energy**
84:16,16
**engaged**
145:8
**engine**
203:4
**engineer**
152:18
**engineering**
55:6 143:6
**enhance**
66:10
**enhanced**
184:19 185:3
**enough**
19:8 31:20 129:3
134:15 154:2 173:18
190:10
**enter**
40:10
**entered**
199:6
**entirely**
108:6 171:17
**entirety**
115:15 188:18
**entitled**
141:22
**entrance**

46:21 51:9 52:10
57:20
**entry**
30:9 56:17,19 58:3,4,6
**enumerate**
28:16
**enumerated**
28:8,11 113:11 197:19
**equal**
54:19 55:3
**equally**
73:11
**equals**
17:1 24:10
**equate**
168:19
**equation**
128:19 132:6 144:2
**equations**
15:7 84:16
**equipment**
167:20
**especially**
166:4
**ESQUIRE**
2:16,21 3:5,11
**estimate**
44:9 196:1 202:18
**estimated**
182:21
**estimating**
184:9
**estimation**
32:13 45:9 88:18 89:1
158:8 176:4
**et**
29:5
**evasive**
131:1 133:21,22
134:16
**even**
58:15 75:10 101:15
129:7 153:19 156:1
170:22 183:11 190:13
199:18
**event**
69:14 72:12 77:22

**events**
161:18 212:11
186:2
**ever**
116:21 126:3,6 139:12
**every**
44:21 55:6 192:6
**everybody**
40:5
**everything**
31:3 34:9 42:3 115:22
148:2,3 155:3 204:14
**evidence**
9:20 15:1 35:22 36:19
68:12 71:21,22 83:7
112:18,21 119:19
128:6 133:6 134:10
146:18 166:12 169:5
171:10 172:6,16
179:19 185:14 187:1
187:4,6,7 190:10
204:16,17 205:8,12
205:17,22
**evident**
96:14
**exact**
39:4
**exactly**
39:6 54:22 57:7 68:14
78:11 79:9 80:20,21
80:22 139:6 183:15
196:2
**Examination**
4:4,5,6,7
**examine**
96:3
**examined**
8:7 172:16 205:13
212:6
**examining**
181:14
**example**
79:17 87:15 125:11
**exceed**
152:10
**except**
134:11

**exception**
67:6
**exclude**
148:6,21
**excuse**
49:10 209:8
**exercise**
31:11
**exhausted**
60:13
**exhibit**
4:11,12,13,14,15,16,17
4:18,19,21 5:1,3,4,6,7
5:8,8,9,10,11,12,13
5:14,15,16,18,19,20
5:21 6:1,2,3,4,5,7,8
6:10,11,13,14,16,17
6:19,20,21 7:1,2,3,5
20:11 21:1,1,2,5,19
22:5,7,14,22 23:7,13
23:15,17 24:3,18 26:8
26:15,17,20 27:4,13
28:12 30:19 35:10,10
35:11 37:17 40:19
41:8 43:15 48:16
50:9 51:11 52:21
53:2,21 59:9 62:20
63:5 67:18,21 68:2
71:1,6 72:4,19,20
74:20 75:12,15,16,18
75:22 76:1,7,11 86:8
86:8 89:21 90:1,8,16
91:17 93:1,2 98:6,11
99:11 102:3 103:22
113:6 114:13 118:6,8
118:14,15 121:9,12
122:9 142:6,19,22
143:1 144:21 145:2
155:16 156:1,12,13
157:1,7,10 158:10,20
161:1 162:4,7 167:15
170:1,6 173:2 182:19
189:3,10,14 190:13
190:16 191:14,15
192:2,22
**exhibited**
156:10

**exhibits**
5:1 6:1 7:1 21:12 22:1
67:14 71:10 98:18
113:14 114:12,18
118:18 142:4 144:1
160:9 185:7 211:6
**exist**
177:18
**existed**
148:18,19 184:6 204:6
204:11
**existence**
177:21
**exit**
104:2 110:8 116:1
206:8
**expand**
174:6
**expect**
87:4 165:15 176:18
202:6
**expecting**
129:2 175:15
**experience**
59:5 66:7 125:18
202:19
**experimentation**
144:11
**expert**
14:13 61:13
**expires**
212:4
**explain**
13:9 72:1 98:10 166:4
210:7
**explained**
89:5
**explanation**
158:6
**Express**
1:10 2:22 155:2 156:3
**extended**
103:5
**extending**
99:16
**external**
74:17 77:22 80:10,12